## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| NATHAN STANLEY, individually and on behalf of and all others similarly situated, | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| NISSAN NORTH AMERICA, INC., a Delaware corporation, and CUMMINS INC., an Indiana corporation, | |
| Defendants. | |

## **CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................1

II.     PARTIES ............................................................................................................6

        A.      The Plaintiff ............................................................................................6

        B.      The Defendants ........................................................................................8

                1.      Nissan North America, Inc. ...........................................................8

                2.      CUMMINS, INC. ...........................................................................9

III.    VENUE AND JURISDICTION .........................................................................9

IV.     FACTUAL ALLEGATIONS ............................................................................10

        A.      The Class Vehicles contain CP4-equipped Cummins 5.0L Diesel
                engines. ..................................................................................................10

        B.      NHTSA Recalls Many of the Class Vehicles Because of Safety
                Concerns. ...............................................................................................11

        C.      Defendants profit from the rise of diesel vehicles in the United States.................12

        D.      The fragile CP4 fuel pump design ........................................................16

        E.      Characteristics of U.S. diesel fuel........................................................26

        F.      The unreliability of U.S. diesel fuel.....................................................32

        G.      Water in U.S. diesel fuel .......................................................................34

        H.      Dirt/corrosion particles and gasoline contamination in U.S. diesel fuel...............35

        I.      Pre-Class Period CP4 failures and industry knowledge ......................35

        J.      The CP4 defect poses an inherent risk to vehicle occupant safety and
                renders the Class Vehicles *per se* defective..........................................42

        K.      In falsely promoting the quality, performance, and dependability of
                their Cummins engine vehicles to consumers, Defendants concealed—
                via omission—the defective nature of the CP4 fuel pump. ...................47

L.     Defendants designed, manufactured, distributed, and sold vehicles it knew would experience catastrophic failures which Defendants would not honor under their warranties. ...................................................................50

M.    Allegations establishing agency relationship between Manufacturer Nissan and Nissan Dealerships ................................................................52

V.    TOLLING OF THE STATUTE OF LIMITATIONS.........................................55

VI.    CLASS ACTION ALLEGATIONS ................................................................58

III.    CAUSES OF ACTION ..................................................................................62

CLAIMS BROUGHT ON BEHALF OF THE CLASS AND ON BEHALF OF THE NAMED PLAINTIFF ...........................................................................................62

COUNT I VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT 15 U.S.C. § 2301, *ET. SEQ.* ......................................................................................62

COUNT II VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*) ............................................66

COUNT III VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT ("CLRA") (CAL. CIV. CODE § 1750, *ET SEQ.*) ............................................70

COUNT IV BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (CAL. COM. CODE §§ 2314 AND 10212) .....................................................75

COUNT V BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (CAL. CIV. CODE § 1791, *ET SEQ.*) ...................................................................78

PRAYER FOR RELIEF ...............................................................................................80

DEMAND FOR JURY TRIAL ....................................................................................80

Plaintiff Nathan Stanley, individually and on behalf of all others similarly situated (hereafter "Plaintiffs" or the "Class"), files this Class Action Complaint against Defendants NISSAN NORTH AMERICA, INC. ("Nissan") and CUMMINS INC. ("Cummins"). This lawsuit is based upon the investigation of counsel, the review of scientific and automotive industry papers, and the investigation of experts with relevant education and experience. In support thereof, Plaintiffs state as follows:

## I. INTRODUCTION

1. Defendants Nissan and Cummins have developed, manufactured, and sold tens of thousands of diesel Nissan Titan XD trucks (MY 2016-2019) with a 5.0-liter Cummins diesel engine (the "Class Vehicles")[1] that contain a ticking "time bomb"[2] known as the Bosch CP4 high-pressure fuel injection pump (the "CP4 pump"), a pump whose problematic nature is so widespread that it has now become the subject of safety recalls encompassing more than 432,000 vehicles,[3]

---

[1] The Class Vehicles consist of MY 2016-2019 Nissan Titan XD trucks with a Cummins 5.0L diesel engine containing the CP4 high-pressure fuel injection pump. Approximately 156,777 2016-2019 model year Nissan Titans have been sold in the U.S. Based on the research of counsel, at least 20,000 of these were sold with the Cummins 5.0L diesel engine containing the CP4 fuel pump at issue in this case. *See* Nissan Titan Sales Figures, Goodcarbadcar.net, available at https://www.goodcarbadcar.net/nissan-titan-sales-figures/ (last accessed Mar. 13, 2023); *Why the Nissan Titan Flopped*, Hotcars.com (Jan. 7, 2023), available at https://www.hotcars.com/nissan-titan-diesel/ #:~:text= Sadly,%20 a%20 vehicle%20 plagued%20 by,2018,%20 sales%20 dropped%20 to%2050,459; *Here's Why Nissan is Discontinuing the Cummins Diesel Titan XD Pickup*, Autoweek.com (Aug. 12, 2019), available at https://www.autoweek.com/ news/ trucks/ a2146781/ heres-why-nissan-discontinuing-cummins-diesel-titan-xd-pickup/.

[2] Trevor Mason, *Common Problems: The CP4 Time Bomb*, Diesel Tech Magazine (Dec. 2017), available at https://www.dieseltechmag.com/2017/12/common-problems-the-cp4-time (last accessed Mar. 22, 2023).

[3] *See, e.g.*, July 29, 2021 Part 573 Safety Recall Report, No. 21V-586, available at https://static.nhtsa.gov/odi/rcl/2021/RCLRPT-21V586-2864.PDF (last accessed Mar. 22, 2023); June 9, 2022 Part 573 Safety Recall Report, No. 22V-406, available at https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V406-1555.PDF (last accessed Mar. 22, 2023); Oct. 13, 2022 Part 573 Safety Recall Report, No. 22V-767, available at https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V767-8697.PDF (last accessed Mar. 22, 2023).

including more than 200,000 Cummins-engine vehicles.[4] The CP4 pump has a fragile and unstable design, which causes its internal metal components—with clearances on the order of 2-4 microns[5]—to rub against each other. This friction generates metal shavings that contaminate the fuel system, eventually leading to catastrophic engine failure with a $10,000+ repair cost. Neither Nissan nor Cummins disclosed this critical defect to purchasers of Class Vehicles prior to purchase.

2.      As the Defendants were aware, Bosch's fragile CP4 pump design was originally built to the specifications of European diesel, which is more lubricious than American diesel. The CP4 is not built to withstand U.S. diesel fuel specifications in terms of lubrication or water content. The CP4 pump uses the fuel itself for lubrication, and the design of the pump requires a cam and two pumping cylinders with individual rollers designed to seamlessly roll together without skipping, sliding, sticking, or wearing in order to operate effectively. If the fuel used with the CP4 pump is not sufficiently lubricious—which most U.S. diesel is not—the cam and rollers wear against each other and generate tiny metal shavings that disperse throughout the high-pressure fuel injection system.  Below is an example of the metal shavings generated by the CP4 pump in diesel trucks:

---

[4]  *See* Nov. 12, 2021 Part 573 Safety Recall Report, No. 21V-880, available at https://static.nhtsa.gov/odi/rcl/2021/RCLRPT-21V880-8784.PDF (last accessed Mar. 22, 2023).
[5] 1 micron = ***40 millionths*** of an inch. By way of comparison, a strand of hair is approximately 70 microns.



3. The release of these metal shavings into the fuel system is catastrophic, as it eventually causes the fuel injectors to become blocked and leads to an entire shutdown of the engine, with no ability to restart. Repair costs for a catastrophic failure are at least $10,000 and are time-intensive; however, any such repair is futile because it will not actually fix the issue so long as the vehicle is being filled with U.S. diesel fuel, and so long as the failed CP4 is being replaced with another, similarly defective CP4.

4. Catastrophic failure can occur as early as mile one, as the fuel injection disintegration process begins at the very first fill of the tank and start of the engine, with pump components beginning to deteriorate and dispersing metal shavings throughout the internal engine components and fuel supply system. Further, catastrophic failure often causes the vehicle to shut off while in motion and renders it unable to be restarted, because the vehicle's fuel injection system and engine component parts have been completely contaminated with metal shards. The sudden and unexpected shutoff of the vehicle's engine while it is in motion (and subsequent inability to restart the vehicle) present an inherent and substantial risk to consumer safety—one which

Cummins publicly recognized in late 2021[6]—and one which Plaintiffs were not aware of prior to purchasing the Class Vehicles.

5.      Defendants' frequent company line is to blame catastrophic failures on "contaminated fuel," which is not covered under warranty because it is "not caused by" Defendants. Their reliance on the "poor fuel quality" defense is problematic, however, because it is basically impossible for customers to determine the quality of their fuel when they fill up at the pump—and one "bad" fueling can lead to catastrophic failure. Consumers have no way to assess the quality of the fuel they purchase or to confirm if a fuel complies with the applicable requirements.

6.      The defect is especially impactful on consumers because Class Vehicles themselves come with a hefty price tag, as these CP4-equipped vehicles range in price from approximately $40,000 to $80,000. Diesel trucks are expensive because diesel engines are traditionally expected to last for a range of 500,000–800,000 miles.

7.      The decision to use the CP4 pump in the Class Vehicles is particularly egregious here because the defective design of the pump has been known for many years within the automotive industry—stretching back at least a decade. Well before Defendants chose to use the CP4 pump, the issue of U.S. diesel fuel consistency and lubrication was a well-known concern throughout the auto manufacturing industry, but nonetheless was totally disregarded in the respective design, manufacture, marketing, and sales or leases of the Class Vehicles. The Defendants, as well as fellow domestic automotive manufacturers Ford, GM, and FCA, had industry-wide experience with catastrophic fuel injection pump failures when cleaner diesel standards were first implemented in the 1990s. By 2002, the Truck & Engine Manufacturers

---

[6] *See supra* nn.3-4.

Association ("EMA")—of which Cummins is a standing member[7]—acknowledged that the lower lubricity of American diesel could cause catastrophic failure in high-pressure fuel injection system components that are made to European diesel specifications (which require more lubricious fuel). Similarly, as a sponsoring member of the Fifth Edition of the Worldwide Fuel Charter, Nissan endorsed the Charter's warnings in September 2013 about how "[i]nadequate lubricity can result in . . . excessive pump wear and, in some cases, catastrophic failure."[8] It is no surprise, then, that Defendants abandoned the CP4 fuel pump for the post-2019 model year Nissan Titan XD 5.0L diesel trucks, likely after seeing scores of problems in the field.[9] And indeed, ***immediately*** after the Class Vehicles hit U.S. roadways, Nissan internally issued a Technical Service Bulletin ("TSB") directing dealer service technicians that in diagnosing ostensible CP4 fuel pump failures, "[d]amage . . . due to [fuel] contamination is not covered by the Nissan New Vehicle Warranty and will be the responsibility of the vehicle owner," and ironically noting that "[v]ehicle owners must be extremely careful to put the appropriate fluid/fuel" in their tanks.[10] But therein lies the crux of the problem: with the advent of Ultra Low Sulfur Diesel (ULSD) fuel, high-lubricity fuels

---

[7] *See* Truck & Engine Manufacturers Association (EMA) membership webpage, http://www.truckandenginemanufacturers.org/companies/ (last accessed Mar. 10, 2023).

[8] Worldwide Fuel Charter at 58 (5th ed. Sept. 2013), available at https://www.acea.auto/files/Worldwide_Fuel_Charter_5ed_2013.pdf; *see also id.* ("Refining processes to remove sulphur tend to simultaneously reduce diesel fuel components that provide natural lubricity. As diesel fuel sulphur levels decrease, the risk of inadequate lubricity also increases.").

[9] *See* MoparInsiders.com, *Ram Moves Away from the CP4.2 Injection Pump for 2021: Good News for Future Buyers* (Dec. 24, 2020), available at https://moparinsiders.com/ram-moves-away-from-the-cp4-2-injection-pump-for-2021/.

[10] *See* Dec. 20, 2016 Nissan TSB No. NTB16-125, available at https://static.nhtsa.gov/odi/tsbs/2016/MC-10109116-9999.pdf (last accessed Mar. 8, 2023); *see also* Dec. 3, 2018 Nissan TSB No. NTB16-125a, available at https://static.nhtsa.gov/odi/tsbs/2018/MC-10152975-9999.pdf (last accessed Mar. 8, 2023) (expanding the affected vehicles to encompass the 2018 and 2019 MYs and providing further diagnostic and repair directions).

are hard to obtain, and the consumer has no way of knowing the lubricity of the fuel at a standard retail filling station. It is therefore the responsibility of the vehicle and engine manufacturers to design and manufacture vehicles that are able to withstand the diesel fuel that's available on the American market—something which both Defendants here wholly failed to do.

8.      No Plaintiff—indeed, no reasonable consumer—would have purchased or leased these vehicles if Defendants' disclosures had been materially truthful. These consumers are entitled to be reimbursed for the many millions of dollars Defendants fraudulently obtained from them, and to be compensated for their actual losses. Plaintiff and Class members are also entitled to be compensated for the cost of repair as a proxy for overpayment at the time of sale for vehicles that have a defect that cannot be repaired.  Plaintiff accordingly brings this class action lawsuit to recoup the damages and expenses incurred as a result of their purchase of the Class Vehicles.

## II.      PARTIES

### A.      The Plaintiff

9.      Plaintiff Nathan Stanley (for the purpose of this paragraph and the two subsequent paragraphs, "Plaintiff" or "Mr. Stanley") is and was throughout the events pleaded herein a resident of the State of California, and domiciled in San Clemente, California. In or around February 2020, Plaintiff purchased a new MY 2019 Nissan Titan XD with the Cummins 5.0L diesel engine (the "Class Vehicle" or "Truck") for approximately $69,768.60 from Carson Nissan, an authorized Nissan dealership in Carson, CA. He purchased the vehicle primarily for personal use, including to run errands and to drive his family around.

10.      On or around January 11, 2023, Mr. Stanley was driving his 2019 Nissan Titan XD 5.0L Truck, VIN 1N6BA1F48KN532962, on Interstate 5 when the Truck suddenly lost power and would not restart. At the time, the Truck had approximately 89,483 miles on its odometer and was still under factory warranty. Stranded on the side of the road, Mr. Stanley had to have the vehicle

towed to Nissan of San Juan Capistrano, an authorized Nissan dealership in San Juan Capistrano, California, for repair. The Nissan service technician inspected the high-pressure fuel injection system and confirmed that the CP4 fuel pump had failed, finding damage to the pump which had contaminated the entire fuel system with metal debris. A complete fuel system repair was recommended for the Truck at an estimated cost of $33,000+; however, Nissan declined to cover the cost of repair under warranty by citing "fuel contamination" and "lack of history"—in other words, Nissan attempted to falsely blame Mr. Stanley for allegedly causing his CP4 to fail. Mr. Stanley paid the initial $834.74 for diagnosis and fuel filter replacement. However, after being told that he was going to be charged more than $33,000 for the full necessary repairs since Nissan refused to cover them under warranty, Mr. Stanley had the Truck towed back to his property, where it has remained in its failed, inoperable state for more than sixty (60) days. Since then he has incurred costs for a rental vehicle, the cost to tow the Class Vehicle itself, and loss of his car allowance.

11.     Prior to purchasing the Class Vehicle, Plaintiff had been looking for an automobile that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. In contemplating his needs, including the need to purchase a vehicle fit for daily use, Plaintiff saw and recalled Defendants' television commercials, radio advertisements, online statements, and printed brochures and advertisements wherein Defendants claimed the Class Vehicles and Class Vehicle engines had greater fuel economy, superior horsepower, and enhanced durability compared to other comparable vehicles on the American market. On the date that Plaintiff purchased the Class Vehicle, and in connection with his purchasing the Class Vehicle, Plaintiff reasonably relied—to his detriment—on the representations by Nissan and Cummins that the Class Vehicle was compatible with American diesel fuel and was durable and reliable. Plaintiff,

absent these representations, would not have purchased the vehicle and/or would have paid less for it. In addition, none of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Class Vehicle had a defective fuel pump which would lead to wear on the components and could lead to catastrophic failure. Had Nissan or Cummins made this disclosure, from his research Plaintiff would have received this disclosure, and he would not have purchased the Class Vehicle or would have paid less for it in an amount at least as much as the cost of repair. There is a substantial difference in the market value of the vehicle promised by Defendants and the market value of the vehicle received by Plaintiff; thus, Plaintiff did not receive the benefit of the bargain, but received less than what was bargained for. Plaintiff brings the claims iterated herein on behalf of himself and all others who purchased or leased a Class Vehicle in the state of California (the "Plaintiffs" or "Class members").

**B.     The Defendants**

**1.     Nissan North America, Inc.**

12.     Defendant Nissan North America, Inc. ("Nissan") is and was a company organized and existing under the laws of Delaware, having a principal place of business in this district at 1 Nissan Way, Franklin, TN 37067-6367. Defendant Nissan regularly conducts and transacts business in this jurisdiction and throughout all fifty U.S. states, either itself or through one or more subsidiaries, affiliates, business divisions, or business units.

13.     Nissan, through its various entities, designs, manufactures, markets, distributes, sells, and leases Nissan automobiles in this district and multiple other locations in the United States. Nissan, and/or its agents and subsidiaries, designed, manufactured, distributed, offered for sale, sold, and installed the engine systems in the Class Vehicles. Nissan also developed and disseminated the materially misrepresentative owners' manuals, warranty booklets, product brochures, advertisements, and other intentionally unreasonable and deceptive promotional

materials relating to the Class Vehicles, with the intent that such documents be purposely distributed throughout all fifty states. Nissan is engaged in interstate commerce, selling vehicles through its network in every state of the United States.

14.     Nissan-authorized automobile dealerships act as Nissan's agents in selling automobiles under the Nissan name and disseminating vehicle information provided by Nissan to customers. At all relevant times, Nissan's dealerships served as its agents for motor vehicle repairs and warranty issues because they performed repairs, replacements, and adjustments covered by Nissan's manufacturer warranty pursuant to the contracts between Nissan and its 1,000+ authorized dealerships nationwide.

### 2.     CUMMINS, INC.

15.     Defendant Cummins, Inc. is a Fortune 500 company that designs, manufactures, and distributes engines, filtration, and power generation products. Cummins is registered to do business in the state of Tennessee and elsewhere across the United States. It conducts business in interstate and foreign commerce through its network of 600 company-owned and independent distributor facilities, supplying its customers with its products, and more than 7,200 dealer locations in over 190 countries and territories. Cummins is headquartered in Columbus, Indiana.

### III.     VENUE AND JURISDICTION

16.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 & 1332. There is also complete diversity of citizenship in this case because each Defendant is a citizen of a different state than the Plaintiff, and the amount in controversy exceeds the sum of $75,000. 28 U.S.C. § 1332. This Court also has supplemental jurisdiction over the state law claims because those claims are integrally related to the federal claims and form part of the same case and controversy under 28 U.S.C. § 1367.

17. The Court also has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from any Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs. Subject matter jurisdiction also arises under the Magnuson-Moss Warranty Act claims asserted under 15 U.S.C. § 2301, *et seq.*

18. This Court has personal jurisdiction over Nissan by virtue of its transacting and doing business in this district and because Nissan is registered to do business in Tennessee. Nissan has transacted and done business in the State of Tennessee and in this district and has engaged in statutory violations and common law tortious conduct in this state and in this district.

19. This Court has personal jurisdiction over Cummins by virtue of its transacting and doing business in this district and because Cummins is registered to do business in Tennessee. Cummins has transacted and done business in the State of Tennessee and in this district and has engaged in statutory violations and common law tortious conduct in Tennessee and in this district.

20. Venue is proper pursuant to 28 U.S.C. § 1391(a) & (b) because a substantial part of the events or omissions giving rise to the claims occurred in this district. Venue is proper pursuant to 18 U.S.C. § 1965(a) & (b) because Nissan and Cummins transact affairs in this district, and the ends of justice require it. Venue is also proper in this district under 28 U.S.C. § 1391(b)(3) because Nissan resides in this judicial district for venue purposes.

## IV. FACTUAL ALLEGATIONS

### A. The Class Vehicles contain CP4-equipped Cummins 5.0L Diesel engines.

21. For purposes of this Complaint, the "Class Vehicles" consist of Nissan-manufactured diesel-fueled automobiles equipped with a 5.0-liter Cummins diesel engine, ranging

from the 2016-2019 model years of Nissan Titan XD trucks. All vehicles falling under this Class Vehicle group were manufactured with the defective CP4 fuel injection pump.

**B.    NHTSA Recalls Many of the Class Vehicles Because of Safety Concerns.**

22.    As referenced above, the CP4 fuel pump has now been subject to numerous safety recalls encompassing more than 432,000 vehicles,[11] including more than 200,000 Cummins-engine vehicles.[12] For example, on November 12, 2021, NHTSA approved a safety recall of 222,410 Ram heavy duty trucks manufactured with a Cummins diesel engine equipped with the CP4. According to the Safety Recall Report:

> Some 2019-2020 MY Ram 2500 vehicles equipped with the Cummins 6.7L Turbo Diesel engine may have been built with a high pressure fuel pump ("HPFP") that could fail prematurely.

> The suspect period began on October 11, 2018, when Cummins 6.7L Turbo Diesel engines with suspect HPFFs were introduced into vehicle production, and ended on November 13, 2020, when Cummins 6.7L Turbo Diesel engines with suspect HPFPs were no longer used in vehicle production.[13]

23.    Under the header "Description of Defect," the Safety Recall Report states that "[a] high pressure fuel pump may introduce internally failed component debris into the fuel system potentially causing fuel starvation. Fuel starvation may result in an unexpected loss of motive power, ***which can cause vehicle crash without prior warning***." *Id.* (emphasis added). NHTSA

---

[11] *See, e.g.*, July 29, 2021 Part 573 Safety Recall Report, No. 21V-586, available at https://static.nhtsa.gov/odi/rcl/2021/RCLRPT-21V586-2864.PDF (last accessed Mar. 22, 2023); June 9, 2022 Part 573 Safety Recall Report, No. 22V-406, available at https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V406-1555.PDF (last accessed Mar. 22, 2023); Oct. 13, 2022 Part 573 Safety Recall Report, No. 22V-767, available at https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V767-8697.PDF (last accessed Mar. 22, 2023).
[12] *See* Nov. 12, 2021 Part 573 Safety Recall Report, No. 21V-880, at 1, available at https://static.nhtsa.gov/odi/rcl/2021/RCLRPT-21V880-8784.PDF (last accessed Mar. 22, 2023).
[13] *Id.*

reported that there were 6,399 warranty claims related to this issue (*id.*), even though the Recalled Vehicles had only been on the market for one or two years.

24.     Likewise, in June 2022, NHTSA issued a recall of more than 100,000 diesel vehicles equipped with the CP4 based on the pump's tendency to fail while the vehicle is in motion. The Safety Recall Report for this recall (No. 22V-406) states, "A HPFP failure may introduce internally failed component debris into the fuel system potentially causing fuel starvation," which "may result in an unexpected loss of motive power, which can cause a vehicle to crash without prior warning."[14] This is the very defect Plaintiff complains of here, and to date, no ameliorative measures have been taken by Nissan or Cummins with respect to repairing the CP4 fuel pump defect in the Class Vehicles.

25.     As detailed below, Defendants knowingly put Class Vehicle owners in jeopardy by using the CP4 pump, as the fragile and unsafe design of the pump has been common knowledge in the auto industry for at least a decade.

**C.     Defendants profit from the rise of diesel vehicles in the United States.**

26.     Diesel engines have long enjoyed a loyal following in some U.S. market segments because of their reliability, fuel efficiency, and power. Diesel engines produce higher torque, even

---

[14]  June 9, 2022 Part 573 Safety Recall Report, No. 22V-406, at 2, available at https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V406-1555.PDF (last accessed Mar. 22, 2023); *see also* July 29, 2021 Part 573 Safety Recall Report, No. 21V-586, available at https://static.nhtsa.gov/odi/rcl/2021/RCLRPT-21V586-2864.PDF (last accessed Mar. 13, 2023) (recalling 11,000+ diesel BMW vehicles for having the CP4 high-pressure fuel pump which can "lead to a protective shut down of the pump with a corresponding loss of vehicle propulsion"); Oct. 13, 2022 Part 573 Safety Recall Report, No. 22V-767, at 3, available at https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V767-8697.PDF (last accessed Mar. 23, 2023) (recalling 11,000+ Jeep and Dodge-brand diesel vehicles due to the risk of CP4 fuel pump failure which "may introduce internally failed component debris into the fuel system" leading to "unexpected loss of motive power, which can cause a vehicle crash without prior warning").

at low revolutions per minute ("RPM"), making them popular in buses, heavy-duty pick-ups, and vans, including commercial vehicles, farm trucks, and ambulances.

27.     The key benefits of diesel engines over their gasoline counterparts are the following:

> **(a) Durability:** Diesel (compression ignition) engines are, by design, stronger and more robust than gasoline (spark ignition) engines, and their long life and low maintenance are among the reasons for their popularity.

> **(b) Fuel Efficiency:** The diesel engine is 20-35% more efficient than a gasoline engine, because the compression ignition cycle (and greater compression ratio) is more thermodynamically efficient than the spark ignition cycle, and because diesel fuel has a greater energy content on a per gallon basis than gasoline. As a result, a diesel engine's fuel cost per mile is expected to be lower than gasoline.

> **(c) Torque and Power:** Diesel engines provide more torque, especially at low engine speeds, which leads to better acceleration and higher towing capacity. Modern diesel engines operating at higher speed can now match or exceed gasoline engines in terms of peak power. This combination of torque and power is another reason why some customers prefer diesel.

28.     The diesel combustion process, invented by Rudolph Diesel over a century ago, uses a hydrocarbon-based fuel which is substantially different than gasoline. Diesel fuel is a heavier and less refined mix of hydrocarbons and is designed to self-ignite when mixed with air under elevated temperatures and pressures. In the diesel combustion process, the fuel is pumped to a very high pressure and then forced into an injector through very small spray holes. This fuel is atomized into spray plumes of fine droplets in the engine combustion chamber. The droplets rapidly evaporate and mix with heated air and spontaneously ignite, thus releasing the energy to drive the piston and pressurize the fuel.

29.     Since the invention and early development of the diesel engine more than 100 years ago, the injection of fuel into the cylinder has been one of its greatest technical challenges. Earlier versions of the fuel injection system were designed as a pump-line-nozzle arrangement where a

fuel pump delivered fuel directly to each injector via its own fuel line. As emission and fuel economy standards have become more stringent, and customer demands for performance have increased, diesel manufacturers switched to a high-pressure, common rail system, starting in Europe in the 1990s.

30.     In a common-rail fuel system, a high-pressure pump supplies fuel to a reservoir (a pressure containment vessel) known as the fuel rail. The rail holds an ample supply of pressurized fuel available to be injected (or "metered") into the engine power cylinders by the fuel injectors. The flow of fuel in each injector is managed by a complex electronic control system, which is programmed by sophisticated algorithms and calibration files. The key advancement with the common rail system is that each injector is capable of injecting in multiple precise pulses of fuel and at varying times based on driving conditions.

31.     The most complex and expensive part of the common rail fuel injection system are the high-pressure components, including the high-pressure pump, the fuel rails, and the injectors.

32.     One of the key benefits of common rail technology is the ability to have multiple fuel injection events in a single injection cycle. Multiple injections, executed by lifting the injector nozzle needle, are used to carefully meter fuel into the cylinder which smooths out the combustion event resulting in lower noise and lower emissions.[15] Modern engines may have multiple injection events, including post injection of fuel used to release fuel into the exhaust stream for the purpose of heating up the aftertreatment components to reduce emissions.

---

[15] The injectors spray an exceedingly fine mist of diesel fuel into the cylinder, where it ignites and powers the engine. The finer the mist, the less emissions, because the combustion process is more homogenous, which has at least two beneficial effects: (1) the smaller droplets evaporate and mix more readily with the air, preventing the development of fuel-rich "pockets" which product particulate matter; and (2) homogenized levels of heat mean there are fewer high peak temperatures, which lead to formation of NOx. The net effect of the high-pressure system is less NOx and particular matter.

33.     In sum, the key benefits of modern common rail fuel system are, among others:[16]

- Providing pressurized fuel to well above 2,000 bar[17] across most of the operating range of the engine (previous mechanical fuel systems could only achieve high pressure at high engine speeds).

- Multiple injection events, accurately timed and measured for the precise engine operating conditions to meet stringent noise and emissions regulations, including the following:

  o Cold-start ability can be improved by early pre-injections to avoid the need for glow plugs.[18]

  o Engine noise can be lowered by pre-injections of fuel prior to main injection to produce power.

  o Aftertreatment systems (particulate filters) can be regenerated by very late post injections.

  o Injection rates can be digitally "shaped" to give an optimum rate of injected fuel to better control the diesel heat release rate, which minimizes NOx emissions.

  o Exhaust particulates can also be lowered by injection "post" or late small amounts of fuel.

- High reliability and durability – common rail systems in Europe have been shown to be more reliable and durable than previous mechanical fuel systems if properly fueled and maintained.

- Less maintenance – modern common rail systems are designed to be self-adapting and require little maintenance.

- Less noise, vibration and handling problems – precise control over the injection and combustion events reduces engine noise, runs more quietly, produces less shaking and shock, and produces better operator control over the acceleration of the vehicle. High pressures are only generated in the centralized fuel pump rather than in individual mechanical injectors, which reduces engine vibration and gear train torques and noises.

---

[16] *See* https://www.bosch-mobility-solutions.com/en/products-and-services/passenger-cars-and-light-commercial-vehicles/powertrain-systems/common-rail-system-piezo/ (last accessed Mar. 13, 2023).

[17] A bar is a unit for measure for pressure. One bar is about 14.8 pounds per square inch; 1,800 bar is equivalent to about 27,000 pounds per square inch.

[18] A glow plug is a heating device which aids in the starting of diesel engines.

- Higher injection pressure – pressures up to 2,500 bar (36,000 pounds per square inch) are only achievable with common rail fuel systems. The higher pressures are necessary for improved fuel atomization and more complete combustion.

- Better engine combustion management – the precision control offered by common rail reduces the mechanical strains on the engine, including peak cylinder pressures, temperatures, and observing exhaust aftertreatment system limits.

34. From the inception of the Class Vehicles, Nissan was in competition with "Big Three" auto manufacturers like Ford, GM, and FCA, each racing to dominate the growing American diesel vehicle market. Defendants looked to international automotive parts supplier Bosch to increase the fuel efficiency and power of its diesel engines. The heart of this diesel revolution would be powered by Bosch's more durable CP3 fuel injection pump, the predecessor to the CP4 fuel injection pump at issue in this suit. The reliability of the CP3 became key to the "million-mile" performance reputation of diesel truck engines in the United States.

35. The CP4 would purportedly maintain reliability while also increasing fuel efficiency and power. The over-simplified design of the CP4 rendered it cheaper to manufacture, but also increased its need for high lubricity fuel, and increased the likelihood that the ultimate failure would be catastrophic.

**D.  The fragile CP4 fuel pump design**

36. The Bosch CP4 fuel pump is directly coupled to the engine, which means it is operating whenever the engine is operating. Since the CP4 is a critical part of the engine system it must be designed for very long life and must be capable of operating with commercially available fuel. A sound and robust design would also make it tolerant to fuels that are commercially sold, but do not meet the proper requirements. It should also be designed to withstand some level of customer abuse and neglect, such as inadvertent misfueling, running out of fuel, delaying a filter change, or draining the water separator.

- 16 -

37.     The CP4 operates at higher pressures than its predecessor, the CP3, and has inherently higher Hertz contact stresses than the CP3, which exacerbates the wearing of the pump parts. The CP3 pump has three pumping cylinders and plungers. As the camshaft rotates, the polygon is moved in a sliding manner against the plunger foot plate and converting rotational (circular) motion into linear (up and down) motion. Below is a diagram of the CP3 pump:

**Figure 1: CP3 Pump**



38.     Because of its sliding foot contact area and lower stresses, the CP3 is more tolerant of poor quality fuel, i.e., fuel that is less lubricious.

39.     The CP4 pump design was a radical departure from the CP3, and it relies on a fragile cam-roller-tappet mechanism which did not exist in the CP3. Instead of the wide plunger foot plates sliding against the wide polygon cam to drive the plungers (as shown in Figure 1 above), the CP4 pump uses a small, 10 mm roller pin (about the size of a AAA battery) as the only source of contact with the camshaft. With this system, the CP4 system is placing a lot of pressure on the contact point between the roller and the cam. This very small area of contact carries all the forces required to transfer the energy to generate the very high pumping pressures. In addition, since the

10 mm diameter roller is about one quarter the size of the camshaft lobe on which it rotates, the smaller roller must rotate 4 times as fast as the CP4 camshaft. Since the Cummins engine drives the CP4 at the same speed as the engine, this means the roller must rotate at 4 times the engine speed, or in the range of 11,200 revolutions per minute (for an engine speed of 2,800 rpm). Below is a schematic of the tappet holding the roller pin, which contacts the cam:

**Figure 2: Roller, Camshaft, and Tappet**



40. Below is a photograph showing a side-by-side comparison of the CP3 and CP4 pumps, which illustrates how the contact area between the CP4's cam and roller is much smaller than the area between the CP3's ring and plunger foot:

**Figure 3: Comparison of CP3 and CP4 Pumps**



41.    The design differences are further illustrated in the graphic below, which again shows the large surface contact area between the polygon and the plunger of the CP3 as compared to the small line contact between the cam and the roller of the CP4:

**Figure 4: Schematic Comparison of CP3 and CP4 Pumps**



42.    The CP3 pump's sliding foot design distributes the load and reduces stresses on the polygon cam follower. It slides back and forth and does not need to roll to create a lubricating fluid film. Conversely, the CP4 cam-roller design results in very high forces along a single line of contact. The friction of the roller in the tappet must be less than the friction on the roller cam

interface or else the roller will not rotate (or spin); instead it will slide. The roller also creates a hydrodynamic lubrication film of fuel between the roller and cam. This film is very thin, on the order of 1 micron or less (1 micron = 40 millionths of an inch). If the roller stops rotating and sticks or slips on the cam, it loses this lubrication film and starts to wear. In real world operating conditions, the result of all these factors is a lack of robustness because of the susceptibility to contamination through metal shavings or other debris, caused in part by metal-on-metal rubbing between the roller pin and the cam.

43.     The critical roller pin design of the CP4 creates very high stress (called Hertz stresses) as diagramed below:

**Figure 5: Hertz Stresses on CP4 Roller and Cam**



44.     Comparing relative Hertz stresses of CP3 and CP4, the CP4 roller-to-cam contact Hertz stresses are about two times higher than the CP3. These higher stresses will increase contact fatigue and wear of the metal parts that come in contact with each other. In the case of the CP4, these parts are the roller and camshaft. Accordingly, use of the CP4 pump for the same amount of force would be more likely to wear and fail than the CP3 for same lubrication conditions of lubricity, viscosity, and fuel quality. This would be aggravated and increase wear dramatically if the roller pin stops rotating and starts sliding. Aggressive roller and cam wear changes the roller diameter to more of a slider and generates wear debris.

45.     Unlike the CP3 pump, which uses a sliding elephant's foot design to spread stresses and shortened distance of metal on metal travel, the CP4's cam-roller design results in very high forces along a single line of contact. The friction of the roller in the tappet must be less than the friction on the roller cam interface. The result of all these factors is fragility, and susceptibility to contamination through metal shavings or other debris, caused in part by metal-on-metal rubbing between the roller pin and the cam.

46.     In addition to the design limitations referenced above, the tappet which houses the roller pin is not prevented from rotating around in its own axis inside the cylindrical pump housing. If the tappet does rotate out of position, the roller pin rotates from parallel to the camshaft, to perpendicular to the camshaft. Once rotated the roller will no longer rotate, and instead the cam slides across the roller, leading to wear and erosion, as a trough is being carved into the cam. The wear and erosion will generate metal shavings that are carried by the fuel throughout the fuel

system, including downstream to the sensitive high-pressure fuel injectors. The photograph below shows the severe wear and gouging caused by rotation of the tappet:[19]

**Figure 6: Wear on the Cam and Roller**



47.     The second issue is additional wear due to the metal-to-metal surface contact between the cam and roller, and metal-to-metal contact between the roller and roller shoe. This wear results in the creation of metal filings which can contaminate the fuel system and damage the injectors. The metal-to-metal wear can occur any time the roller stops rotating inside the tappet shoe. Metal particles that lodge inside the roller shoe can effectively jam the rolling pin in a stuck position. In addition, low viscosity caused by water in the fuel can reduce the film layer thickness the roller depends on to ride above the shoe.

48.     If particles enter the roller shoe, and if the film of fluid is not thick enough, the hard diamond-like coating of the tappet roller shoe can wear off. As the coating wears, damage becomes progressively worse, even as the wearing generates more hard and fine particles that can make

---

[19] Tomasz Osipowicz, *Testing of Modern Fuel Injection Pumps*, 15 TEKA COMM'N OF MOTORIZATION AND ENERGETICS IN AGRICULTURE 57-60 (2015), available at https://bibliotekanauki.pl/articles/792084.pdf.

their way through the fuel system to the injectors. Below is a close-up of a CP4 tappet roller shoe, showing abrasive wear of the coating:

**Figure 7: Wear on the Diamond Coating**



49.     Finally, the pump depends upon the fuel to lubricate the roller pin and the cam shaft and prevent wear. U.S. diesel fuel (as explained further below) is refined to a less lubricious specification limit as compared to Europe. Based on Bosch's own documents, the U.S. fuel lubricity specifications are borderline for the CP4 pump. Any fuel that is less than the minimum specified lubricity can lead to premature wear and/or failure.

50.     Small wear particles (small enough to pass through the engine's filters, or created downstream of the filters through corrosion or wear) are problematic—and potentially catastrophic—for the CP4 for two reasons. First, if the wear particles come in between the cam and the roller, they can create increased point-contact stresses which can damage the ultra-smooth faces of the components, eventually leading to spalling, cracking or loss of material. Second, if the wear particles lodge between the roller and the roller shoe they can cause the roller to stick. If the roller sticks or stops rolling it can cause the tappet to slide between the cam and the roller or to rotate out of alignment with the cam. Any of these conditions causes stress, metal fatigue, wear, and ultimately catastrophic failure.

51.     Catastrophic failure can occur through accumulation of wear when the roller skids on the camshaft and aggressively wears to the point of complete roller and tappet breakdown. Large fragments of the worn parts can crack the fuel pump housing and cause fuel leakage to the engine compartment. Migration of wear particles into the common rail, injectors, and engine can cause progressive or sudden damage to the pump, injectors, engine, turbocharger, and aftertreatment systems. Engine stall or failure to start can also occur which leads to a "mission disabling" failure, which leads to the vehicle either limping to a repair shop or becoming completely stranded on the side of the road.

52.     Catastrophic failure occurs when the level of wear is so severe the pump plunger is not able to complete the full pressurizing stroke and the fuel pressure target is not achieved. If the pump is completely unable to pressurize the fuel, the engine will not start or. if it is running, the engine will stop. As a result, the vehicle must be towed as it is no longer operable.

53.     When a catastrophic CP4 pump failure is confirmed, not only must the pump itself be replaced, the entire high-pressure sub-system consisting of fuel lines, fuel rails, sensors, and injectors must be replaced as well. On the low-pressure side, the fuel tank must be drained and thoroughly cleaned, the fuel lines much be flushed, and the both fuel filters replaced.

54.     Even if the pump does not catastrophically fail, small, micron-sized metal filings from the wearing process may enter into the high-pressure fuel system. This can lead to fuel injector damage, which impacts the precise control of fuel flow. Additional and unwanted excess fuel can lead to a number of issues including damaging or prematurely ageing the pistons, cylinders, turbo charger, or the downstream aftertreatment components.

55.     Criticism of the CP4 pump's fragile design and sensitivity to fuel quality began almost immediately after it was introduced in Europe in approximately 2007. Indeed, the defective

CP4 pump has been the subject of numerous scholarly and analytical industry articles describing how the pump can catastrophically fail, as well as how wear in the pump can generate metal shavings which can cause injector problems and engine over-fueling. For example, a European academic investigator described the problem as follows in a peer-reviewed industry publication:

> Fuel injection pump Bosch CP4 is composed of: a drive shaft, a roller in the holder and a plunger pumping section. The most durable component of the tested fuel injection pump tested is its plunger pumping section. The roller with its holder is in the pump body. *A defect of this component is lack of stabilization, which causes that the whole roller can rotate 360° in the pump body*.
>
> If the roller starts rotating around its own axis during the pump operation, it is no longer possible for it to return to its original position. Then, it starts destroying a cam on the pump drive shaft. As a result of friction on a cam and a roller, metal filings are generated, fouling and destroying the whole fuel supply system.[20]

56. A second report, presented to the International Congress on Combustion Engines, stated as follows:

> An improper cam-roller-pusher solution is a **fundamental flaw** of this generation of [CP4] pumps. The applied roller significantly contributed to reducing forces in the mechanism by utilizing rolling friction, however the pusher with a circular cross-section had a tendency to rotate, particularly when contaminants were present, friction was elevated by inferior fuel quality or insufficient fuel quantity. When the roller's position changes to perpendicular relative to the shafts' axis, rolling friction changes to sliding friction, which exponentially accelerates the mechanism's wear. Metal filings from the damaged roller destroy inter-operating element of the pumping section, and cause seizing when they penetrate into injectors.[21]

---

[20] Osipowicz, *supra* n.19.
[21] Mateusz Bor, et al., *Analysis of Hypocycloid Drive Application in a High-Pressure Fuel Pump*, 118 MATEC WEB OF CONFERENCES: VII INTERNATIONAL CONGRESS ON COMBUSTION ENGINES, 00020 (2017), available at https://www.matec-conferences.org/articles/matecconf/pdf/2017/32/matecconf_icce2017_00020.pdf (emphasis added).

57.     The figure below from one of the academic reports shows the orientation of a rotated tappet and the damage that occurs when the roller rotates on its axis, causing the cam to slide across the roller, rather than rolling together with it:

**Figure 8: Effects of Rotation of the Roller**



58.     These same academics summarized the problem as one of design that is highly sensitive to the quality of fuel:

> Due to the high precision of injection process control, with high pressure or fuel compression, these systems are characterized by sensitively to the quality of applied fuel due to the large faces acting on the system's elements. Numerous design solutions are susceptible to damage resulting from defective design of a given element, beside damage generated by fuel of insufficient quality. In the case of pump defects, leading to the creation of filings with diameters below several micrometers, other elements of the injection systems are also damaged very frequently, which increase repair costs significantly.[22]

## E.     Characteristics of U.S. diesel fuel

59.     As the foregoing suggests, for the CP4 pump design to work, the properties and quality of diesel fuel are vitally important. Key fuel properties such as minimum levels of lubricity

---

[22] *Id.*

and viscosity must be met at all times throughout the life of the engine. If either property is compromised, then wear can occur, leading to shorter life and failure. As detailed below, the overall quality of diesel fuel in the United States is inadequate for this design.

60.     The CP4 relies on diesel fuel itself to maintain lubrication. The lubricity of diesel in Europe is more standardized than American diesel, but European diesel is also dirtier. Because the sulfur in diesel exhaust is a major cause of smog and acid rain, in 2007 the EPA required diesel fuel sold in the U.S. to have less than 15 ppm of sulfur. This is known as Ultra Low Sulfur Diesel ("ULSD"). It is produced through a refinery process known as hydrodesulfurization ("HDS"). Sulfur provides some of the lubricity needed for the pump to operate. But the refinery process required to produce low sulfur diesel destroys a variety of important nitrogen and oxygen-based polar and organic compounds that give diesel fuel its lubricity. Indeed, ULSD fuel is considered to be very "dry" and incapable of lubricating vital diesel fuel delivery components, specifically high-pressure fuel pumps and injectors; as a result, American diesel does not contain the lubrication necessary for the Bosch CP4 Pump to operate durably, and these fuel injection system components "are at risk of premature and even catastrophic failure when ULSD fuel is introduced to the system."[23]

61.     Low sulfur diesel fuel first appeared in American markets in the 1990s, with fewer than 500 ppm of sulfur. It is estimated that 65 million fuel injection pumps failed as a result. It was thought that the pumps failed at the equivalent of 100–200 hours of operation. Thus, the critical importance of lubricity for diesel injection pumps was well known to all auto manufacturers for a decade or more before the Class Vehicles were designed or introduced into the market.

---

[23] Arlen Spicer, *Diesel Fuel Lubricity Additives: Study Results*, THE DIESEL PLACE (Aug. 26, 2007), available at http://www.jatonkam35s.com/DeuceTechnicalManuals/ Diesel_fuel_additive_test.pdf.

62.     The main body that sets standards for diesel fuel is the ASTM;[24] the specific standard for diesel fuel is known as the ASTM-D975, which has been adopted by the EPA as a binding regulation.[25] Lubricity in diesel fuel is quantified as measurement of wear. A test method called a high frequency reciprocating rig (HFRR) involves oscillating a weighted ball across a flat plate and measuring the scratches or "wear scar" pattern on the surface. The diameter of the wear scar (measured in micrometers) is thus an indicator of lubricity, with larger diameters indicating low (poor) lubricity fuel and smaller diameters indicating high (better) lubricity fuels.

63.     In the United States, the minimum HFRR wear scar diameter is 520, compared to the European standard of 460 wear scar. Since the CP4 pump is self-lubricating with the diesel fuel it is pumping, the lubricity of U.S. diesel is crucial to the pump's durability and longevity. And since the lubricity of the diesel fuel is a critical factor in the durability of the pump, careful attention should have been paid to the difference in U.S. and European fuels.

64.     Since as early as 2002, automotive engine manufacturers have been well aware of the mismatch between engine part specifications that require a maximum of 460 wear scar, and the lower lubricity specifications of ULSD:

> Lubricity describes the ability of a fluid to minimize friction between, and damage to, surfaces relative to motion under loaded conditions. Diesel fuel injection equipment relies on the lubricating properties of fuel. Shortened life of engine components such as fuel injection pumps and unit injectors can usually be attributed to lack of fuel lubricity and, hence, lubricity is of concern to engine manufacturers. This property is not addressed adequately by ASTM D 975.[26]

---

[24] "ASTM" previously stood for the American Society for Testing and Materials. Now, however, the ASTM standards are negotiated and implemented worldwide. The governing body is currently known as ASTM International.
[25] 40 C.F.R. § 80.1468.
[26] Truck & Engine Manufacturer's Ass'n ("EMA"), *EMA Consensus Position Pump Grade Specification* (Apr. 22, 2002), available at http://www.truckandenginemanufacturers.org/

65.     Further, the EMA made clear:

> Regardless of the fuel sulfur level, ASTM D975 currently requires
> lubricity specified as a maximum wear scar diameter of 520
> micrometers using the HFRR test method (ASTM D6079) at a
> temperature of 60°C. Based on testing conducted on ULSD fuels,
> however, fuel injection equipment manufacturers have required that
> ULSD fuels have a maximum wear scar diameter of 460
> micrometers. EMA recommends that the lubricity specification be
> consistent with the fuel injection equipment manufacturers'
> recommendation.

8/8/2005 EMA Position Paper entitled "North American Ultra Low Sulfur Diesel Fuel

Properties."[27]

66.     In a September 2009 Common Position Statement published by the Joint Diesel

Fuel Injection Equipment Manufacturers (or "Joint FIE Manufacturers") regarding Fuel

Requirements for Diesel Fuel Injection Systems, the Joint FIE Manufacturers expressed the

following comments to their colleagues in the automotive industry:

---

file.asp?A=Y&F=20020422+EMA+Consensus+Position+Pump+Grade+Specification%2Epdf&
N=20020422+EMA+Consensus+Position+Pump+Grade+Specification%2Epdf&C=documents
(last accessed Mar. 13, 2023).
[27] EMA, *North American Ultra Low Sulfur Diesel Fuel Properties* (Aug. 18, 2005), available at
http://www.truckandenginemanufacturers.org/articles/article.asp?DOCUMENT_ID=12560&
F_PG=2&F_ARTICLE_ID=11 (last accessed Mar. 13, 2023). U.S.-automotive-industry-wide
knowledge of the need to manufacture vehicles with equipment capable of handling the U.S.'s
low-lubricity diesel fuel many years before the manufacture of the vehicles at issue here confirms
Defendants' knowledge of the problem. *See, e.g.*, *In re Gen. Motors LLC CP4 Fuel Pump Litig.*,
393 F. Supp. 3d 871, 879 (N.D. Cal. 2019) (upholding Plaintiffs' CP4-defect-based fraudulent
concealment claims against GM based on the following allegations which are synonymously
present here: "Plaintiffs allege that GM became aware of the need to install equipment capable of
handling low lubricity diesel fuel many years before manufacturing the vehicles at issue here,
because the entire automotive industry had 'experience[d] . . . widespread catastrophic fuel
injection pump failures when cleaner diesel standards were first implemented in the 1990s.' When
low-sulfur diesel 'first appeared in the American market in the 1990's,' an 'estimated . . . 65
million fuel injection pumps failed as a result.' . . . Plaintiffs also allege that although industry
publications amply described the need for American diesel fuel pumps to withstand low lubricity
diesel fuel, GM equipped its vehicles with a Bosch CP4 Pump whose specifications plainly showed
they were inadequate to process American diesel fuel." (citations omitted)).

The continuous world-wide tendency to increase engine performance and reduce emissions has necessitated the development of new generations of enhanced diesel fuel injection equipment, supporting the achievement of stringent legislation targets. Rising injection pressures and multiple injections result in higher operating temperatures, increased contract pressures and reduced clearances . . . . Alterations to fuel quality, e.g., by increasingly severe refinery hydroprocessing being introduced to remove Sulphur also reduce the content of aromatics and destroy surface active compounds and antioxidants. ***Removal of these beneficial compounds effects boundary lubrication, commonly known as lubricity, and inherent oxidation stability and must be compensated for.*** Fuel parameters such as cetane number, viscosity, density, lubricity, oxidation stability, sulfur and aroma content, together with the absence of free water and dirt contamination, are key parameters required to ensure performance of equipment in the field.

Biofuels are becoming increasingly available to end-users [including] in the United States of America . . . . It must be recognized that the physical and chemical characteristics of bio components are significantly different to conventional fuels and that care must be taken in their specification and use. Diesel fuel injection equipment (FIE) manufacturers fully support the development of alternative sources of fuel . . . . ***However, many vehicles, engines and equipment are not designed to run on them. It is recommended to refer to the vehicle and engine manufacturers 'Limitations of Use' documents for guidance.***[28]

67. Likewise, in a July 2014 study on the use of fuel injection equipment with global diesel fuels, Parker Racor, the leading global supplier of diesel fuel filtration systems, explained the following:

The increase in system pressures in diesel engines has a significant effect on filtration requirements. These systems are highly vulnerable to many forms of contaminants and the need for robust high efficiency filtration has never been higher. . . . An analysis of global diesel fuel quality shows that although the fuel quality in the developed markets has improved, significant quality concerns still remain. Levels of water and contaminants remain at levels that can cause long term issues to the latest fuel injection systems.

---

[28] Joint FIE Manufacturers, *Fuel Requirements for Diesel Fuel Injection Systems: Diesel Fuel Injection Equipment Manufacturers: Common Position Statement 2009* (Sept. 2009), available at https://advancedbiofuelsusa.info/fuel-requirements-for-diesel-fuel-injection-systems-diesel-fuel-injection-equipment-manufacturers-common-position-statement-2009/ (emphasis added).

Specifically, the levels of contaminants smaller than 5 microns remain very high. These particles can be small enough to pass into the internal clearances of high pressure fuel injection systems and can lead to erosion and wear of critical areas leading to a loss in system performance and eventually system malfunction. Diesel filtration balances pressure drop, useful life and efficiency. ***However the real long term effect on fuel system life is often not adequately considered[,] as much of the engine durability testing performed is done using high quality fuel that doesn't represent the range of fuels seen in the market***. Consideration of filtration performance under less than ideal conditions is necessary to develop an acceptable level of protection.[29]

68.     Most diesel fuel in the United States is produced by distillation of petroleum oil in a refinery. The fuel is refined and processed to meet certain specifications outlined in regulations and guidelines adopted by the EPA. The refinery also blends additives into the fuel to meet the applicable specifications. Once U.S. diesel fuel is produced in the refinery it enters a distribution system where it travels to terminals and then ultimately to a fuel pumping station. In the US, fuel may be transported in a variety of ways included pipelines, trucks, and rail. The figure below is a schematic showing the flow of fuel from its source (crude oil) through refining and distribution:

---

[29] Steven Hardison & Adam Pearce, *July 2014 Summary of Fuel Injection Equipment with Respect to Diesel Fuel Filtration* at i, PARKER RACOR & AVL (Jan. 7, 2015), available at https://www.parker.com/literature/Racor/RSL0194%20Rev%20-%20(TAP_AVL-Fuel-Study-Racor).pdf (emphasis added); *see also id.* at 13 ("Careful monitoring of fuel quality and filter performance is needed to protect sensitive diesel engine injection systems"); *id.* at 31 ("Modern high pressure diesel fuel injection systems contain very small internal clearances and are vulnerable to any build-up of deposits on these components. . . . This issue has become a significant concern in the industry").

**Figure 9: Transport of Fuel from Source to Gas Station**



69. Fuel is tested to ensure it meets ASTM specification once it leaves the refinery and again when it leaves the bulk terminal. Fuel may be blended (with biodiesel for example), or enhanced with various additives at either the refinery or the terminal. Although there is a system in place to try to achieve uniformity of fuel quality, as described below, in practice there are a number of factors that lead to the frequent production of substandard quality fuel.

**F. The unreliability of U.S. diesel fuel**

70. Despite EPA requirements, in reality, U.S. diesel frequently contains even less than 15 ppm of sulfur, a truth that is widely known within the U.S. automotive industry.

71. Notably, according to Infineum's[31] 2014 Worldwide Winter Diesel Fuel Quality Survey testing 341 diesel fuel samples from around the world, **all** diesel fuel samples the

---

[30] *See* U.S. Energy Information Administration, *Diesel fuel explained: Where our diesel comes from*, available at https://www.eia.gov/energyexplained/diesel-fuel/where-our-diesel-comes-from.php (last updated July 5, 2022).

[31] Infineum is a company that is globally recognized as the leader in diesel fuel quality surveys.

organization collected and tested from the U.S. and Canada contained sulfur levels of 10 ppm or less.[32]

72.     Other fuel surveys indicate that U.S. diesel scar differs drastically across the continental U.S. and thus does not uniformly offer sufficient lubrication for the pump. For example, in 2018 Infineum conducted a survey of the lubricity of U.S. diesel fuel from various regions of the continental U.S. and found the following:

**Table 1: Survey of lubricity of U.S. diesel fuel (2018)[33]**

|  | Minimum lubricity scar score | Maximum lubricity scar score | Mean | Sample size | Locations exceeding 520 wear scar | Locations exceeding 460 wear scar | Locations exceeding 400 wear scar |
|---|---|---|---|---|---|---|---|
| **East Coast** | 219 | 506 | 385 | 10 | 0 | 1 | 5 |
| **Midwest** | 198 | 526 | 390 | 37 | 1 | 9 | 24 |
| **West Coast** | 289 | 526 | 448 | 10 | 1 | 6 | 7 |
| **Total** |  |  |  | 57 | 2 | 16 | 36 |

73.     Based on this chart, it is clear that there are certain locations where the fuel is not lubricious enough, and the CP4 pump's design leaves little margin for error. Over the course of a truck's lifetime, a truck driver will likely use diesel fuel that is "dry," which will lead to the damage to the engine outlined herein.

74.     However, with the advent of Ultra Low Sulfur Diesel (ULSD) fuel, high-lubricity fuels are hard to obtain and the consumer has no way of knowing the lubricity of the fuel at a standard retail filling station. To that extent, the numbers listed in Table 1 are troubling: about three in ten diesel fuel stations violate European lubricity standards (460 wear scar), which is the

---

[32] *Infineum Worldwide Winter Diesel Fuel Quality Survey 2014* at 6-7, INFINEUM INT'L LTD. (2014), available at https://www.infineuminsight.com/media/1094/wdfs-2014-intro-and-trends.pdf.

[33] *See Infineum Worldwide Winter Diesel Fuel Quality Survey 2018*, INFINEUM INT'L LTD. (2018), available at https://www.infineuminsight.com/media/2228/infineum-wdfqs-2018-v10-14112018.pdf.

minimum standard for the CP4 pump to operate effectively. *See supra* ¶¶ 64-65 (EMA lobbied for 460 wear scar). Based on this data, it seems all but inevitable that truck owners will eventually fill up their trucks with diesel fuel that is "dry" and harmful to the trucks' engines.

## G.    Water in U.S. diesel fuel

75.    U.S. diesel fuel can also easily degrade and move off specification during transportation and storage, including from the entry of water into the fuel.[34] Water can seep into the fuel supply, which decreases the fuel's viscosity.[35] During transfer of fuel—either from refinery to storage tanker, or from tanker to the pump—air can get into the fuel. When the air cools, water condenses and drops into the tank. If this occurs, the fuel loses viscosity, which has a directly negative effect on its lubricity, resulting in an insufficient layer of protection between the roller pin and the tappet shoe.

76.    The potential for water to get into the fuel supply is a well-known and easily anticipatable problem for OEMs such as Nissan, and engine manufacturers such as Cummins. Diesel fuel tanks "breathe" through filler caps and vents, and as fuel is withdrawn by the fuel pump, humid air can enter the fuel tank and water can condense when the fuel tank cools. Yet Defendants continue to blame customers for water in the fuel, based on the flimsy assumption that the consumers are at fault for what is a foreseeable condition to the vehicle manufacturer.

---

[34] Rick Chapman, *Why Fuel Quality Standards are Important*, STI Webinar – Petroleum Storage Tank Maintenance, INNOSPEC (Dec. 18, 2013), available at https://www.steeltank.com/Portals/0/Shop%20Fab/12.18.13STI%20webinar%20Fuel%20Specs%20FINAL.pdf.

[35] Viscosity is a measure of the thickness of a liquid, which can affect the lubricity. Generally, a viscous liquid is more lubricious, although there are many exceptions: corn syrup is viscous but not lubricious; cooking spray is lubricious but not viscous.

## H. Dirt/corrosion particles and gasoline contamination in U.S. diesel fuel

77. Diesel fuel can become contaminated by dirt or corrosion particles. Fuel tanks can become rusty through exposure to air. The net result of contamination is the particles clog up the two filters in the fuel injection system.

78. Diesel fuel can also become contaminated with gasoline or other liquids, partly when diesel is held in storage tanks or transported in tanker trucks that previously contained gasoline, kerosene, or other liquid fuels or petroleum products. Since gasoline is less viscous, it makes the diesel less viscous as well, which decreases its lubricity.

79. In sum, because the CP4 pump is a critical part of the engine system, it must be designed for very long life and, most importantly, must be capable of operating with commercially available fuel. A reasonable, prudent manufacturer has a duty to design or select a fuel injection pump designed for the fuel of the country in which the vehicle is to be sold. Yet, Nissan and Cummins had Bosch supply its inherently incompatible CP4 fuel injection pump for use in the Class Vehicles, beginning in the 2016 model year. It was certainly no secret to Nissan or Cummins that the Bosch CP4 Pump is inappropriate for diesel vehicles in the U.S.

## I. Pre-Class Period CP4 failures and industry knowledge

80. The Bosch CP4 fuel injection pump was defective and incompatible with U.S. diesel fuel from the get-go, even prior to its usage in the Class Vehicles. For example, on February 7, 2011, the National Highway Traffic Safety Administration's ("NHTSA") Office of Defects Investigation ("ODI") opened a safety investigation based on 160 complaints "alleging incidents of engine stall and/or loss of power that appear to be related to high pressure fuel pump ("HPFP") failures in certain model year (MY) 2009 through 2010 Volkswagen Jetta and MY 2010 Volkswagen Gold and Audi A3 vehicles equipped with [turbo diesel engine] clean diesel engines. Approximately half of the reports indicate that the failure resulted in an engine stall incident, with

many of these alleging stall incidents at highway speeds in traffic with no restart."[36] During this

investigation, ODI requested documents not only from Volkswagen and Bosch, but also from Ford,

GM, and FCA. Documents that the OEMs produced were subsequently published on NHTSA's

website.

81.    These documents demonstrate widespread—and early—knowledge of the defect

and its potentially catastrophic effects. Among the documents' disclosures are the following:

- In September 2009, Bosch, at the time supplying the defective CP4 fuel pump
  to Audi and Volkswagen, received a notice from Audi about a "3rd HPP failure"
  in the U.S., explaining, "I'm afraid there's bad news from the U.S.: After 2
  failures in the field . . . the 3rd HPP failure has now occurred in the EC endurance
  run."[37] Photos attached to the email show the failed Bosch CP4 fuel pump,
  replete with metal shavings in the gasket:[38]



---

[36] *See* NHTSA, *ODI Resume for Investigation No. EA 11-003* (Feb. 7, 2011),
https://static.nhtsa.gov/odi/inv/2011/INOA-EA11003-5971.PDF.
[37] *See* EA11003EN-00639[0].
[38] *Id.* at EA11003EN-001068[2]-[4].





- In August 2009, Audi sent Bosch a failed CP4 fuel pump for analysis after "[t]he high pressure fuel pump failed catastrophically shedding metal shavings throughout the entire fuel system . . . . This car will require a complete new fuel system from tank to injectors and everything in between. This will be a very lengthy repair (weeks) . . . . We need to determine if component failure or bad fuel is to blame."[39] Thereafter, on September 1, 2009, Bosch responded to Audi with the following analysis note from their failed pump inspection: "Gentleman, [t]he pump mentioned below was analyzed. The result of the finding is sand-like particles in the fuel. ***Defect caused by customer***." *Id.* at 38 (emphasis added).[40]

---

[39] *See* March 7, 2011 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59347P.pdf," at 35.

[40] *See also* March 7, 2011 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59347P.pdf," at 21 (Mar. 31, 2008 email from Volkswagen to Bosch re: "Radio: Drivetrain damage failure US07 (Jetta)," in which the parties are discussing an HPFP failure in a 2007 Jetta and the Volkswagen representative states, "Can you (panel of experts) explain to us how the failure mechanism was after this mileage? . . . . We will certainly not accept a failure because of fuel quality! . . . . We also see a big risk here for our BIN5

- In May 2010, after analyzing foreign particles found in the fuel filter of a failed Audi diesel engine equipped with a CP4 fuel pump and determining that the biodiesel used in the subject engine was "insufficient[ly] cleans[ed]" resulting in deposit formation "which is not conducive to establishing the lubricating film in the [fuel pump] roller support," Bosch noted that, "When [diesel fuel] viscosity is too low, the lubricating film is not established properly and mixed friction and surface contact occurs = bad."[41]

- In a June 2010 email chain between Bosch and representatives of Audi and Volkswagen regarding the catastrophic failure of a CP4 pump in an 2010 Audi A3 TDIdiesel vehicle (published on NHTSA's website), Audi asked Bosch, "[W]hy are the defects mentioned below still present after replacing the high-pressure pump and the injector? What could the [dealer] have done wrong by way of incorrect repair so that such defects are appearing?" Bosch responded that "In this case the complete fuel system (HPP, rail, injectors, all lines) need to be changed . . . . I assume that because of the 'cruncher,' the entire system is contaminated with chips, which are then pumped in circulation and can soon lead to the next failure! The rough running can be explained by the fact that a chip is already present before or in the injector and is impairing its function."[42]

---

pump, which has to manage with the same fuel in USA"); May 2012 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59334P.pdf," at 9-10 (July 4, 2008 email from Audi to Bosch re: "CP4 BIN5 3rd and 4th failure in USA," analyzing root cause of CP4 field failures and positing, "Why is it that EC pumps do not fail? Because of a different fuel?"); July 27, 2012 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59345P.pdf," at 7 (emphasis added) (June 30, 2009 email between Bosch and Audi representatives re: "ANS: HPP measures/ USE," in which the Audi representative writes, "I don't think you're reading my mails anymore! Please look at the failure curves specifically, then you'll see that *we only have a problem in certain markets[.] . . . Depending on how poor the fuel currently on the market is*"); *id.* ("I'd prefer to have a more robust pump").

[41] July 27, 2012 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59345P.pdf," at 12-14 (May 26, 2010 email chain between Audi and Bosch representatives re: "Particle analyses, fuel filter").

[42] *See* July 7, 2008 email between Audi and Bosch representatives re: "Performance drop AU716 98017 with shavings in the HPP," discussing how "[s]omething is disintegrating" in the Audi 716 fuel pump and that "[w]e are a bit speechless" about "[t]he shavings, or whatever it is"), submitted as part of Bosch's May 2012 responses to NHTSA ODI Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59334P.pdf," at 6; *id.* at 27 (July 31, 2008 email from Audi representative re: "Fuel quality in [**REDACTED**]," stating that, "With our [Audi's] V6TDI with the high-pressure pump CP4.2 we have significantly higher failure rates in [**REDACTED**] (higher by a factor of approx. 30 than the average of all markets) . . . . Have you any information suggesting that such a thing could be possible with this country-specific diesel fuel?"); *id.* at 28-31 (Feb.-May 2011 email chain between Audi, Volkswagen and Bosch representatives re: "Status CP4 USA," in

- In June 2011, Bosch received a report from Volkswagen regarding a CP4 pump failure in a 2.0L Volkswagen TDI in which the Volkswagen representative explained, "I have here a pump from a 2.0L TDI. I have been testing a lot of these this week and many have an amount of 'metal Debris' or other metallic particles in them."[43]

82.   By the end of 2011, it was well known that Bosch CP4 failures in U.S. Audi and Volkswagen vehicles were widespread and catastrophic.[44]

83.   Although many of the communications cited above in the NHTSA investigation involved Bosch and Audi or Volkswagen, Nissan and Cummins engineers almost certainly would have heard about these problems early on. Vehicle manufacturers such as Nissan, FCA, Ford, and GM, and component manufacturers such as Bosch, Delphi, and Cummins, have significant and dedicated departments which continuously monitor regulatory compliance with safety, emissions, customs, and tax laws. Their marketing departments monitor their competitors and public domain information to track emerging trends which may impact their business, such as the release of new competitive products or problems with commonly used components on other manufacturer's products. These departments maintain extensive databases of competitive information including

---

which the parties discuss the substantial increase in warranty claims with the implementation of the CP4 in vehicles in the U.S. market).

[43] Mar. 7, 2011 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59347P.pdf," at 12 (June 9, 2011 email from Volkswagen Group of America, Inc. to Bosch re: "2.0L TDI Fuel Pump").

[44] *See* July 27, 2012 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59345P.pdf," at 69 (Sept. 15, 2011 email from Volkswagen to Bosch: "***I think the [CP4] failures are well known***. It is also important to know that not only the high-pressure fuel pump, but the entire injection system is to be replaced in case of damage to a HPP with a cost >[**REDACTED**] caused by chip contamination") (emphasis added). *See also* Mar. 22, 2011 email from Bosch employee to Volkswagen employees regarding analysis of failing CP4 fuel pumps, produced in response to NHTSA Inquiry EA11003EN-00639[0], available at https://static.nhtsa.gov/odi/inv/2011/INRD-EA11003-59428P.PDF (last accessed Mar. 13, 2023) (showing that, by March 2011, Bosch was continuing to receive "a respectable number" of CP4 "mechanical breakdowns" in the U.S.); *id.* at 2-4 (spreadsheet showing results of Bosch's pre-analysis of HPFP failures in Volkswagen/Audi vehicles where "metal chips found in fuel system").

design details, teardown analyses and reverse engineering to maintain their competitive edge or comparative advantage. These databases are searchable by employees and information is pushed to new product development teams.

84.     Specific departments in OEMs (including Product Compliance, Liability, and Environmental Management) will monitor many public (and subscription) sites such as truckandenginemanufacturers.org, NHTSA.gov, EPA.gov, the California Air Resources Board (ww2.arb.ca.gov), and international agencies (e.g., www.cen.eu, ASTM.org) to ensure compliance with all standards, regulations and awareness of changing regulations, recalls, and safety-related issues, among others. They will also subscribe or fund firms to do this analysis and information gathering for them. They also employ lobbyists in government agencies to keep abreast of new situations. These firms are all well informed about market conditions and product liability potential issues.

85.     In addition, the federal Safety Act and related regulations require the quarterly submission to NHTSA of "early warning reporting" data, including claims relating to property damage received by the automotive manufacturer, warranty claims paid by the automotive manufacturer, consumer complaints, incidents involving injury or death, and field reports prepared by the automotive manufacturer's employees or representatives concerning failure, malfunction, lack of durability, or other performance issues.[45]

86.     Emerging problems (such as the NHTSA investigation of Volkswagen/Audi CP4 pump failures) would certainly be tracked by Nissan and other OEMs. There are federal regulatory requirements mandating such tracking. Relevant information would then be condensed and pushed to design, development, testing, service and quality departments to ensure that they were aware of

---

[45] 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21.

these emerging problems. These global firms maintain extensive bodies of knowledge such as "lessons learned" or "engineering standard work" databases to ensure that problems encountered internally or externally are codified into their own standards and disseminated to working levels of engineering, design, quality and service. "Lessons learned" from competitors are invaluable since they avoid similar problems during development and production. These "lessons learned" databases are particularly important when OEMs develop global products at multiple engineering centers around the world. "Lessons learned" and competitive benchmarking are key steps in the Design Validation Planning of all major OEMs and part of their "Value Analysis" studies for New Product Introduction.

87. In addition, working level engineers and designers also are encouraged to join trade organizations such as the Society of Automotive Engineers, American Society of Mechanical Engineers, and ASTM, and to subscribe to many trade publications and tradeshows to stay current with changing requirements and competitive information. When a new product, regulation, standard, or issue is being announced or rumored, all major automotive news organizations will investigate and report on these developments since they are crucial for the OEMs' business. Product problems are also tracked closely since they affect stock market valuations and warranty accruals in SEC filings.

88. Government organizations such as NHTSA, EPA, and CARB routinely push information to OEMs and require responses to ensure that they are on notice of emerging safety issues, recalls, emissions and safety compliance changes. This information is required to be published broadly by OEMs within their internal websites to employees to put them on notice, and there are compliance audits to ensure that employees are trained and certified where necessary.

89.     NTHSA recalls and investigations would certainly be communicated to the product development, quality, purchasing, and service teams of Nissan and Cummins.

90.     Accordingly, information about the CP4 pump's problems would have been widely known throughout the industry, and certainly known to Nissan and Cummins.[46]

## J.     The CP4 defect poses an inherent risk to vehicle occupant safety and renders the Class Vehicles *per se* defective.

91.     The federal Safety Act and related regulations require the quarterly submission to NHTSA of "early warning reporting" data, including claims relating to property damage received by the automotive manufacturer, warranty claims paid by the automotive manufacturer, consumer complaints, incidents involving injury or death, and field reports prepared by the automotive manufacturer's employees or representatives concerning failure, malfunction, lack of durability, or other performance issues.[47]

92.     The Safety Act further requires immediate action when a manufacturer determines or should determine that a safety defect exists.[48] A safety defect is defined by regulation to include any defect that creates an "unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle" or "unreasonable risk of death or injury in an accident."[49] Within five days of learning about a safety defect, a manufacturer must notify NHTSA

---

[46] This industry-wide knowledge demonstrates Defendants' knowledge of the defect. *See In re: General Motors LLC CP4 Fuel Pump Litig.*, 393 F. Supp. 3d at 880-81 (quoting *Zuehlsdorf v. FCA US LLC*, No. EDCV 18-1877 JGB (KKx), 2019 WL 2098352 (C.D. Cal. Apr. 30, 2019)) ("'Plaintiff gives several plausible explanations of how Defendant GM became aware of the alleged defect, including 'pre-production testing, design failure mode analysis, calls to its customer service hotline, and customer complaints made to dealers,' and alleges that 'this knowledge and information was exclusively in the possession of FCA US and its network of dealers.' . . . . At this stage, the Court finds that Plaintiffs have adequately pled knowledge." (internal punctuation omitted)).

[47] 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21.

[48] *See United States v. General Motors Corp.*, 574 F. Supp. 1047, 1050 (D.D.C. 1983).

[49] 49 U.S.C. § 30102(a)(8).

and provide a description of the vehicles potentially containing the defect, including "make, line, model year, [and] the inclusive dates (month and year) of manufacture," a description of how these vehicles differ from similar vehicles not included in the recall, and "a summary of all warranty claims, field or service reports, and other information" that formed the basis of the determination that the defect was safety related.[50] Then, "within a reasonable time" after deciding that a safety issue exists, the manufacturer must notify the owners of the defective vehicles.[51] Violating these notification requirements can result in a maximum civil penalty of $15,000,000.[52]

93.     Based on their commercial interests and their duty to monitor safety-related complaints or concerns, both Nissan and Cummins assuredly saw *scores* of consumer complaints regarding the now-notorious CP4 pump failures. For example, on November 30, 2016, the following consumer reported the following incident to NHTSA regarding his 2016 Nissan Titan XD 5.0L Cummins-engine truck:

- *ON NOVEMBER 2, 2016, I WAS DRIVING MY 2016 NISSAN TITAN XD (DIESEL) ON A CITY STREET WHEN THE ENGINE SUDDENLY SHUT DOWN ON ME. I WAS ABLE TO GET THE VEHICLE SAFELY TO THE SIDE OF THE ROAD (LOSS OF POWER STEERING AND BRAKES). I HAD THE VEHICLE TOWED TO THE DEALERSHIP, WHERE IT REMAINS TO THIS DAY (NOVEMBER 30). THE DEALERSHIP, ALONG WITH ASSISTANCE FROM NISSAN, HAS NOT BEEN ABLE TO REPAIR OR RESTART THE VEHICLE TO DATE. MY UNDERSTANDING IS THE FUEL HAS BEEN TESTED AND WAS DETERMINED TO BE CLEAN DIESEL AND PROBLEM FREE. THE FUEL RAILS WERE FIRST REPLACED, WITH NEGATIVE RESULTS. THE HIGH PRESSURE FUEL PUMP WAS THEN REPLACED, AGAIN WITH NEGATIVE RESULTS. MY LAST CONTACT WITH THE DEALERSHIP WAS ONE WEEK AGO, AND I WAS TOLD THE NISSAN ENGINEER'S FELT THE FUEL SYSTEM/ENGINE WAS NOT GETTING "PRIMED" AND THEY WERE GOING TO LOOK INTO THAT SYSTEM. STILL, THE VEHICLE REMAINS AT THE DEALERSHIP AND THEY HAVE NOT BEEN ABLE TO START THEN VEHICLE OR CORRECT THE PROBLEM. I AM CONCERNED OTHER OWNERS OF THIS TYPE OF VEHICLE MAY OR MAY ALREADY HAVE EXPERIENCED SIMILAR*

---

[50] 49 U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)–(c).
[51] 49 C.F.R. §§ 577.5(a), 577.7(a).
[52] 49 U.S.C. § 30165(a)(1).

*ISSUES. THIS IS OBVIOUSLY A SAFETY ISSUE THAT NEEDS TO BE CHECKED BECAUSE IT COULD RESULT IN A SEVERE ACCIDENT RESULTING IN INJURY, LOSS OF LIFE AND/OR PROPERTY DAMAGE.*[53]

94.     Similarly, on July 10, 2019, the owner of a 2018 Nissan Titan XD with the 5.0L Cummins diesel engine posted the following about his CP4 failure experience on TitanXDForum.com:

- *My 2018 [Nissan Titan XD] with 42k has been at the dealer since 7/1. No warning just shut down and would not start. It was just authorized yesterday and they are replacing 100% of the entire fuel system. The tech said they have to replace anything that has touched the fuel and they have had this exact same thing happen to 3 other trucks and it seems to becoming a common issue. He said there is a re-designed high pressure pump that is suppose to fix it. Total repair $11k they are stating that it is going to take 2-3 weeks to get parts then 4-5 to replace EVERYTHING.*[54]

95.     On October 7, 2020, the owner of a 2016 Titan XD posted the following in an online forum with the subject, "2016 Titan XD Diesel Fuel Pump Failure:"

- *Does anyone know anything about any problems/failed high-pressure fuel pump on the 2016 Titan XD diesel?*

   *I just received a call from the dealership that my XD now has a failed high-pressure fuel pump that will need to be replaced as well as the entire fuel system because metal shavings from the failed pump are in the fuel system (total repair cost $21,000). It took them one month, two different dealerships, to diagnose this problem, not to mention the fact that they had to completely take apart the engine as they thought that the engine got seized on me. Luckily or not so luckily for me they have changed all the time oil and filters from day one.*

   *Unfortunately, my manufacturer power train warranty has expired (I have 108,000 miles on it), and the "lifetime-limited power train warranty" that I purchased from Nissan does not cover this repair since this part and fuel system is not on the list of covered items even though this pump is built into the engine (what a waste of money).*

   *Does anyone have any suggestions who to contact or to who speak about this?*[55]

---

[53] NHTSA ID No. 10928751.

[54] Jul. 10, 2019, "Fuel Pump Problems," available at https://www.titanxdforum.com/threads/fuel-pump-problems.42824/ (last accessed Mar. 10, 2023).

[55] Oct. 7, 2020, "2016 Titan XD Diesel Fuel Pump Failure," available at titantalk.com/threads/2016-titan-xd-diesel-fuel-pump-failure.427878/ (last accessed Mar. 8, 2023).

96.     On May 4, 2022, one 2017 Nissan Titan XD diesel owner posted about his experience with CP4 failure on TitanXDForum.com in a thread titled, "Fuel System Grenade:"

- *Just happened to mine at 124,000 miles. They say it will cost $21,000 to replace fuel system in my 2017 XD. Not covered by extended warranty. I wish I had known this was a common problem.*[56]

97.     Likewise, on June 15, 2022, the owner of a 2017 Titan XD posted the following to a forum on TitanTalk.com:

- *My 2017 XD diesel high pressure pump failed too. My truck has 80k miles. My factory warranty expire 3 month ago and, just like other people, the extended warranty company denied my claim because back when the truck was around 29k miles I went over the 10k miles by 1500 miles to replace the diesel filters. I fail to see the relationship 50k miles later, but I am wondering to how many other people this has happened. The more I read into this, I find more and more cases with the same issue. The dealer wants almost 16k to replace the pump + all the lines and fuel injectors.*[57]

98.     One month later, this same Titan owner reported that Nissan was declining to pay the repair under warranty, and further lamented, "I know they will be coming to repo my truck because I am not paying $16,800 to repair the truck and I am not making payment on a truck that doesn't run."[58]

99.     These are just a sample of the myriad complaints lodged over the years by owners of Class Vehicles who have experienced catastrophic CP4 fuel pump failure. But the automotive industry at large has criticized the CP4 fuel pump for these very same problems for many years.

---

[56] May 4, 2022, "Fuel System Grenade," available at https://www.titanxdforum.com/threads/fuel-system-grenade.42831/ (last accessed Mar. 10, 2023).
[57] Jun. 15, 2022, "Diesel High pressure Pump Failure," available at https://www.titantalk.com/threads/diesel-high-pressure-pump-failure.433344/ (last accessed Mar. 10, 2023).
[58] Jul. 13, 2022, "Diesel High pressure Pump Failure," available at https://www.titantalk.com/threads/diesel-high-pressure-pump-failure.433344/ (last accessed Mar. 10, 2023).

For example, one automotive industry publication went so far as to say that CP4 failures are one of the top five problems with the 5.0L Cummins engine Nissan Titan XD.[59] In another industry article titled, "The Nissan Titan Never Got It Together," TheDrive.com noted that the Nissan Titan suffered from CP4 fuel pump failures early on.[60] And still another industry publication noted that the CP4 "[is] an injection pump that's seen countless failures in LML Duramax and Nissan Titan applications over the years…"[61] Indeed, the online complaints about the CP4 fuel pump in U.S. diesel trucks are endless.[62]

---

[59] Aug. 17, 2021, "The 5 Most Common 5.0 Cummins Engine Problems," DieselIQ.com, available at https://dieseliq.com/5-0-cummins-engine-problems/ (last accessed Mar. 10, 2023).

[60] Jul. 1, 2022, "The Nissan Titan Never Got It Together," TheDrive.com, available at https://www.thedrive.com/news/the-nissan-titan-never-got-it-together (last accessed Mar. 10, 2023).

[61] Jan. 12, 2022, "Making the Cummins Great Again—With a Factory CP3 Fuel Pump Swap," DrivingLine.com, available at https://www.drivingline.com/articles/making-the-cummins-great-again-with-a-factory-cp3-fuel-pump-swap/ (last accessed Mar. 10, 2023).

[62] Plaintiffs incorporate by reference the following CP4 failure complaints against competitor OEMs, including complaints in Cummins-engine FCA vehicles: *see* Consol. & 2d Am. Class Action Compl. at ¶¶ 192-215, *Chapman v. GM LLC*, No. 2:19-cv-12333-TGB (E.D. Mich. May 22, 2020), ECF No. 40 (complaints regarding CP4 failures in 2011-2016 Duramax diesel trucks); 2d Am. Class Action Compl. at ¶¶ 184-189, *Droesser v. Ford Motor Co.*, No. 5:19-cv-12365-JEL-APP (E.D. Mich. June 10, 2020), ECF No. 44 (detailing same in 2011-2020 Ford Power Stroke diesel trucks); 1st Am. Class Action Compl. at ¶¶ 98-117 *Withrow v. FCA US LLC*, No. 2:19-cv-13214-LJM-KGA (E.D. Mich. Mar. 27, 2020), ECF No. 26 (detailing same in 2014-present model year EcoDiesel Dodge Ram and Jeep Grand Cherokee vehicles); 2d Am. Class Action Compl. at ¶¶ 157(1)-(2), 158(3)-(31), 159, *Sharp v. FCA US LLC*, No. 2:21-cv-12497-LVP-CI (E.D. Mich. Feb. 1, 2022), ECF No. 25 (detailing same in 2019-2020 model year Dodge Ram heavy duty trucks with 6.7L diesel engines manufactured by Cummins).

**K. In falsely promoting the quality, performance, and dependability of their Cummins engine vehicles to consumers, Defendants concealed—via omission—the defective nature of the CP4 fuel pump.**

100. At least from 2015 to the present, Defendants have extensively advertised the performance benefits of the Cummins 5.0L diesel engine located within all of the subject the 2016-2019 Nissan Titan XD vehicles, without disclosing the existence of the pump that was known to be defective. At all times relevant to this action, Defendants omitted and/or concealed the CP4 fuel pump defect. Indeed, at no point during the period relevant to this action did Defendants inform buyers or lessees of the Class Vehicles that the Bosch-supplied CP4 fuel pump and accompanying fuel system components within the Cummins 5.0L diesel engine were incompatible with the ordinary use of American diesel fuel, or that the defective CP4 pump starts damaging the vehicle's fuel injection system and engine immediately upon the vehicle's first use. In fact, Defendants' advertisements represents that the Class Vehicles are fit for driving on *American roadways*, which implies that American diesel fuel is being used in, and compatible with, the Class Vehicles; this is simply not true from day one.

101. Likewise, Defendants repeatedly told consumers that the Class Vehicles were dependable, long-lasting, and of the highest quality. In so doing, Defendants led consumers, including Plaintiffs and putative Class members, to believe that the Class Vehicles would be free from defects that result in fuel injection system failure and consequential engine shutdown which results in outrageously expensive repair costs.

102. For example, the 2016 Nissan Titan XD 5.0L Cummins diesel truck brochure makes no disclosure about the defective pump, but instead states as follows:

> When you've got over 12,000 lbs. (5,443 kg) in tow, climbing a
> steep grade in oppressive heat, you'll be glad to have legendary

power, a broad torque curve with massive low-end grunt and reliability under the hood.[63]

103.    Instead, Nissan touted the Cummins engine in the Class Vehicles as being built with "commercially proven components underneath"[64] the hood—something which could not be further from the truth.

104.    Cummins similarly touted the "maximum durability"[65] of the 2016-2019 Titan XD 5.0L diesel engine, and further advertised: "High injection pressures from the latest Bosch® High Pressure Common Rail (HPCR) fuel system and piezo fuel injectors provide precise fuel control for optimized in-cylinder combustion, leading to better fuel efficiency and reduced emissions."[66]

105.    As with other model years, Nissan touted the 2017 model year Class Vehicles as having "America's Best Truck Warranty" at 5 years/100,000 miles,[67] yet did not disclose that CP4 fuel pump failure repairs would be denied under this promised warranty.

---

[63]    2016 Nissan Titan XD Brochure, at 4, available at https://cdn.dealereprocess.org/cdn/brochures/nissan/ca/2016-titan.pdf (last accessed Mar. 14, 2023).

[64]    2016 Nissan Titan XD Brochure, at 2, available at https://www.auto-brochures.com/makes/Nissan/Titan/Nissan_US%20Titan_2016.pdf (last accessed Mar. 14, 2023); *see also id.* at 4 ("Legendary power, reliability, and efficiency. Under TITAN® XD's hood beats the heart of a beast — an available 5.0-liter, V8 turbo-diesel built by legendary manufacturer Cummins.").

[65]    "The 2016 Nissan Titan: Powered by Cummins," Cummins Newsroom, Jan. 12, 2015, available at https://www.cummins.com/news/2015/01/12/2016-nissan-titan-powered-cummins (last accessed Mar. 14, 2023); "CUMMINS 5.0L V8 TURBO DIESEL FOR PICKUPS," available at https://www.cummins.com/engines/cummins-50l-v8-turbo-diesel (last accessed Mar. 14, 2023).

[66] https://www.cummins.com/engines/cummins-50l-v8-turbo-diesel (last accessed Mar. 14, 2023); *see also id.* ("A two-stage fuel filter system for the 5.0L V8 Turbo Diesel features the latest NanoNet™ media from Cummins Filtration, *to ensure that the HPCR fuel system is fully protected against fuel contamination*.") (emphasis added).

[67]    2017 Nissan Titan XD Brochure, at 2, available at https://cdn.dealereprocess.org/cdn/brochures/nissan/2017-titan.pdf (last accessed Mar. 14, 2023).

106.     For the 2017 model year, Nissan again boasted about the "tested, proven, commercial-grade components" under the hood of the Nissan Titan XD, yet the CP4 is anything *but* commercial-grade:[68]



107.     The 2018 and 2019 Nissan Titan XDs were likewise touted as having "commercial strength components" within their Cummins 5.0L diesel engine, and Nissan further advertised: "The engine also includes a Bosch® HPCR fuel system to deliver precise fuel control and multiple injections per combustion stroke, which helps increase efficiency and reduce traditional 'diesel clatter.'"[69]

---

[68]     2017 Nissan Titan XD Brochure, at 3, available at https://cdn.dealereprocess.org/cdn/brochures/nissan/ca/2017-titanxd.pdf (last accessed Mar. 14, 2023).

[69]     2018 Nissan Titan XD Press Kit, available at https://usa.nissannews.com/en-US/releases/release-de3ca75de54443ef809fa8c4d2d59613-us-2018-nissan-titan-xd-press-kit (last accessed Mar. 14, 2023); 2019 Nissan Titan Press Kit, available at https://usa.nissannews.com/en-US/releases/release-715fb77451e5418b807f5e39ffa996df-us-2019-nissan-titan-xd-press-kit (last accessed Mar. 14, 2023).

108.     Nowhere in these or any other communication did Nissan or Cummins disclose that the Class Vehicles contained a defective CP4 injection pump prone to catastrophic failure.

109.     These advertisements and public statements are cited here to demonstrate that Defendants knew that reliability, durability, and power were material considerations for consumers.  Defendants fully understood that the use of a defective high-pressure fuel pump was material to consumers, but deliberately withheld this information in their advertising campaign and public statements.

**L.     Defendants designed, manufactured, distributed, and sold vehicles it knew would experience catastrophic failures which Defendants would not honor under their warranties.**

110.  Nissan provided an express 5-year/100,000 written warranty on the Class Vehicles it manufactured. This warranty "is provided to the original and subsequent owner(s) of a Nissan vehicle originally distributed by Nissan which is originally sold by a Nissan authorized Nissan dealership in the United States," and includes "any repairs needed to correct defects in materials or workmanship of all parts and components of each new Nissan vehicle supplied by Nissan. . ."[70] Under the "ENGINE" subsection of the section titled, "For How Long and What is Covered," the covered parts listed include, "Cylinder heads and block and all internal parts, . . . [including] fuel pump, [and] fuel injectors[.]"[71]

---

[70]  2019 Nissan Titan XD Warranty Information Booklet, at 5-6, available at https://www.nissanusa.com/content/dam/Nissan/us/manuals-and-guides/titan/2019/2019-Nissan-Titan-warranty-booklet.pdf (last accessed Mar. 14, 2023).

[71] *Id.* at 6.

111. Likewise, the Cummins Diesel Engine Limited Warranty that comes with the Class Vehicles purports to cover "the following engine parts and components: . . . fuel injection pump & injectors."[72]

112. On many occasions, however, Defendants have refused to honor their warranties—even after their customers presented the same fuel pump problem in the Class Vehicles two (or more) times for repair under warranty. In return, Defendants have disingenuously claimed that the pump failures are not caused by any Defendant and thus not covered under warranty.

113. Despite the clear mis-match between the CP4 fuel pump and American diesel fuel, Defendants have not hesitated to pass the average $8,000–$10,000 cost of catastrophic failure along to the consumer. Nissan's logic apparently is that when the CP4 self-destructs because of its innate incompatibility with American diesel, and produces metal shavings in the fuel, which is then launched into the high-pressure fuel system and the engine, then the fuel supply is "contaminated," and this is somehow the customer's fault. Because the fuel is now contaminated with metal from the pump, the repairs are for fuel contamination and are not covered by the warranties.

114. In sum, Defendants' decision to use the Bosch CP4 high-pressure fuel pump in the Class Vehicle engine was a grave error, particularly because of the varying and unpredictable levels of lubricity of U.S. diesel fuel. The CP4 is the most important component on a modern diesel engine. If it fails, the engine is not operational, and when it generates metal debris, the fine material makes its way into the sensitive high-pressure components such as the fuel injectors.

115. Even when the engines do not experience catastrophic failure, the fragile design causes damage to the engine and component parts, including broken injector tips, over-fueling,

---

[72] *Id.* at 7.

melted or damaged pistons, exhaust values, turbochargers, cylinder heads, exhaust manifolds, and damage to the emission control system. Although no vehicle design is flawless, and some wearing of parts is inevitable and permissible, the use of the CP4 pump in the Class Vehicles posed an unacceptable and preventable risk to Class Vehicle owners and lessees.

## M. Allegations establishing agency relationship between Manufacturer Nissan and Nissan Dealerships

116. Upon information and belief, Manufacturer Defendant Nissan has impliedly or expressly acknowledged that Nissan-authorized dealerships are its sales agents, the dealers have accepted that undertaking, Nissan has the ability to control authorized Nissan dealers, and Nissan acts as the principal in that relationship, as is shown by the following:

    i. Manufacturer Nissan can terminate the relationship with its dealers at will;

    ii. The relationships are indefinite;

    iii. Manufacturer Nissan is in the business of selling vehicles as are its dealers;

    iv. Manufacturer Nissan provides tools and resources for Nissan dealers to sell vehicles;

    v. Manufacturer Nissan supervises its dealers regularly;

    vi. Without Manufacturer Nissan, the relevant Nissan dealers would not exist;

    vii. Manufacturer Principal Nissan requires the following of its dealers:

        1. Reporting of sales;

        2. Computer network connection with Manufacturer Nissan;

        3. Training of dealers' sales and technical personnel;

        4. Use of Manufacturer Nissan-supplied computer software;

        5. Participation in Manufacturer Nissan's training programs;

6. Establishment and maintenance of service departments in Nissan dealerships;

7. Certification of Nissan pre-owned vehicles;

8. Reporting to Manufacturer Nissan with respect to the car delivery, including reporting customers' names, addresses, preferred titles, primary and business phone numbers, e-mail addresses, vehicle VIN numbers, delivery date, type of sale, lease/finance terms, factory incentive coding, if applicable, vehicles' odometer readings, extended service contract sale designations, if any, and names of delivering dealership employees; and

9. Displaying Manufacturer Nissan logos on signs, literature, products, and brochures within Nissan dealerships.

viii. Dealerships bind Manufacturer Nissan with respect to:

1. Warranty repairs on the vehicles the dealers sell; and

2. Issuing service contracts administered by Manufacturer Nissan.

ix. Manufacturer Nissan further exercises control over its dealers with respect to:

1. Financial incentives given to Nissan dealer employees;

2. Locations of dealers;

3. Testing and certification of dealership personnel to ensure compliance with Manufacturer Nissan's policies and procedures; and

4. Customer satisfaction surveys, pursuant to which Manufacturer Nissan allocates the number of Nissan cars to each dealer, thereby directly controlling dealership profits.

x. Nissan dealers sell Nissan vehicles on Manufacturer Nissan's behalf, pursuant to a "floor plan," and Manufacturer Nissan does not receive payment for its cars until the dealerships sell them.

xi. Dealerships bear Nissan's brand names, use Nissan's logos in advertising and on warranty repair orders, post Nissan-brand signs for the public to see, and enjoy a franchise to sell Manufacturer Nissan's products, including the Class Vehicles.

xii. Manufacturer Nissan requires Nissan dealers to follow the rules and policies of Manufacturer Nissan in conducting all aspects of dealer business, including the delivery of Manufacturer Nissan's warranties described above, and the servicing of defective vehicles such as the Class Vehicles.

xiii. Manufacturer Nissan requires its dealers to post Nissan's brand names, logos, and signs at dealer locations, including dealer service departments, and to identify themselves and to the public as authorized Nissan dealers and servicing outlets for Manufacturer Nissan cars.

xiv. Manufacturer Nissan requires its dealers to use service and repair forms containing Manufacturer Nissan brand names and logos.

xv. Manufacturer Nissan requires Nissan dealers to perform Manufacturer Nissan's warranty diagnoses and repairs, and to do the diagnoses and repairs according to the procedures and policies set forth in writing by Manufacturer Nissan.

xvi. Manufacturer Nissan requires Nissan dealers to use parts and tools either provided by Manufacturer Nissan, or approved by Manufacturer Nissan, and to inform Nissan when dealers discover that unauthorized parts have been installed on one of Manufacturer Nissan's vehicles.

xvii. Manufacturer Nissan requires dealers' service and repair employees to be trained by Nissan in the methods of repair of Nissan-brand vehicles.

xviii. Manufacturer Nissan audits Nissan dealerships' sales and service departments and directly contacts the customers of said dealers to determine their level of satisfaction with the sale and repair services provided by the dealers; dealers are then granted financial incentives or reprimanded depending on the level of satisfaction.

xix. Manufacturer Nissan requires its dealers to provide Nissan with monthly statements and records pertaining, in part, to dealers' sales and servicing of Manufacturer Nissan's vehicles.

xx. Manufacturer Nissan provides technical service bulletins and messages to its dealers detailing chronic defects present in product lines, and repair procedures to be followed for chronic defects.

xxi. Manufacturer Nissan provides its dealers with specially trained service and repair consultants with whom dealers are required by Manufacturer Nissan to consult when dealers are unable to correct a vehicle defect on their own.

xxii. Manufacturer Nissan requires Nissan-brand vehicle owners to go to authorized Nissan dealers to obtain servicing under Nissan warranties.

xxiii. Nissan dealers are required to notify Manufacturer Nissan whenever a car is sold or put into warranty service.

## V. TOLLING OF THE STATUTE OF LIMITATIONS

117. As of the date of this Complaint, Defendants continue to market their vehicles based on superior durability, performance, fuel efficiency, and compatibility with U.S. diesel fuel, despite their knowledge that the Class Vehicles are defective and have catastrophically failed or inevitably will catastrophically fail. In fact, Defendants still have not disclosed and continue to

conceal that the Class Vehicles are defective, incompatible with American diesel fuel, and will experience costly progressive and/or catastrophic failure.

118.    Until shortly before the filing of this Complaint, Plaintiff and putative Class members had no way of knowing about Defendants' wrongful and deceptive conduct with respect to the defective Class Vehicles.

119.    With respect to Class Vehicles that have not experienced a catastrophic CP4 pump failure, the putative Class members did not discover and could not reasonably have discovered prior to purchase that their Class Vehicles are defective, that their Class Vehicles are out of specification and incompatible with American diesel fuel, that this incompatibility results in the breakdown of vehicle components and contamination of fuel caused by the defective CP4 fuel pump, that the durability and performance of their Class Vehicles is impaired by this defect and incompatibility and that such durability and performance is far less than Defendants promised, or that, as a result of the foregoing, they overpaid for their vehicles, the value of their vehicles is diminished, and/or their vehicles will require costly modification to avoid a catastrophic, even more costly failure, and that any such modifications will impair other qualities of the Class Vehicles that formed a material part of the bargain between the parties in the purchase of the Class Vehicles by putative Class members.

120.    With respect to Class Vehicles that have experienced a catastrophic CP4 pump failure prior to the filing of this Complaint, putative Class members did not discover and could not reasonably have discovered that their CP4 pump failure was due to a defect known to Defendants or that such failure was due to an incompatibility between the Class Vehicle and the fuel intended by Defendants to be used in the Class Vehicles.

121.     Within the period of any applicable statutes of limitation or repose, Plaintiff and Class members could not have discovered through the exercise of reasonable diligence that Defendants were concealing the conduct complained of herein and misrepresenting the defective nature of the Class Vehicles.

122.     Plaintiff did not discover, and did not know of facts that would have caused a reasonable person to suspect that Defendants did not report information within their knowledge to consumers, dealerships or relevant authorities; nor would a reasonable and diligent investigation have disclosed that Defendants were aware of the non-conforming and defective nature of the CP4 fuel pump and the Class Vehicles in which it was incorporated. Plaintiff only learned of the defective nature of the CP4 fuel injection pump and his vehicle and of Defendants' decision to design and sell such unfit defective vehicles only shortly before this action was filed.

123.     All applicable statutes of limitation and repose have also been tolled by Defendants' knowing, active, and fraudulent concealment, and denial of the facts alleged herein throughout the time period relevant to this action.

124.     Instead of disclosing the defective nature of the CP4 fuel pumps to consumers, Defendants have falsely represented that CP4 pump failure in the Class Vehicles is caused by Plaintiff and Class members' conduct or by the use of contaminated fuel.

125.     In reality, Defendants' conduct in designing, manufacturing, marketing, or selling Class Vehicles for use with American diesel fuel, with which Defendants knew the Class Vehicles were particularly incompatible, causes the "fuel contamination" that ultimately leads to a catastrophic CP4 pump failure.

126.     Defendants, with the purpose and intent of inducing putative Class members to refrain from filing suit, pursuing warranty remedies, or taking other action with respect to

Defendants' conduct or the Class Vehicles, fraudulently concealed the true cause of CP4 pump failure by blaming Plaintiff and putative Class members and/or other causes when Defendants, even before the design, manufacture, or sale of the Class Vehicles, knew that the defective nature of the Bosch CP4 Pump would and has caused fuel contamination and resulting catastrophic CP4 pump failure.

127.     Defendants were under a continuous duty to disclose to putative Class members the true character, quality and nature of the durability and performance of Class Vehicles, the ongoing process of fuel contamination in Class Vehicles, CP4 pump failure, and the true cause of CP4 pump failure. Instead, Defendants knowingly, affirmatively, and actively concealed or recklessly disregarded the foregoing facts. As a result, Defendants are estopped from relying on any statutes of limitation or repose as a defense in this action.

128.     For the foregoing reasons, all applicable statutes of limitation and repose have been tolled by operation of the discovery rule and by Defendants' fraudulent concealment with respect to all claims against Defendants; and, Defendants are estopped from asserting any such defenses in this action.

## VI.     CLASS ACTION ALLEGATIONS

129.     Pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings this action on behalf of himself and on behalf of all members of the following putative Class:

> All persons or entities who purchased or leased one or more of the
> "Class Vehicles" in the State of California.

130.     Excluded from the Class are individuals who have personal injury claims resulting from a CP4 fuel injection pump failure. Also excluded from the Class are Defendants and their officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns, as well as any entity in which Defendants have a controlling interest. In

addition, governmental entities and any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff are excluded from the Class. Plaintiff reserves the right to revise the Class definition based upon information learned through discovery.

131.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff and Class members can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

132.    The Class Representative's claims are typical of claims of the Class, and he will fairly and adequately represent and protect the interests of Class in that he has no interests antagonistic to those of the putative Class members.

133.    The amount of damages suffered by each individual member of the Class, in light of the expense and burden of individual litigation, would make it difficult or impossible for individual class members to redress the wrongs done to them. The putative Class members have all suffered harm and damages as a result of Defendants' unlawful and wrongful conduct. Absent a class action, Defendants will likely not have to compensate victims for Defendants' wrongdoings and unlawful acts or omissions, and will continue to commit the same kinds of wrongful and unlawful acts or omissions in the future; indeed, upon information and belief, Defendants continue to deny the faulty nature of their CP4-equipped Nissan Titan XD diesel vehicles with 5.0L Cummins diesel engines.

134.    **Numerosity under Federal Rule of Civil Procedure 23(a)(1):** The Class members are so numerous that individual joinder of all of their members is impracticable. Due to the nature of the trade and commerce involved, Plaintiffs believe that the total number of Class

members is at least in the thousands, and certainly more than 100 individuals. While the exact number and identities of the Class members are unknown at this time, such information can be ascertained through appropriate investigation and discovery, as well as by the notice Class members will receive by virtue of this litigation so that they may self-identify. The disposition of the claims of Class members in a single class action will provide substantial benefits to all Parties and the Court. Members of the Class may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice. The number of persons for whom this action is filed who are citizens of California, or who purchased or leased one or more of the Class Vehicles in California, effectively exhausts the membership of the Class.

135. **Commonality and Predominance under Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3):** This action involves common questions of law and fact which predominate over any questions affecting individual Class members, including, without limitation:

    a. Whether Defendants engaged in the conduct alleged herein;

    b. Whether Defendants knew about the CP4 fuel pump defect and the inherent problems related thereto when the defective pump is used with American diesel fuel, and if so, how long Defendants knew or should have known as much;

    c. Whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed the defective Class Vehicles into the stream of commerce in the United States;

    d. Whether the diesel engine systems that are the subject of this complaint are defective such that they are not fit for ordinary consumer use;

e. Whether Defendants omitted material facts about the quality, durability, fuel economy, and vehicle longevity of the Class Vehicles;

f. Whether Defendants designed, manufactured, marketed, and distributed Class Vehicles with defective or otherwise inadequate fuel injection systems;

g. Whether Defendants' conduct violates states' consumer protection statutes, and constitutes breach of contract or warranty and fraudulent concealment, as asserted herein;

h. Whether putative Class members overpaid for their vehicles at the point of sale or lease; and

i. Whether putative Class members are entitled to damages and other monetary relief and, if so, what amount.

136. **Typicality under Federal Rule of Civil Procedure 23(a)(3):** Plaintiff's claims are typical of the Class members' claims because all have been comparably injured through Defendants' wrongful conduct as described above.

137. **Adequacy of Representation under Federal Rule of Civil Procedure 23(a)(3):** Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the Class members he seeks to represent. Additionally, Plaintiff has retained counsel with substantial experience in handling complex class action and multi-district litigation. Plaintiff and his counsel are committed to prosecuting this action vigorously on behalf of the putative Class and have the financial resources to do so. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

138. **Superiority of Class Action under Federal Rule of Civil Procedure 23(b)(3):** A class action is superior to any other available means for the fair and efficient adjudication of this

controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The financial detriment suffered by Plaintiff and the other members of the putative Class is relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants. Accordingly, it would be impracticable for the members of the putative Class to individually seek redress for Defendants' wrongful conduct. Even if members of the putative Class could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

### III.    CAUSES OF ACTION

**CLAIMS BROUGHT ON BEHALF OF THE CLASS
AND ON BEHALF OF THE NAMED PLAINTIFF**

**<u>COUNT I</u>
VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
15 U.S.C. § 2301, *ET. SEQ.***

139.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

140.    Named Plaintiff Stanley brings this Count on behalf of himself and on behalf of the putative Class.

141.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

142.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). The Plaintiff and Class members are consumers because

they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

143. Nissan and Cummins are a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

144. 15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

145. Nissan and Cummins provided Plaintiff and Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Nissan and Cummins warranted that the Class Vehicles and Class Vehicle engines were fit for their ordinary purpose as safe motor vehicles compatible with U.S. diesel fuel, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

146. Nissan and Cummins breached their implied warranties, as described in more detail above, and are therefore liable to Plaintiff and Class members pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles and Class Vehicle engines share a common defect in that they are all equipped with a Bosch CP4 high-pressure fuel injection pump which is not compatible with the lubricity of American diesel fuel. This incompatibility causes the Class Vehicles to suddenly fail during normal operation, leaving occupants of the Class Vehicles vulnerable to crashes, serious injury, and death. Even where death or serious injury does not occur, the CP4's incompatibility with American diesel fuel renders the Class Vehicles and Class Vehicle engines, when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving in America with standard American diesel fuel.

147.    In their capacity as warrantor, Nissan and Cummins had knowledge of the inherently defective nature of the high-pressure fuel-injection system in the Class Vehicles and Class Vehicle engines. Any effort by Nissan or Cummins to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles and Class Vehicle engines is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

148.    Any limitations Nissan or Cummins might seek to impose on their warranties are procedurally unconscionable. There was unequal bargaining power between Defendants and Plaintiffs, as, at the time of purchase and lease, Plaintiffs had no other options for purchasing warranty coverage other than directly from Nissan and/or Cummins.

149.    Any limitations Nissan or Cummins might seek to impose on their warranties are substantively unconscionable. Defendants knew that the Class Vehicles and Class Vehicle engines were defective and incompatible with U.S. diesel fuel, and that the Vehicles would fail when used as intend. Moreover, Defendants knew the Class Vehicles and Class Vehicle engines would pose safety risks after the warranties purportedly expired. Defendants failed to disclose this defect to Plaintiffs. Thus, Defendants' enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

150.    Plaintiffs have had sufficient direct dealings with either Nissan or its agents (dealerships) to establish privity of contract between Nissan and Plaintiffs. Nonetheless, privity is not required here because Plaintiffs are intended third-party beneficiaries of contracts between Nissan and its dealers, and specifically, of Nissan's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers. Plaintiffs are also the intended beneficiaries of Cummins

warranties. Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the aforementioned defect, as catastrophic CP4 fuel pump failure can cause the vehicle to stall while in motion and then subsequently become unable to be restarted, which increases the risk of a crash and presents an unreasonable risk to vehicle occupant safety.

151.     Pursuant to 15 U.S.C. § 2310(e), Plaintiff is entitled to bring this class action and is not required to give Nissan and Cummins notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiff pursuant to Rule 23 of the Federal Rules of Civil Procedure.

152.     Because Nissan and Cummins are refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiff and Class members have not re-accepted their Class Vehicles by retaining them.

153.     The amount in controversy of Plaintiff's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiff and Class members seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiff is entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiff in connection with the commencement and prosecution of this action.

154.     Plaintiff also seeks the establishment of a Nissan and Cummins-funded program for Plaintiff and Class members to recover out-of-pocket costs incurred in attempting to rectify and/or mitigate the effects of the CP4 incompatibility defect in their Class Vehicles and Class Vehicle engines.

## COUNT II

### VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
### (CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*)

155. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

156. Named Plaintiff Stanley brings this Count on behalf of himself and the putative Class against all Defendants.

157. California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

158. In the course of Defendants' business, they willfully failed to disclose and actively concealed that the CP4 fuel pump in the Class Vehicles is particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of Defendants' advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel. Accordingly, Defendants engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Class Vehicles.

159. In purchasing or leasing the Class Vehicles, Plaintiff and the putative Class members were deceived by Defendants' failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure

(oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle).

160.    Plaintiff and the putative Class members reasonably relied upon Defendants' false misrepresentations. They had no way of knowing that Defendants' representations were false and gravely misleading. As alleged herein, Defendants engaged in extremely sophisticated methods of deception. Plaintiff and the putative Class members did not, and could not, unravel Defendants' deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component part in the Class Vehicles and Plaintiff and putative Class members were not aware of the defective nature of the CP4 fuel pump in that high-pressure fuel injection system prior to purchase or lease.

161.    Each Defendant's actions as set forth above occurred in the conduct of trade or commerce.

162.    Defendants' deception, fraud, misrepresentation, concealment, suppression, or omission of material facts were likely to and did in fact deceive reasonable consumers.

163.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the putative Class.

164.    Defendants knew or should have known that their conduct violated the California UCL.

165.    Defendants owed Plaintiff and the putative Class members a duty to disclose the truth about the heightened incompatibility of the CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because Defendants:

           a.    Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in their vehicles,

including the uptick in warranty claims seen upon the introduction of the CP4 into the Class Vehicles;

b.      Intentionally concealed the foregoing from Plaintiff and the putative Class; and/or

c.      Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiff and the putative Class that contradicted these representations.

166.    Due to their specific and superior knowledge that the Bosch CP4 Pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, Defendants' false representations regarding the increased durability of the Class Vehicles, and Plaintiff's and putative Class members' reliance on these material representations, Defendants had a duty to disclose to Plaintiff and putative Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 Pumps will fail in Class Vehicles, that Class Vehicles do not have the expected durability over other diesel vehicles or of their namesake predecessor engines, that failure of the Bosch CP4 Pumps will cause damage to Class Vehicle engines and engine systems, and that Plaintiff and putative Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiff and putative Class members, Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiff and the putative Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. Defendants represented to Plaintiff and putative Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4

fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

167. Defendants' conduct proximately caused injuries to Plaintiff and putative Class members.

168. Plaintiff and putative members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendants' conduct in that Plaintiff and putative Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendants' misrepresentations and omissions.

169. The CP4 fuel pump defect involves a safety defect which presents an actual and/or imminent risk to vehicle occupant safety; specifically, the risk of a moving stall, which is a known consequence of the CP4 fuel pump defect, presents a risk to occupant safety which Defendant Cummins has admittedly recognized through the November 12, 2021 Part 573 Safety Recall Report of other Cummins-engine diesel vehicles equipped with the defective CP4 fuel pump. Defendants' violations present a continuing risk to Plaintiff and Class members as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest. Put simply, defective cars are just not worth as much.[73] Further, even without a safety issue, Plaintiffs overpaid at the point of sale as these vehicles have impaired performance due to the defect

170. Plaintiff and the putative Class seek monetary relief against Defendants in an amount to be determined at trial. Plaintiff and the putative Class also seek punitive damages

_____

[73] *See, e.g.*, *In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1163 (C.D. Cal. 2011) ("[O]nce the safety defect is sufficiently and plausibly pled by all Plaintiffs, the economic losses resulting from the defect are readily established: defective cars are simply not worth as much.").

because Defendants engaged in aggravated and outrageous conduct with an evil mind. Indeed, Defendants carried out despicable conduct with willful and conscious disregard of the rights of others. Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages

171.    Plaintiff and the putative Class also seek attorneys' fees and any other just and proper relief available.

## COUNT III

### VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT ("CLRA") (CAL. CIV. CODE § 1750, *ET SEQ.*)

172.    Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

173.    Plaintiff brings this Count on behalf of himself and the putative Class against all Defendants.

174.    Each Defendant is a "person" under Cal. Civ. Code § 1761(c).

175.    Plaintiff and the putative Class members are "consumers" as defined by Cal. Civ. Code § 1761(d), who purchased or leased one or more Class Vehicles.

176.    The California Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer . . . ." Cal. Civ. Code § 1770(a).

177.    In the course of Defendants' business, Defendants willfully failed to disclose and actively concealed that the CP4 fuel pump in the Class Vehicles is particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of Defendants'

advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel. Accordingly, Defendants engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Class Vehicles.

178.    In purchasing or leasing the Class Vehicles, Plaintiff and the putative Class members were deceived by Defendants' failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle).

179.    Plaintiff and the putative Class members reasonably relied upon Defendants' false misrepresentations. They had no way of knowing that Defendants' representations were false and gravely misleading. As alleged herein, Defendants engaged in extremely sophisticated methods of deception. Plaintiff and the putative Class members did not, and could not, unravel Defendants' deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component part in the Class Vehicles and Plaintiff and the putative Class members were not aware of the defective nature of the CP4 fuel pump in that high-pressure fuel injection system prior to purchase or lease.

180.    Each Defendant's actions as set forth above occurred in the conduct of trade or commerce.

181.    Defendants' deception, fraud, misrepresentation, concealment, suppression, or omission of material facts were likely to and did in fact deceive reasonable consumers.

182.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the putative Class.

183.    Defendants knew or should have known that their conduct violated the California CLRA.

184.    Defendants owed Plaintiff and the putative Class members a duty to disclose the truth about the heightened incompatibility of the CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because Defendants:

a.    Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in their vehicles, including the uptick in warranty claims upon the introduction of the CP4 into the Class Vehicles;

b.    Intentionally concealed the foregoing from Plaintiff and the putative Class members; and/or

c.    Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiff and the putative Class that contradicted these representations.

185.    Due to Defendants' specific and superior knowledge that the Bosch CP4 Pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, Defendants' false representations regarding the increased durability of the Class Vehicles, and Plaintiff's and putative Class members' reliance on these material representations, Defendants had a duty to disclose to Plaintiff and putative Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 Pumps will fail in Class Vehicles, that Class Vehicles do not have the expected durability over other diesel vehicles or of their namesake predecessor engines, that failure

of the Bosch CP4 Pumps will cause damage to Class Vehicle engines and engine systems, and that Plaintiff and putative Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiff and putative Class members, Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiff and putative Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. Defendants represented to Plaintiff and putative Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

186. Each Defendant's conduct proximately caused injuries to Plaintiff and putative members.

187. Plaintiff and putative Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendants' conduct, Plaintiff and putative Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendants' misrepresentations and omissions.

188. The CP4 fuel pump defect involves a safety defect which presents an actual and/or imminent risk to vehicle occupant safety; specifically, the risk of a moving stall, which is a known consequence of the CP4 fuel pump defect, presents a risk to occupant safety which Defendant Cummins has admittedly recognized through the November 12, 2021 Part 573 Safety Recall Report of other Cummins-engine diesel vehicles equipped with the defective CP4 fuel pump.

Nissan has implicitly recognized the CP4 fuel pump problems in the Class Vehicles by issuing internal TSBs directing Nissan dealer service technicians in how to avoid covering CP4 fuel pump repairs by blaming the consumer for "contaminated fuel," and by discontinuing the use of the CP4 altogether after the 2019 model year. Defendants' violations present a continuing risk to Plaintiff as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

189.    Under Cal. Civ. Code § 1780(a), Plaintiff and putative Class members seek monetary relief against Defendants for the harm caused by Defendants' violations of the CLRA as alleged herein.

190.    Under Cal. Civ. Code § 1780(b), Plaintiff and putative Class members seek an additional award against Nissan of up to $5,000 for each Plaintiff who qualifies as a "senior citizen" or "disabled person" under the CLRA. Defendants knew or should have known that their conduct was directed to one or more Plaintiffs or putative Class members who are senior citizens or disabled persons. Defendants' conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person. Putative Class members who are senior citizens or disabled persons are substantially more vulnerable to Defendants' conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from each Defendant's conduct.

191.    Plaintiff and putative Class members also seek punitive damages against Defendants because their unlawful conduct constitutes malice, oppression, and fraud under Cal. Civ. Code § 3294.

192. Plaintiff and putative Class members seek an order enjoining Defendants' unfair or deceptive acts or practices, restitution, costs of court, and attorneys' fees under Cal. Civ. Code § 1780(e), and any other just and proper relief available under CLRA.

193. On or about February 21, 2023, Plaintiff sent a notice letter to Defendant Nissan complying with Cal. Civ. Code § 1780(b), and on March 16, 2023, Plaintiff sent notice letters to both Defendants in connection with same. Because Defendants have failed to remedy their unlawful conduct within the requisite period, Plaintiff and the putative Class members seek all damages and relief to which Plaintiff and the putative Class members are entitled.

<u>**COUNT IV**</u>

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(CAL. COM. CODE §§ 2314 AND 10212)**

194. Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

195. Plaintiff brings this Count individually and on behalf of the putative Class against each Defendant.

196. As set forth above, Plaintiff and putative Class members have suffered from a defect that existed in the Class Vehicles which began damaging the Class Vehicles and their fuel delivery systems upon the first use of the Class Vehicles. Plaintiff and putative Class members are seeking recovery for this manifested defect and any and all consequential damages stemming therefrom.

197. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which the vehicles are used is implied by law pursuant to Cal. Com. Code §§ 2314 and 10212. "The core test of merchantability is fitness for the ordinary purpose for which such goods are used. Such fitness is shown if the product is in safe condition and substantially free from defects." *Isip v. Mercedes-Benz, USA, LLC*, 155 Cal. App. 4th 19, 26 (2007); *see also Mexia*

*v. Rinker Coat Co., Inc.*, 174 Cal. App. 4th 1291 (2009). Thus, "where a car can provide safe, reliable transportation, it is generally considered merchantable." *Am. Suzuki Motor Corp. v. Superior Court*, 37 Cal. App. 4th 1291 (1995). As demonstrated herein, the Class Vehicles are not substantially free from defects; the Class Vehicles contain an existing, manifested defect which can destroy the engines and other fuel system components and which renders the Class Vehicles unreliable.

198.    Each Defendant is and was at all times a "merchant" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under § 2103(1)(d).

199.    With respect to leases, each Defendant is and was at all relevant times a "lessor" of motor vehicles under Cal. Com. Code § 10103(a)(16).

200.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

201.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which the vehicles are used is implied by law pursuant to Cal. Com. Code §§ 2314 and 10212.

202.    The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are particularly incompatible with the use of American diesel fuel (the fuel Defendants intended and expected Plaintiff and putative Class members to use) in that use of American diesel fuel (the only fuel reasonably available to Plaintiff and putative Class members) causes a breakdown of the CP4 fuel pump (a condition that Defendants knew would occur prior to their design and sale of the Class Vehicles), resulting in fuel contamination of the

fuel delivery system, failure of components in the Class Vehicle, and, often, catastrophic failure of the Bosch CP4 Pump.

203.    It was reasonable to expect that Plaintiff and putative Class members may use, consume, or be affected by the defective vehicles, regardless of contractual privity with Defendants.

204.    The Class Vehicles contained an inherent defect that was substantially certain to result in malfunction during the useful life of the product.

205.    Plaintiff and putative Class members were and are third-party beneficiaries to the Defendant manufacturer's contracts with Nissan-certified/authorized retailers who sold the Class Vehicles to Plaintiffs.[74]

206.    In addition, or in the alternative, Plaintiff and putative Class members directly relied upon Defendants' advertising, as alleged above.[75]

207.    Defendants were provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Class Vehicles, by letters from Plaintiff's counsel, on behalf of Plaintiff, to Defendants, complaints by Plaintiff or Class

---

[74] *See In re Nexus 6P Prod. Liab. Litig.*, 293 F. Supp. 3d 888, 922 (N.D. Cal. 2018) ("[California law] allow[s] plaintiffs to bring implied warranty claims in the absence of privity if the plaintiff shows that he was a beneficiary to a contract between the defendant and a third party."); *id.* ("Because third party beneficiary status is a matter of contract interpretation, a person seeking to enforce a contract as a third party beneficiary must plead a contract which was made expressly for his [or her] benefit and one in which it clearly appears that he [or she] was a beneficiary." (citations omitted)); *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 983 (N.D. Cal. 2014) ("[T]here is an exception to the privity requirement that applies when a plaintiff is the intended beneficiary of implied warranties in agreements linking a retailer and a manufacturer." (citations omitted)).

[75] *See Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir. 2008) (holding that, for purposes of a breach of implied warranty claim, a Plaintiff need not stand in vertical contractual privity with the defendant when the plaintiff relies on written labels or advertisements of a manufacturer).

members to Defendants either orally or in writing, complaints to Nissan dealerships, intermediate sellers, or repair facilities either orally or in writing, presentation of the vehicles for repair to dealerships or to intermediate sellers or repair facilities, countless consumer complaints regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint.

208.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and putative Class members have been damaged in an amount to be proven at trial.

## COUNT V

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (CAL. CIV. CODE § 1791, *ET SEQ.*)

209.     Plaintiff incorporates by reference the paragraphs above as if fully set forth herein, and brings this Count on behalf of himself and the putative Class against all Defendants.

210.     The Class Vehicles are "consumer goods" and Plaintiff and putative Class members are "buyers" within the meaning of Cal. Civ. Code § 1791. Each Defendant is also a "manufacturer," "distributor," or "retail seller" under Cal. Civ. Code § 1791.

211.     The implied warranty of merchantability included with the sale of each Class Vehicle means that Defendants warranted that each Class Vehicle (a) would pass without objection in trade under the contract description; (b) was fit for the ordinary purposes for which the Class Vehicle would be used; and (c) conformed to the promises or affirmations of fact made on the container or label.

212.     The Class Vehicles would not pass without objection in the automotive trade because of the defect affecting the Bosch CP4 fuel pump, which also makes them unfit for the ordinary purpose for which a Class Vehicle would be used.

213. The Class Vehicles are not adequately labeled because their labeling fails to disclose the defect and risk of stalling and does not advise the members of the proposed Class of the existence of the issue prior to experiencing failure firsthand.

214. Defendants' actions have deprived Plaintiff and the members of the putative Class of the benefit of their bargains and have caused Class Vehicles to be worth less than what Plaintiff and other members of the putative Class paid.

215. As a direct and proximate result of Defendants' breach of implied warranty, Plaintiff and putative Class members received goods whose condition substantially impairs their value. Plaintiff and putative Class members have been damaged by the diminished value of their Class Vehicles.

216. Under Cal. Civ. Code §§ 1791.1(d) and 1794, Plaintiff and putative Class members are entitled to damages and other legal and equitable relief, including, at their election, the right to revoke acceptance of Class Vehicles or the overpayment or diminution in value of their Class Vehicles. They are also entitled to all incidental and consequential damages resulting from Defendants' breach, as well as reasonable attorneys' fees and costs.

217. On February 21, 2023, and on March 16, 2023, Plaintiff provided notice to Defendant Nissan in accordance with Cal. Civ. Code §§ 1790 *et seq*. Plaintiff provided notice of same to Defendant Cummins on March 16, 2023. As of the time of this filing, Defendants have failed to rectify the qualms detailed in the aforementioned letters, which are the subject of this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of members of the putative Class, respectfully requests that the Court enter judgment in their favor and against Nissan and Cummins as follows:

A.     Certification of the proposed Class, including appointment of Plaintiff's counsel as Class Counsel;

B.     An order temporarily and permanently enjoining Nissan and Cummins from continuing unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.     Injunctive relief in the form of an adequate recall, free replacement, or vehicle buy-back program;

D.     An order establishing Nissan and Cummins as a constructive trustee over profits wrongfully obtained, plus interest;

E.     Costs, restitution, damages, including punitive damages, exemplary damages and treble damages, and disgorgement in an amount to be determined at trial;

F.     An order requiring Nissan and Cummins to pay both pre- and post-judgment interest on any amounts awarded;

G.     An award of costs and attorney's fees; and

H.     Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all claims so triable.

DATED: March 23, 2023   STRANCH, JENNINGS & GARVEY, PLLC

/s/ J. Gerard Stranch, IV
J. Gerard Stranch, IV (BPR #023045)
James G. Stranch, III (BPR #002542)
Michael G. Stewart (BPR #016920)
223 Rosa L. Parks Avenue, #200
Nashville, TN 37203
Telephone: (615) 254-8801
Facsimile: (615) 255-5419
gstranch@stranchlaw.com
jstranch@stranchlaw.com
mstewart@stranchlaw.com

Steve W. Berman*
Jerrod C. Patterson*
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
jerrodp@hbsslaw.com

Robert C. Hilliard*
Lauren Akers*
Bonnie J. Rickert*
HILLIARD MARTINEZ GONZALES LLP
719 S. Shoreline Blvd.
Corpus Christi, TX 78401
Telephone: (361) 882-1612
Facsimile: (361) 882-3015
bobh@hmglawfirm.com
lakers@hmglawfirm.com
brickert@hmglawfirm.com

*Attorneys for Plaintiffs and the Proposed Class*

* to seek admission *pro hac vice*