# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| NATHAN STANLEY et al., | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Case No. 3:23-cv-00261** |
| | ) | **Judge Aleta A. Trauger** |
| NISSAN NORTH AMERICA, INC. and | ) | |
| CUMMINS, INC., | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Before the court are two separate Motions to Dismiss the plaintiff's First Amended Complaint ("FAC") (Doc. No. 23), filed respectively by defendant Nissan North America, Inc. ("Nissan") (Doc. No. 30) and Cummins Inc. ("Cummins") (Doc. No. 32). For the reasons set forth herein, both motions will be granted in part and denied in part.

## I.    FACTS AND PROCEDURAL HISTORY

Plaintiff Nathan Stanley, on behalf of himself and others similarly situated, filed his original Class Action Complaint initiating this action in March 2023, asserting claims against Nissan and Cummins arising from Nissan's use in certain vehicles of an engine manufactured by Cummins that contained an allegedly defective fuel injection pump—the Bosch CP4 high-pressure fuel injection pump ("CP4" or "CP4 fuel pump"). (Doc. No. 1.) Stanley was the only named plaintiff in the original Complaint, and he asserted claims under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, and California state law, including claims for violations of California's Unfair Competition Law and Consumer Legal Remedies Act, as well as statutory claims for breach of the implied warranty of merchantability.

The First Amended Class Action Complaint ("FAC") ("Doc. No. 32) was filed in June 2023. In addition to Stanley, it asserts claims on behalf of six other representative plaintiffs (Claude Harris, Joshua West, Billy Perry, David Fishman, Kevin Conlin, and Richard Werts), individually and on behalf of several putative "classes" and "subclasses." Like those in the original Complaint, the claims in the FAC against both Nissan and Cummins arise from Nissan's sale (and each plaintiff's purchase) of certain vehicles—specifically Nissan Titan XD pick-up trucks manufactured from 2016 through 2019 (the "Trucks" or "Class Vehicles")—that each contain a 5.0L Cummins diesel engine that itself incorporates the allegedly defective CP4 fuel pump.

Following the filing of the FAC, the defendants filed Motions to Compel Arbitration and stay litigation of the claims of Nathan Stanley, a California resident, and Joshua West, a Texas resident, on the basis that these two plaintiffs had signed Retail Installment Sales Contracts containing arbitration agreements when they purchased their Nissan Trucks and that, as a result, they were obligated to arbitrate their claims. (*See* Doc. Nos. 28, 34.) In response to these motions, the plaintiffs voluntarily dismissed Stanley and West as plaintiffs.[1]

Collectively, the five remaining representative plaintiffs ("named plaintiffs") seek to bring claims on behalf of a nationwide "fraud by omission" class; a Colorado class comprised of individuals "or entities" that purchased or leased one or more Class Vehicles in Colorado; a Florida class comprised of individuals "or entities" that purchased or leased one or more Class Vehicles in Florida; a Maryland class comprised of individuals "or entities" that purchased or leased one or more Class Vehicles in Maryland; and a Texas class comprised of individuals "or entities" that

---

[1] As a result of this dismissal, all of the California claims are dismissed, because Stanley was the only named plaintiff alleged to be a California resident. The analysis herein, therefore, does not address any claims under California law. Although Joshua West has been dismissed as a plaintiff, the Texas-based claims are not dismissed in their entirety, because named plaintiff Claude Harris is also a Texas resident.

purchased or leased one or more Class Vehicles in Texas. (*Id.* ¶ 152.)[2] Individuals with personal injury claims arising from CP4 fuel pump failure are expressly excluded from any class. (Doc. No. 23 ¶ 153.)

The named plaintiffs assert the following claims on behalf of themselves and these putative classes and subclasses:

**Multi-state Claims:**

(1) common law fraudulent concealment/fraud by omission (on behalf of the "fraud by omission" class, or each state-specific class, against both defendants). (FAC ¶¶ 163–81.)

**Colorado Claims:**

(2) violations of the Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. § 6-1-101 *et seq.* (on behalf of the Colorado class against both defendants) (FAC ¶¶ 245–63);

(3) unjust enrichment (on behalf of the Colorado class against Nissan only) (*id.* ¶¶ 264–73);

(4) breach of the implied warranty of merchantability, as codified in Colo. Rev. Stat. § 4-2-314 (on behalf of the Colorado class against both defendants) (FAC ¶¶ 274–81).

**Florida Claims:**

(5) violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. Ann. § 501.201 *et seq.* (on behalf of the Florida class against both defendants) (FAC ¶¶ 282–95);

(6) unjust enrichment (on behalf of the Florida class against Nissan only) (*id.* ¶¶ 296–305);

(7) breach of the implied warranty of merchantability, as codified in Fla. Stat. Ann. §§ 672.314 and 680.212 (on behalf of the Florida class against both defendants) (FAC ¶¶ 306–15).

---

[2] No representative plaintiff is an "entity," and the plaintiffs do not define the term "entity" for purposes of their claims.

**Maryland Claims:**

(8) violations of the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann. § 13-101 *et seq.* (on behalf of the Maryland class against both defendants) (FAC ¶¶ 316–23);

(9) breach of the implied warranty of merchantability, as codified in Md. Code Com. Law § 2-314 (on behalf of the Maryland class against both defendants) (FAC ¶¶ 324–31);

(10) unjust enrichment (on behalf of the Maryland class against Nissan only) (*id.* ¶¶ 332–41).

**Texas Claims:**

(11) violations of the Texas Deceptive Trade Practices Consumer Protection Act ("TDTPA"), Tex. Bus. & Com. Code § 17.41 *et seq.* (on behalf of the Texas class against both defendants) (FAC ¶¶ 342–55);

(12) breach of the implied warranty of merchantability, as codified in Tex. Bus. & Com. Code §§ 2.314 and 2A212 (on behalf of the Texas class against both defendants) (FAC ¶¶ 356–65).

The representative plaintiffs, their state of residence, where they purchased their Trucks, the model year of each vehicle, and year of purchase are summarized in the chart below:

| Representative Plaintiff | Purchase Date | Model Year | State (of residence and purchase) |
|---|---|---|---|
| Richard Werts | September 2016 (new) | 2016 | Florida |
| Billy Perry | January 2018 (new) | 2017 | Colorado |
| Claude Harris | March 2018 (pre-owned) | 2017 | Texas |
| David Fishman | January 2019 (pre-owned) | 2017 | Colorado |
| Kevin Conlin | July 2020 (new) | 2019 | Maryland |

(*See* FAC ¶¶ 9, 13, 22, 24, 26, 28.)

Plaintiff Richard Werts, a Florida resident, purchased a new 2016 Truck from an authorized Nissan dealership in Lakeland, Florida in September 2016. As of May 2023, the Truck had

approximately 67,000 miles on the odometer. (*Id.* ¶ 28.) In May 2020, when the vehicle had around 33,000 miles on the odometer, the CP4 fuel pump failed catastrophically when Werts was driving on the interstate near Baton Rouge, Louisiana. He narrowly avoided an accident when the vehicle "just shut off while traversing this well-known, high-traffic area." (*Id.* ¶ 29.) He had to pay to have the vehicle towed to a local Nissan dealership and to stay in a hotel for the three days it took to repair the vehicle. He was unaware of the defect prior to this incident and seeks all damages for his losses, including the "full purchase price of the truck" and "out-of-pocket losses" incurred from overpaying for the vehicle when he purchased it, though he does not actually allege that he had to pay for the repair.[3] He brings suit on his own behalf and on behalf of all others who purchased or leased a Vehicle in the state of Florida.

Plaintiff Claude Harris, a Texas resident, purchased a "certified pre-owned 2017" Truck in March 2018 from an authorized Nissan dealership in Boerne, Texas for approximately $46,000. The Truck had approximately 13,000 miles on it at the time of purchase. In May 2023, with over 100,000 miles on the odometer, Harris was driving the Truck on a highway when the engine suddenly sputtered. The vehicle died by the time he reached the shoulder and would not restart. Harris paid $100 to have the Truck towed to the Nissan dealership in Boerne, where he was informed that the CP4 pump had failed. Nissan told him the damage was no longer under warranty and that the repair would cost $22,000. Harris's insurance company refused to cover the damage, because it was due to a mechanical defect. He brings claims on behalf of himself and others who purchased or leased a Class Vehicle in the state of Texas. (FAC ¶¶ 13–18.)

---

[3] The repair would apparently have been covered under the five-year/100,000-mile warranty, discussed below.

Plaintiff Billy Perry, a Colorado resident, purchased a new 2017 Truck from an authorized Nissan dealership in Colorado Springs, Colorado in January 2018. As of May 2023, the Truck had approximately 70,000 miles on the odometer. (*Id.* ¶ 22.) Plaintiff David Fishman, also a Colorado resident, purchased a certified pre-owned 2017 Truck in January 2019 for approximately $52,000 from an authorized Nissan dealership in Fort Collins, Colorado. At the time of purchase, the vehicle had 51,000 miles on the odometer. As of the date of the FAC, it had over 100,000 miles on the odometer. (*Id.* ¶ 24.) Neither Perry nor Fishman alleges that the fuel pump in his particular Truck has actually failed or that he was required to replace it. However, they allege that neither Nissan nor Cummins disclosed the defective CP4 fuel pump and that they would not have purchased the vehicle—or would have paid substantially less for it—if they had known about the defect. They allege losses in the form of overpayment for vehicles at the time of purchase and diminished value of the vehicles, "benefit of the bargain damages," and damages incurred from decreased performance and fuel economy. They bring claims on behalf of themselves and all others who purchased a Class Vehicle in the state of Colorado. (*Id.* ¶¶ 23, 25.)

Plaintiff Kevin Conlin, a Maryland resident, purchased a new 2019 Truck from an authorized Nissan dealership in Hurlock, Maryland in July 2020. As of the filing of the FAC, the Truck had approximately 90,000 miles on the odometer. (*Id.* ¶ 26.) Conlin also alleges that he was not aware of the defect at the time of purchase, did not receive the benefit of the bargain, and was harmed at the point of sale. He seeks related damages and brings claims on his own behalf and on behalf of a class defined as all others who purchased or leased a Class Vehicle in the state of Maryland. (*Id.* ¶ 27.)

Although only some of the plaintiffs have experienced catastrophic failure of the CP4 fuel pump in their vehicle, they all allege injury at the point of sale, because they allegedly paid a

premium to purchase the Trucks, since the Trucks run on diesel fuel and are advertised to have a longer life, greater fuel efficiency, and better reliability and durability than comparable non-diesel vehicles. (*See, e.g.*, *id.* ¶¶ 12, 18, 23, 122 & n.64.) Most of the plaintiffs claim that they relied to their detriment on such representations in advertisements and marketing materials about the Trucks; that they were unaware of the defective CP4 fuel pump; that they would not have purchased the vehicle or would have paid less for it absent these representations, and that, if Nissan or Cummins had disclosed the defective fuel pump, they either would not have purchased the Class Vehicle or would have paid substantially less for it (by at least as much as the cost of repair), and that the market value of the Class Vehicles is substantially less than their value as promised, such that the plaintiffs did not receive the benefit of the bargain when they purchased their vehicle.

Regarding the CP4 fuel pump itself, while the FAC goes into some detail as to the design and functioning of the fuel pump, it suffices here to say that, as alleged by the plaintiffs, design flaws in the CP4 fuel pump cause rubbing and friction between metal interior parts of the pump when it runs. The rubbing creates minute metal shavings that are released into the fuel system and begin to accumulate from the first time the engine is started. Contamination from the metal debris damages the entire fuel system and can ultimately lead to catastrophic engine failure. (*Id.* ¶¶ 1–4, 55–73.)

The potential for malfunction inherent in the pump is exacerbated by a factor unique to the United States: that American diesel fuel is "drier," or less lubricious, than the diesel fuel available in Europe, due to differing regulatory standards. More specifically, in order to comply with environmental regulations, diesel fuel in the U.S. is refined through a process that removes sulfur along with a variety of other compounds that are important to making diesel fuel lubricious. It has long been known that this characteristic of American diesel fuel has the potential to be problematic.

When Ultra Low Sulfur Diesel ("ULSD") was introduced into the American market in the 1990s, it immediately caused a marked increase in the failure of fuel injection pumps. As a result, the plaintiffs assert that the "critical importance of lubricity for diesel injection pumps" was well known in the industry long before Class Vehicles were designed or sold in the United States. (*Id.* ¶ 80.)

Moreover, because the CP4 pump itself uses the diesel fuel for lubrication, "the lubricity of U.S. diesel is crucial to the pump's durability and longevity. And since the lubricity of the diesel fuel is a critical factor in the durability of the pump, careful attention should have been paid to the difference in U.S. and European fuels" before introducing the CP4 into the American market. (*Id.* ¶ 82.) The CP4 was introduced in Europe in 2007, and its "fragile design and sensitivity to fuel quality" immediately garnered criticism, including in "numerous scholarly and analytical industry articles" describing its perceived "defective design" and "fundamental flaws." (*Id.* ¶¶ 74–77.) Because of the CP4's allegedly poor design that inherently makes it require even more lubrication than other fuel pumps, the plaintiffs allege that the use of the CP4 pump is incompatible with American diesel fuel. (*Id.* ¶¶ 2, 92, 98.)

In other words, it is the combination of the allegedly defective pump design and the less lubricating American diesel fuel that leads to metal-on-metal wear inside the fuel pump and the release of the small metal shavings that can build up within the pump or within the engine block and fuel system generally. Too much buildup of metal in the fuel injectors can lead to "catastrophic failure," meaning that the engine stalls and the Truck comes to a halt. Once this happens, the engine cannot be restarted. The vehicle must then be towed, and extensive repairs are required to render it operable again, including, not just replacement of the pump itself, but also replacement of the "entire high-pressure sub-system," comprised of "fuel lines, fuel rails, sensors, and injectors." (*Id.*

¶ 72.) In addition, "the fuel tank must be drained and thoroughly cleaned, the fuel lines must be flushed, and both fuel filters replaced." (*Id.*)

Even before catastrophic failure of the CP4 fuel pump, however, the migration of worn parts can cause damage throughout the engine and fuel system. That is, "small, micron-sized metal filings from the wearing process may enter into the high-pressure system, leading to fuel injector damage, which impacts the calibrated flow of fuel and can lead to a number of other problems. (*Id.* ¶ 73.) The plaintiffs assert that the CP4 fuel pump is *per se* defective from the first time the engine is started and poses a serious risk to vehicle occupant safety, given the inherent risk of engine stall while the vehicle is in motion. (*Id.* ¶¶ 196, 215.)

The plaintiffs allege that, even before its use in the Class Vehicles manufactured by Nissan beginning in 2016, Nissan and Cummins were on notice that the CP4 fuel pump was defective and incompatible with U.S. diesel fuel. The plaintiffs allege that complaints and investigations into problems with the CP4, in a variety of different makes and models of vehicles, date from as early as 2009. (*Id.* ¶¶ 99–109.) In addition, the CP4 fuel pump has been the subject of "numerous safety recalls, pointing to large recalls of vehicles manufactured by other companies but incorporating the CP4 fuel pump, in November 2021, June 2022, and October 2022. (FAC ¶¶ 41–43 & nn. 11–14.)

The plaintiffs also allege that, in 2011, the National Highway Traffic Safety Administration ("NHTSA") Office of Defects Investigation ("ODI") opened a safety investigation based on 160 complaints of engine stall or power loss related to the CP4 fuel pump in certain 2009 and 2010 Volkswagen and Audi vehicles with diesel engines. (*Id.* ¶ 99.) In the course of its investigation, the ODI requested documents from other automobile manufacturers then using the CP4 fuel pump, including Ford, General Motions ("GM"), and Fiat Chrysler Automobiles ("FCA"). The

documents produced in the investigation were subsequently published on NHTSA's website. According to the plaintiffs, the documents demonstrate "widespread—and early—knowledge" of the CP4's defect and its potentially catastrophic effects. (*Id.* ¶ 100.) As a result of the broad investigation and the published documents, claim the plaintiffs, "it was well known" by the end of 2011 that CP4 fuel pump failures in U.S. Audi and Volkswagen vehicles "were widespread and catastrophic." (*Id.* ¶ 101.)

The plaintiffs acknowledge that the defendants were not involved, or implicated, in the 2011 investigation. Still, the plaintiffs allege that Nissan (and Cummins) would have known about it, because vehicle and component manufacturers, including Nissan and Cummins, "have significant and dedicated departments [that] continuously monitor regulatory compliance with safety . . . laws." (*Id.* ¶ 102.) Such manufacturers purportedly also "monitor their competitors and public domain information to track emerging trends [that] may impact their business, such as . . . problems with commonly used components on other manufacturer[s'] products" and "maintain extensive databases" organizing such information. (*Id.*) The plaintiffs also allege that automakers and auto part manufacturers maintain specific departments devoted to monitoring public and subscription sites

> to ensure compliance with all standards, regulations and awareness of changing regulations, recalls, and safety-related issues, among others. They will also subscribe or fund firms to do this analysis and information gathering for them. They also employ lobbyists in government agencies to keep abreast of new situations. These firms are all well informed about market conditions and product liability potential issues.

(*Id.* ¶ 103.) For these and other reasons alleged in the FAC, the plaintiffs assert that NHTSA recalls and investigations would "certainly" have been communicated to Nissan and Cummins, and "information about the CP4 pump's problems would have been widely known throughout the industry, and certainly known to Nissan and Cummins." (*Id.* ¶¶ 108, 109.)

Finally, the plaintiffs allege that, given their "commercial interests and their duty to monitor safety-related complaints or concerns," Nissan and Cummins would have "assuredly" seen "scores of consumer complaints regarding the now-notorious CP4 pump failures," beginning shortly after Nissan began manufacturing the Class Vehicles. (*Id.* ¶ 112.) The plaintiffs provide only a handful of examples of such complaints, one from 2016 that does not pertain specifically to the fuel pump and others dating from 2019, 2020, and 2022, *after* most of the named plaintiffs had purchased their Class Vehicles. (*Id.* ¶¶ 112–16.) The plaintiffs assert, however, that these are just a "sample of the myriad complaints lodged over the years" by owners of Class Vehicles. (*Id.* ¶ 118.)

Without making much effort to distinguish between the two defendants, the plaintiffs allege that the defendants, collectively, "extensively advertised the performance benefits of the Cummins 5.0L diesel engine located within all of the subject . . . 2016–2019 Nissan Titan XD vehicles," beginning in 2015, without disclosing the known defects inherent in the CP4 fuel pump. (FAC ¶ 119.) The defendants allegedly intentionally concealed or omitted the CP4 fuel pump defect and failed to inform buyers or lessees of the Class Vehicles that the CP4 fuel pump was incompatible with the ordinary use of American diesel fuel or that the defective pump starts damaging a vehicle's fuel injection system from its first use. To the contrary, say the plaintiffs, the defendants' advertisements represent that Class Vehicles are "fit for driving on *American roadways*," thus falsely implying compatibility with American diesel fuel. (*Id.*) The defendants purportedly advertised the Class Vehicles as "dependable, long-lasting, and of the highest quality," leading consumers, including the plaintiffs and putative class members, to believe that the Class Vehicles would be free from defects resulting in fuel injection system failure and engine shut down. (*Id.*; *see also id.* ¶¶ 120–28.)

Nissan has an express five-year/100,000-mile written warranty on Class Vehicles that covers the fuel pump and fuel injectors. (*Id.* ¶ 129.) Cummins likewise has an engine warranty that comes with Class Vehicles and covers the "fuel injection pump & injectors." (*Id.* ¶ 130.) However, according to the plaintiffs, the defendants have frequently failed to honor their warranties, disingenuously claiming that the fuel pump problems are not their fault and are instead caused by contaminated fuel—despite knowing that ordinary American diesel fuel is not compatible with the CP4 fuel pump and despite the fact that the "contamination" in the fuel is often caused by the metal shavings that result when the fuel pump "self-destructs." (*Id.* ¶¶ 131–32.)[4]

Based on the allegedly defective fuel pump and the defendants' failure to disclose its defects, the plaintiffs bring their fraud and warranty-based claims against both Nissan and Cummins. In response to the FAC, Nissan filed its Motion to Dismiss and supporting Memorandum (Doc. No. 31), seeking dismissal of all claims asserted against it under Rules 12(b)(6) and 9 of the Federal Rules of Civil Procedure. Cummins likewise seeks dismissal, asserting in its Memorandum (Doc. No. 33) that dismissal is warranted under Rule 12(b)(2), because the court lacks personal jurisdiction over Cummins. Alternatively, it too seeks dismissal of all claims under Rule 12(b)(6), for failure to state a claim for which relief may be granted, and dismissal of the fraud-based claims under Rule 9. It further asserts that the named plaintiffs lack standing to bring claims on behalf of a nationwide class. The plaintiffs filed a consolidated Memorandum in Opposition ("Response") to both motions (Doc. No. 46), and the defendants each filed a Reply in further support of their respective motions (Doc. Nos. 49, 50).

---

[4] The named plaintiffs do not allege that they were denied warranty coverage for fuel pump malfunctions that occurred during the warranty period.

## II.     NISSAN'S MOTION

### A.     Standards of review

#### 1.     Rule 12(b)(6)

In ruling on a motion to dismiss under Rule 12(b)(6), the court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016). Federal Rule of Civil Procedure 8(a)(2) requires only that a complaint contain "a short and plain statement of the claim." Fed. R. Civ. P. 8(a)(2). However, "[t]he factual allegations in the complaint need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, *i.e.*, more than merely possible." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). A plaintiff must plead more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (alteration in original) (quoting *Twombly*, 550 U.S. at 555, 557). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

When presented with a Rule 12(b)(6) motion, the court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)).

Consideration of extrinsic materials need not convert a motion to dismiss into a motion for summary judgment, "so long as [the materials] are referred to in the complaint and are central to the claims contained therein." *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 681 (6th Cir. 2011) (quoting *Bassett*, 528 F.3d at 430).

### 2. Rule 9(b)

Fraud-based claims—irrespective of how they are characterized—must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b). Two kinds of fraud claims are potentially implicated here—claims based on affirmative misrepresentations and claims based on omissions—and the requirements differ somewhat for each. Under Sixth Circuit precedent, to properly state a claim for affirmative misrepresentations, the pleading must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) (citation omitted). "Inherently subjective" statements, sometimes called mere "puffery," cannot form the basis of a fraud action. *See, e.g.*, *Raymo v. FCA US LLC*, 475 F. Supp. 3d 680, 705–06 (E.D. Mich. 2020) (citations omitted).

For claims involving fraudulent omissions, Rule 9(b) requires a plaintiff to plead "the who, what, when, where, and how" of the alleged omission. *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 256 (6th Cir. 2012). Specifically, a plaintiff must allege "(1) precisely what was omitted; (2) who should have made the representation; (3) the content of the alleged omission and the manner in which the omission was misleading; and (4) what [the defendant] obtained as a consequence of the alleged fraud." *Id.*

### B. Fraud Claims Against Nissan

Nissan's motion asserts that the plaintiffs' common-law fraud and statutory consumer protection claims that are based on fraud fail because: (1) the plaintiffs do not allege actionable

affirmative misrepresentations, aside from advertising puffery, with the particularity required by Rule 9; (2) Nissan can only be liable for fraudulent omission if it concealed facts of which it actually had knowledge, and the plaintiffs have not adequately alleged facts showing that Nissan had knowledge of the purportedly defective CP4 fuel pump at or before the time the named plaintiffs bought their Trucks; (3) the economic loss doctrine, as espoused by Florida, Maryland, and Texas, bars the claims of plaintiffs Werts, Conlin, and Harris; and (4) Werts' claim under the FDUTPA is time-barred.

### 1. Fraudulent Misrepresentations

Nissan acknowledges that the FAC focuses on allegedly fraudulent omissions, but it points out that the pleading also contains some allegations of affirmative misrepresentations, insofar as the plaintiffs allege that they relied to their detriment on various advertisements and marketing materials "wherein Defendants claimed the Class Vehicles and Class Vehicle engines had greater fuel economy, superior horsepower, and enhanced durability compared to other comparable vehicles on the American market." (FAC ¶ 12; *see also id.* ¶¶ 18, 21, 23, 119–22, 124–26, 140.) Nissan argues that, "[t]o the extent Plaintiffs are attempting to premise their claims on misrepresentations, they fail because they are not pleaded with particularity under Rule 9(b) and the challenged statements are not actionable." (Doc. No. 31, at 26.) In response, the plaintiffs confirm that their claims "are based on omissions rather than affirmative misrepresentations." (Doc. No. 46, at 17.)

Because the FAC clearly states claims based on fraudulent omissions rather than fraudulent misrepresentation based on affirmative statements, the court does not construe the FAC as stating or intending to state separate, actionable claims based on affirmative misrepresentations. Because the FAC does not state any such claims, the court has no need to consider whether such claims

should be dismissed. Nissan's motion will be denied as moot, insofar as it seeks the dismissal of claims that do not appear in the FAC.

### 2. *Nissan's Pre-Sale Knowledge of Alleged Defects*

Nissan argues that it can only be liable for fraudulently omitting material facts of which it had knowledge at the time the named plaintiffs purchased their Trucks. It asserts that the allegations in the FAC fail to establish that it had knowledge of the allegedly defective CP4 fuel pump *prior* to the plaintiffs' purchases of their respective Trucks.

Nissan states in a footnote that it accepts, for purposes of its Motion to Dismiss, the plaintiffs' assumption that "their individual claims are governed by the law of the states where they each live and bought their vehicles." (Doc. No. 31, at 6 n.3.) It also asserts, in the same footnote, that the substantive laws of the relevant states (Colorado, Texas, Maryland, Florida) "all . . . require that defendants have prior knowledge of an allegedly concealed defect," both for purposes of the plaintiffs' common-law fraudulent omission claims and their statutory consumer protection act claims. (*Id.*) For their part, the plaintiffs make no effort to distinguish among the laws of the various states in response to this argument. Rather, they expressly concede that, to satisfy Rule 9(b)'s pleading requirement for any fraud-based claims, whether under common law or statute, pertaining to the sale of an allegedly defective product, the plaintiffs must adequately allege that the manufacturer "knew of a defect before the sale." (Doc. No. 46, at 17.)

Because the parties agree that this is a required element and discuss the pre-sale knowledge without reference to any particular state's law, the court also accepts for purposes of Nissan's motion that the plaintiffs must adequately allege that Nissan had pre-sale knowledge of the alleged defect in order for any of the fraud-based claims to proceed.

In the FAC, the plaintiffs allege that the defendants had notice of the alleged defect from several sources that collectively establish the defendants' knowledge of the problems inherent in

the CP4 before it began selling the Class Vehicles, including: (1) "automotive-industry-wide knowledge of the need to manufacture vehicles with equipment capable of handling the U.S.'s low-lubricity diesel fuel" (FAC ¶ 84 n.27), dating from the 1990s, when an "estimated 65 million fuel injection pumps" failed as a result of the introduction of low-sulfur diesel fuel into the U.S. market (*id.* ¶ 80); (2) criticism of the CP4 fuel pump specifically, beginning shortly after it was introduced in Europe in 2007, in scholarly and industry articles (*id.* ¶ 74); (3) the 2011 NHTSA investigation of complaints about the CP4 fuel pump in Audi and Volkswagen 2010 and 2011 diesel vehicles; (4) numerous NHTSA recalls of vehicles using CP4 fuel pumps, based on fuel pump failure, in 2021 and 2022; and (4) consumer complaints about the CP4 fuel pump in the Class Vehicles specifically. The defendants argue that the allegations in the FAC fail to show that any of these sources, individually or collectively, would have been sufficient to put Nissan on notice of problems with the Class Vehicles before the named plaintiffs purchased their vehicles.

There have been numerous class action lawsuits filed in the last several years asserting claims virtually identical to those here against different automobile manufacturers that sold vehicles with engines incorporating the CP4 fuel pump, in which the defendants have filed motions to dismiss raising virtually identical defenses to those at issue here. *See, e.g.*, *Droesser v. Ford Motor Co.*, No. 19-cv-12365, 2023 WL 2746792 (E.D. Mich. Mar. 31, 2023) (granting in part motion to dismiss); *Berry v. FCA US, LLC*, No. 2:19-CV-00023, 2022 WL 18671067 (S.D. Tex. Mar. 25, 2022) (same); *Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d 1257 (E.D. Mich. 2021) (same); *Withrow v. FCA US LLC*, No. 19-13214, 2021 WL 2529847 (E.D. Mich. June 21, 2021), *amended*, 2021 WL 9629458 (E.D. Mich. July 21, 2021) (same); *Click v. Gen. Motors LLC*, No. 2:18-CV-455, 2020 WL 3118577 (S.D. Tex. Mar. 27, 2020) (same); *In re Gen. Motors LLC CP4 Fuel Pump Litig.*, 393 F. Supp. 3d 871 (N.D. Cal. 2019) (same). In basically all of these, the courts

found that the plaintiffs adequately alleged the various automobile manufacturers' pre-sale knowledge of the purported defect based on very similar allegations to those made here.

Although the facts of the case before this court vary slightly, and this court is not bound by the decisions in the cited cases, the court is nonetheless persuaded, like those courts, that the plaintiffs have adequately alleged Nissan's pre-sale notice of the alleged defect, at least for purposes of Nissan's Motion to Dismiss. As the district court noted in *Chapman*, although there is no "smoking gun," and none of the sources of knowledge standing alone would have been sufficient, the plaintiffs' allegations collectively are sufficient to at least give rise to an inference that Nissan knew from the time it began manufacturing the Class Vehicles that the CP4 fuel pump was defective and incompatible with American diesel fuel.

First, it is important to note that, while the "circumstances constituting fraud" must be pleaded with some particularity under Rule 9, knowledge "may be alleged generally." Fed. R. Civ. P. 9(b). Thus, the plaintiffs must simply allege sufficient facts to make the knowledge allegation "plausible on its face." *Republic Bank & Tr. Co.*, 683 F.3d at 247 (quoting *Iqbal*, 556 U.S. at 678). In addition, courts have generally recognized that the pleading standard may be relaxed, "where information is only within the opposing party's knowledge." *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 680 (6th Cir. 1988) (citing 5 C. Wright & A. Miller, Federal Practice & Procedure: Civil § 1298, at 416 n.94 (1969)).

Turning to the sources of knowledge alleged in the FAC, the court cannot consider the recalls *per se* as factoring into Nissan's knowledge, because the recalls identified in the pleading were all initiated after each of the named plaintiffs had purchased their vehicles. Similarly, the plaintiffs' allegations of consumer complaints are not particularly persuasive, because the plaintiffs only point to five such complaints, one of which does not directly allege a defective fuel

pump and most of the others of which were posted after most of the named plaintiffs had purchased their vehicles. Notwithstanding this oversight, the plaintiffs also assert that the consumer complaints highlighted in the FAC are just a "sample" of the "myriad" or "scores" of similar consumer complaints of which Nissan would have been aware. And they allege that Nissan would have been monitoring such complaints, due to its "commercial interests" and "duty to monitor safety-related complaints or concerns." (FAC ¶ 112.)

The plaintiffs also allege that Nissan would have been aware of industry publications concerning the problems inherent in the less lubricious low-sulfur American diesel fuel and the problems it began causing with fuel pumps as early as the 1990s and would have known about the criticisms of the CP4 fuel pump arising as soon as it was introduced in Europe, largely for the same reasons. Likewise, according to the plaintiffs, Nissan would have known about the 2011 NHTSA investigation into complaints about the CP4 fuel pump arising from its use in certain Audi and Volkswagen vehicles. Nissan's connection to that investigation is not as direct as that of Ford, GM, and FCA, all of which were asked by the NHTSA to produce documents relating to their use of the CP4. However, the plaintiffs also allege that the documents produced in the course of that investigation were eventually published on the NHTSA's website, that these documents established the existence of clear problems with the CP4 fuel pump and its "potentially catastrophic effects" (*id.* ¶ 100), and that Nissan would have known about the investigation and its findings, because Nissan and other automobile manufacturers have "significant and dedicated departments [that] continuously monitor their competitors and public domain information to track emerging trends [that] may impact their business," including "problems with commonly used components on other manufacturer[s'] products." (*Id.* ¶ 102.)

Considered in their totality and accepted as true for purposes of the defendants' motions, the facts alleged in the FAC plausibly establish that Nissan would have known about the 2011 investigation and knew about the defective CP4 fuel pump before the plaintiffs purchased their vehicles. As the plaintiffs paint the picture, knowledge about problems with the CP4 fuel pump was effectively in the water by the time Nissan began manufacturing the Trucks with Cummins engines that used the CP4 fuel pump. Discovery may ultimately yield facts establishing that Nissan did not have such knowledge, but at this juncture Nissan has not established that it is entitled to dismissal of all of the plaintiffs' fraud-based claims solely on the basis of a lack of pre-sale knowledge of the defect.

### 3. *The Economic Loss Doctrine*

Next, Nissan asserts that the economic loss doctrine, as applied in Florida, Maryland, and Texas, prohibits a plaintiff from maintaining a fraudulent omission tort action against a manufacturer for damage to the product itself or losses that arise from the plaintiff's inability to use the product. (Doc. No. 31, at 29.) The plaintiffs assert that each of these states recognizes exceptions to the doctrine that apply here.

### a) *Florida Law*

The Florida Supreme Court has explained that "the economic loss rule is a judicially created doctrine that sets forth the circumstances under which a tort action is prohibited if the only damages suffered are economic losses." *Tiara Condo. Ass'n v. Marsh & McLennan Cos.*, 110 So. 3d 399, 401 (Fla. 2013). The court defined economic loss as "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profit—without any claim of personal injury or damage to other property." *Id.* (internal quotation marks omitted). Economic loss also extends to "diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold." *Casa Clara*

*Condo. Ass'n, Inc. v. Charley Toppino and Sons, Inc.*, 620 So. 2d 1244, 1246 (Fla. 1993)). "The rule has its roots in the products liability arena, and was primarily intended to limit actions in the products liability context." *Tiara Condo. Ass'n*, 110 So. 3d at 401. The Florida Supreme Court further explained that the economic loss rule is "the fundamental boundary between contract law, which is designed to enforce the expectancy interests of the parties, and tort law, which imposes a duty of reasonable care and thereby encourages citizens to avoid causing physical harm to others." *Id.* (internal quotation marks omitted). In *Tiara*, the court expressly limited the application of the economic loss rule to the products liability context, while noting exceptions, including "fraudulent inducement, and negligent misrepresentation, or free-standing statutory causes of action." *Id.* at 406.

In the face of products liability actions seeking economic losses only, federal district courts have consistently and repeatedly construed the holding in *Tiara* as barring fraudulent concealment/fraudulent omission claims under Florida common law. In *In re Takata Airbag Products Liability Litigation*, for example, the court expressly considered and rejected the plaintiffs' argument that *Tiara* did not bar their claims, finding that the Florida Supreme Court, in referencing fraudulent inducement in dicta, did *not*

> intend[] to abridge the economic loss rule in the products liability setting to allow fraudulent inducement and negligent misrepresentation claims (and by implication fraudulent concealment claims), even where the action for fraud depends upon precisely the same allegations as a warranty claim—*i.e.*, a claim the product failed to work as promised.

*Id.* at 1338–39. The district court agreed with and followed other district court opinions likewise finding that the Florida Supreme Court "did not intend to allow such products liability claims to survive." *Id.* at 1339 (citing *Aprigliano v. Am. Honda Motor Co.*, 979 F. Supp. 2d 1331, 1337–39 (S.D. Fla. 2013); *Burns v. Winnebago Indus., Inc.*, No. 8:13-cv-1427-T-24, 2013 WL 4437246, at *4 (M.D. Fla. Aug. 16, 2013); *In re Atlas Roofing Corp. Chalet Shingle Prods. Liab. Litig.*, No.

1:13-md-2495-TWT, 2015 WL 3796456, at *3 (N.D. Ga. June 18, 2015)). As the court stated in *Burns*,

> [t]o hold otherwise would allow the economic loss rule to be manipulated such that any time a purchaser received a defective product that did not cause any injuries or damage to other property, such a purchaser could assert claims for negligent and fraudulent concealment regarding the defect to avoid the economic loss rule.

*Burns*, 2013 WL 4437246, at *4. More recent cases are uniformly in accord. *See, e.g.*, *In re Subaru Battery Drain Products Liab. Litig.*, 1:20-CV-03095-JHR-JS, 2021 WL 1207791, at *29 (D.N.J. Mar. 31, 2021) (holding that fraudulent concealment claims brought by Florida subclass were barred by the economic loss rule); *Pinon v. Daimler AG*, 1:18-CV-3984-MHC, 2019 WL 11648560, at *15 (N.D. Ga. Nov. 4, 2019) (same).

And the one case to consider the issue directly has concluded that Florida's application of the economic loss rule also bars similar claims under the FDUTPA. *See Karpel v. Knauf Gips KG*, 635 F. Supp. 3d 1336, 1339 (S.D. Fla. 2022) (expressly holding that "*Tiara* also abrogated any exception to the economic loss rule for 'free-standing statutory causes of action[,]' including FDUTPA, in the products liability context").[5]

Although the Florida state courts do not appear to have addressed the question after *Tiara*, this court is persuaded by the great weight of district court decisions that plaintiff Richard Werts' fraudulent omission and FDUTPA claims are barred under Florida's application of the economic loss rule.[6] These claims will be dismissed.

---

[5] In *Cardenas v. Toyota Motor Corp.*, 418 F. Supp. 3d 1090 (S.D. Fla. 2019), contrary to *Karpel*, the court dismissed a common law fraudulent omission claim but did not dismiss an FDUTPA claim. However, it is not clear that the defendants argued in that case that the economic loss rule barred recovery under the FDUTPA for claims based on fraudulent omissions. *See Cardenas*, 418 F. Supp. 3d at 1105. In *Karpel*, however, the court was directly confronted with the question and noted that it appeared to be the first to consider it. *Karpel*, 635 F. Supp. 3d at 1339.

[6] Florida courts have recognized an exception for fraud claims based on affirmative misrepresentation. *See, e.g.*, *Prewitt Enters., LLC v. Tommy Constantine Racing, LLC*, 185 So. 3d

*b)* *Texas Law*

In Texas, too, the economic loss rule generally prevents recovery in tort for purely economic damage unaccompanied by injury to persons or property in the product liability context. *LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234, 235 (Tex. 2014); *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 418 (Tex. 2011). Although the actual holding in *Sharyland* was that the economic loss rule did not operate to "preclude[] recovery completely between contractual strangers in a case not involving a defective product," the Texas Supreme Court reaffirmed in that case that the rule "applies when losses from an occurrence arise from failure of a product and the damage or loss is limited to the product itself." *Id.* at 417–18 (quoting *Equistar Chemicals, L.P. v. Dresser–Rand Co.*, 240 S.W.3d 864, 867 (Tex. 2007)).

While product liability cases alleging fraudulent omission have not arisen frequently in Texas, the Texas Court of Appeals and federal courts construing and applying Texas law have generally held that these claims, too, are barred by the economic loss rule. *See, e.g.*, *Ibe v. Jones*, 836 F.3d 516, 526 (5th Cir. 2016) (dismissing fraudulent concealment claim under economic loss doctrine and distinguishing the claim from fraudulent inducement, which is not barred); *Robinson v. Gen. Motors LLC*, No. 20-663-RGA-SRF, 2021 WL 3036353, at *11 (D. Del. July 19, 2021) (recommending dismissal of the fraudulent concealment claims asserted by Texas plaintiffs under Texas law), *report and recommendation adopted*, 1:20-CV-00663, 2021 WL 7209365 (D. Del. Nov. 30, 2021); *Simms v. Jones*, 879 F. Supp. 2d 595, 600 (N.D. Tex. 2012) (dismissing claims for fraudulent concealment and negligent misrepresentation as "foreclosed by the independent injury rule," also known as the economic loss rule, while noting that, "[i]n contrast to Plaintiffs'

---

566, 570 (Fla. Dist. Ct. App. 2016) (holding that a fraudulent inducement claim based upon affirmative misrepresentations of present fact at the time of contracting "did not merge with the breach of contract claim" and was independently actionable).

other tort claims, the independent injury rule does not strictly apply to the tort of fraudulent inducement"); *Greco v. Jones*, 38 F. Supp. 3d 790, 797 (N.D. Tex. 2014) (same, citing *Simms*); *see also Barzoukas v. Found. Design, Ltd.*, 363 S.W.3d 829, 834–35 (Tex. App. 2012) (characterizing the economic loss rule as intended to "address[] efforts to use negligence and product liability claims as vehicles for recovery of economic losses" (citing *Sharyland*, 354 S.W.3d at 414–15)).

The court finds that plaintiff Claude Harris's Texas common law fraudulent omission claim is also barred by the economic loss rule. The parties, however, have not adequately briefed whether the rule applies to his claim under the TDTPA. The court declines, at this juncture, to dismiss that statutory claim.[7]

<blockquote>c)     Maryland Law</blockquote>

While Maryland has recognized that, ordinarily, "damages for economic loss are not available in a tort action," it recognizes an exception in the products liability context. *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 265 (Md. 2007). "Even when a recovery, based on a defective product, is considered to be for purely economic loss, a plaintiff may still recover in tort if this defect creates a substantial and unreasonable risk of death or personal injury." *Id.* (citation omitted).

The plaintiffs here allege that

[t]he Class Vehicles are unreasonably fragile and inherently defective such that normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain

---

[7] At least one district court addressing a similar argument has concluded that the economic loss doctrine does not necessarily bar claims under the TDTPA. *See In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 448 (S.D.N.Y. 2017) ("[T]he real issue is whether the Texas Plaintiffs state claims under the DPTA. To the extent they do, their claims arise independent of contract and are not barred by the economic loss rule."), *modified on reconsideration*, 14-MC-2543 (JMF), 2017 WL 3443623 (S.D.N.Y. Aug. 9, 2017).

> component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby increasing the risk of serious injury or death . . . .

(FAC ¶ 279.) The plaintiffs have adequately alleged an exception to the application of the economic loss rule under Maryland law, such that plaintiff Kevin Conlin's fraud-based claims are not subject to dismissal.

### C. Breach of Implied Warranty of Merchantability

Nissan seeks dismissal of the breach of implied warranty of merchantability claims ("IWM claims") on a number of grounds, the first of which is that the plaintiffs' allegations do not state colorable IWM claims. They also argue that some plaintiffs' claims are time-barred, barred by the absence of privity, or expired along with the express written warranties.

### 1. Failure to State a Claim

Nissan asserts that the plaintiffs' IWM claims fail under the laws of each of the relevant states, because the plaintiffs do not allege facts showing that their vehicles were truly "unmerchantable," in the sense of being "truly unfit" for use. (Doc. No. 31, at 36.)

The laws of each of the states at issue here define "merchantable" to mean that a good is fit "for the ordinary purposes for which such goods are used." *See* Colo Rev. Stat. § 4-2-314(2)(c); Fla. Stat. Ann. § 672.314(2)(c) (same); Fla. Stat. Ann. § 680.212(2)(c) (essentially the same, but applying to lessors); Md. Code Ann., Com. Law § 2-314(2)(c); Tex. Bus. & Com. Code § 2.314(b)(3); Tex. Bus. & Com. Code § 2A.212(b)(3) (virtually identical language, but pertaining to lessors). Neither party argues that the standard for merchantability differs meaningfully from state to state, and this court has not identified any barrier to considering this argument uniformly across the states.

Courts generally recognize that the implied warranty of merchantability, in the vehicle context, "is simply a guarantee that [the vehicle] will operate in a safe condition and [is]

substantially free of defects." *O'Connor v. BMW of N. Am., LLC*, 18-CV-03190-CMA-STV, 2020 WL 2309617, at *9 (D. Colo. Jan. 7, 2020) (quoting *Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 297 (4th Cir. 1989)), *report and recommendation adopted*, 18-CV-03190-CMA-STV, 2020 WL 1303285 (D. Colo. Mar. 19, 2020); *see also Bang v. BMW of N. Am., LLC*, No. 15-6945, 2016 WL 7042071, at *7 (D.N.J. Dec. 1, 2016) (same).

Based on this definition, Nissan argues that the "ordinary purpose" of a vehicle is to provide transportation and that, insofar as all of the named plaintiffs admit to being able to drive their Trucks, their IWM claims fail. (Doc. No. 31, at 36.) Nissan cites a number of cases that support that proposition. *See, e.g.*, *Chiarelli v. Nissan N. Am., Inc.*, 14-CV-4327 NGG VVP, 2015 WL 5686507, at *8 (E.D.N.Y. Sept. 25, 2015) ("Here, as alleged by Plaintiffs, the Class Vehicles were each operated for over five years (or more) and for tens of thousands of miles before any issues with the Timing Chain Tensioning System arose. As alleged, there simply is no question that the vehicles were fit for their intended purpose for a substantial period of time and use."); *Szymczak v. Nissan N. Am., Inc.*, 10 CV 7493 VB, 2011 WL 7095432, at *11 (S.D.N.Y. Dec. 16, 2011) ("Courts . . . have consistently held that an automobile that was driven for years without problems was merchantable and fit for its ordinary use at the time of sale." (collecting cases)); *Sheris v. Nissan N. Am. Inc.*, No. 07–2516 (WHW), 2008 WL 2354908, at *6 (D.N.J. June 3, 2008) ("The weight of authority, from courts across the country, indicates that plaintiffs may not recover for breach of the implied warranty of merchantability under the facts" where plaintiffs have driven their cars without problems for years." (internal quotation marks and collected citations omitted).

The plaintiffs counter that cases addressing more serious problems and, in particular, specifically addressing allegations of defective CP4 fuel pumps, have held that, where plaintiffs adequately allege that a defect in the vehicles gives rise to the possibility of "sudden engine stall

and catastrophic failures," that is sufficient at the pleading stage to establish that the vehicles are "unfit and unsafe," for purposes of IWM claims. (Doc. No. 46, at 38.) And the plaintiffs are correct that a number of opinions support this view as well. *See, e.g.*, *Berry v. FCA US, LLC*, 2:19-CV-00023, 2022 WL 18671067, at *13 (S.D. Tex. Mar. 25, 2022) ("Plaintiff alleges that the CP4 pump does not operate and the vehicles are not capable of transportation when the alleged natural consequence of using U.S. diesel fuel occurs. And the immediate initiation of the conditions that lead to catastrophic engine failure supports the allegation that the vehicle, even if driven, is not safe transportation. A functioning, but unreasonably dangerous product can violate the implied warranty of merchantability."); *Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d 1257, 1276 (E.D. Mich. 2021) (finding the plaintiffs' allegations of "unexpected stall-out, which could occur at any time due to a fuel pump failure and could also result in potentially extensive repair costs, to be sufficient to allege that these trucks were not 'safe and reliable'" and "serious enough to plausibly allege unmerchantability"); *In re Gen. Motors LLC CP4 Fuel Pump Litig.*, 393 F. Supp. 3d 871, 883 (N.D. Cal. 2019) ("Where, as here, Plaintiffs allege that their vehicles were unmerchantable due to an alleged latent safety defect that was present at the time of sale [referring to the allegedly defective CP4 fuel pump] and that they could not reasonably have discovered sooner, . . . they have set forth sufficient facts to defeat a motion to dismiss.").

Other district courts within the Sixth Circuit have recognized that "cars are not merchantable merely because they are able to provide transportation. Rather, to be fit for its ordinary purpose, a standard road vehicle must be able to provide safe and reliable transportation and be substantially free of defects." *Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772, 785 (E.D. Mich. 2019); *Chapman*, 531 F. Supp. 3d at 1276. As in those cases, the plaintiffs here allege that their vehicles, at the time of purchase, contained "an existing, manifested defect which can destroy

the engines and other fuel system components" and were "particularly incompatible with the use of American diesel fuel . . . in that use of American diesel fuel (the only fuel reasonably available to Plaintiff and putative Class members) causes a breakdown of the CP4 fuel pump . . . , resulting in fuel contamination of the fuel delivery system, failure of components in the Class Vehicle, and, often, catastrophic failure" of the fuel pump. (Doc. No. 23 ¶¶ 224, 229.) They further allege that such "catastrophic failure often causes the vehicle to shut off while in motion and renders it unable to be restarted, because the vehicle's fuel injection system and engine component parts have been completely contaminated with metal shards. The sudden and unexpected shutoff of the vehicle's engine while it is in motion (and subsequent inability to restart the vehicle) present an inherent and substantial risk to consumer safety." (*Id.* ¶ 4.)

While this court is not bound by other opinions addressing the CP4 fuel pump in other vehicles, it is nonetheless persuaded that, at the pleading stage, the plaintiffs' allegations that their vehicles were defective at the time of purchase and could unexpectedly stall at any time due to a fuel pump failure, which could also result in extensive and expensive repairs, are sufficient to allege that the Class Vehicles were not "safe and reliable" at the time of purchase. Nissan's motion to dismiss the IWM claims for failure to state a claim will be denied.

### 2. *Absence of Privity*

Nissan argues that Werts' IWM claim fails, because, under Florida law (which the parties agree governs Werts' claims), a "plaintiff cannot recover economic losses for breach of implied warranty in the absence of privity." *Mesa v. BMW of N. Am., LLC*, 904 So.2d 450, 458 (3d Fla. Dist. Ct. App. 2005). Indeed, Florida courts have repeatedly dismissed IWM claims under Florida law for lack of contractual privity where the plaintiff purchaser did not purchase a product directly from the defendant, including in the context of claims against automobile manufacturers. *See, e.g.*, *Rentas v. DaimlerChrysler Corp.*, 936 So.2d 747, 751 (Fla. Dist. Ct. App. 2006) (affirming

dismissal of IWM claims against auto manufacturer DaimlerChrysler for lack of contractual privity, where the plaintiffs purchased vehicle from the dealership, and not directly from DaimlerChrysler); *Cerasani v. Am. Honda Motor Co.*, 916 So. 2d 843, 847 (Fla. Dist. Ct. App. 2005) (affirming dismissal of IWM claim against American Honda for lack of contractual privity where the plaintiff did not lease her vehicle directly from American Honda); *Mesa*, 904 So. 2d at 458 (same). Federal district courts applying Florida law have likewise dismissed IWM claims in the absence of privity. *See, e.g.*, *Padilla v. Porsche Cars N. Am., Inc.*, 391 F. Supp. 3d 1108, 1117 (S.D. Fla. 2019) ("Consistent with Florida law, and this Court's application thereof, because Plaintiffs did not purchase their used vehicles directly from Porsche, they lack contractual privity with Porsche and their implied warranty claim necessarily fails as a matter of law."); *Tershakovec v. Ford Motor Co.*, 17-21087-CIV, 2018 WL 3405245, at *10 (S.D. Fla. July 12, 2018) (same); *In re Takata Airbag Products Liab. Litig.*, 193 F. Supp. 3d 1324, 1346 (S.D. Fla. 2016) (same).

The plaintiffs here argue that the defendants have failed to recognize the "third-party beneficiary exception" to the privity rule, which the district court applied in *Sanchez-Knutson v. Ford Motor Co.*, 52 F. Supp. 3d 1223, 1233 (S.D. Fla. 2014). In *Sanchez-Knutson*, the court found that, because the plaintiff pleaded that she purchased a Ford vehicle from a dealer who was an agent of Ford and that the plaintiff was the intended consumer of the vehicle, she adequately pleaded that she had third-party beneficiary status to bring an IWM claim. *Id.* at 1234. "The dealers were not intended to be the ultimate consumers of the subject vehicles, and have no rights under the warranty agreements provided by Ford. Ford's warranties were designed for and intended to benefit the consumers only." *Id.* (quoting the complaint).

This court is not persuaded that *Sanchez-Knutson* followed Florida law and notes that numerous district court cases after that ruling have continued to apply the law as unequivocally

stated in *Mesa*, *Rentas*, and *Cerasani*. Although the Florida Supreme Court has not weighed in on this subject, this court is bound by the holdings in those reported Florida appellate court decisions, to the effect that, "[u]nder Florida law, a plaintiff cannot recover economic losses for breach of implied warranty in the absence of privity." *Mesa*, 904 So.2d at 458. In all of those cases as well, the consumers were the intended end purchasers of the vehicles at issue. The courts recognized that *express* warranties did not require privity of contract but nonetheless held that such privity was required for implied warranties. The court, therefore, will dismiss plaintiff Werts' IWM claim for lack of privity.

### 3.    *The Statute of Limitations*

Next, Nissan argues that the IWM claims brought by Perry, Fishman, and Harris (under Colorado and Texas law) are time-barred.[8] The plaintiffs respond that (1) the discovery rule applies; (2) if not, they have adequately pleaded that the statute of limitations was tolled by fraudulent concealment; and (3) "at the very least the statute of limitations is a fact question that should not be resolved at the motion-to-dismiss stage." (Doc. No. 46, at 45.) In its Reply, Nissan argues that the plaintiffs have not alleged facts that would permit equitable tolling and that the law is clear that the discovery rule does not apply to IWM claims under Colorado and Texas law.

At the motion to dismiss stage, a court can dismiss a claim if "the allegations in the complaint affirmatively show that the claim is time-barred." *G.G. Marck & Assocs. v. Peng*, 762 F. App'x 303, 307 (6th Cir. 2019) (quoting *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012)). That is, a motion to dismiss based on the statute of limitations "can be granted only

---

[8] It also asserts that Werts' claim is time-barred. Having already concluded that Werts' IWM claim must be dismissed, the court does not address whether it is also time-barred.

where the defense appears valid from the face of the Complaint alone." *Father Flanagan's Boys Home v. Donlon*, 449 F. Supp. 3d 739, 743 (S.D. Ohio 2020) (citation omitted).

Perry's and Fishman's claims are brought under Colorado law, which contains an express three-year statute of limitations that begins to accrue "when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." Colo. Rev. Stat. § 4-2-725(2). And the breach occurs "when tender of delivery is made." *Id.* In other words, the discovery rule does not apply. *See Stanford v. C.R. Bard, Inc*., No. 1:21-cv-00576-DDD-SBP, 2023 WL 9024610, at *3 (D. Colo. Nov. 9, 2023) (distinguishing between warranty claims, to which the discovery rule did not apply, and other tort claims, to which it did); *O'Connor v. BMW of N. Am., LLC*, No. 18-CV-03190-CMA-STV, 2020 WL 2309617, at *5 (D. Colo. Jan. 7, 2020) ("[T]he breach of warranty claims accrued on the date each Plaintiff purchased their BMW vehicle.").

Harris purchased his vehicle in Texas in 2018, and his claim arises under the Texas Uniform Commercial Code, which incorporates a four-year statute of limitations. Under Texas law, the IWM claim accrued upon delivery of the vehicle, regardless of his knowledge of the alleged breach. *See* Tex. Bus. & Com. Code § 2.725(b). Thus, the discovery rule likewise does not apply to IWM claims under Texas law. *See Click v. Gen. Motors LLC*, No. 2:18-CV-455, 2020 WL 3118577, at *14 (S.D. Tex. Mar. 27, 2020) ("[T]he discovery rule does not toll breach of implied warranty of merchantability claims.").

Perry and Fishman allege, respectively, that they bought their vehicles in January 2018 and January 2019, more than three years before this suit was filed. Harris purchased his vehicle more than four years before filing this lawsuit. Thus, all of these plaintiffs' IWM claims are barred unless equitable tolling applies. The plaintiffs, in response to Nissan's motion, assert, incorrectly, that the discovery rule applies, but they also argue that the limitations period was tolled by the doctrine of

fraudulent concealment and that whether the limitations period is tolled raises a fact question that should not be resolved on a motion to dismiss.

Texas and Colorado allow "tolling where a defendant 'engage[d] in fraudulent concealment of facts pertinent to the existence of a claim.'" *Garrett v. Fleming*, 362 F.3d 692, 697 (10th Cir. 2004) (quoting *Garrett v. Arrowhead Improvement Ass'n*, 826 P.2d 850, 853 n.7 (Colo. 1992)); *see also Click*, 2020 WL 3118577, at *14. "[T]o prove that the statute of limitations was tolled by a defendant's fraudulent concealment, a plaintiff must show that his ignorance of his cause of action was not the result of his lack of diligence, but was due to affirmative acts or active deception by the [d]efendant to conceal the facts giving rise to the claim." *O'Connor*, 2020 WL 2309617, at *6 (D. Colo. Jan. 7, 2020) (quoting *Indus. Constructors Corp. v. U.S. Bureau of Reclamation*, 15 F.3d 963, 969 (10th Cir. 1994)). To establish equitable tolling, a plaintiff must show:

> (1) the concealment of a material existing fact that in equity and good conscience should be disclosed; (2) knowledge on the part of the party against whom the claim is asserted that such a fact is being concealed; (3) ignorance of that fact on the part of the one from whom the fact is concealed; (4) the intention that the concealment be acted upon; and (5) action on the concealment resulting in damages.

*Id.* (quoting *First Interstate Bank v. Piper Aircraft Corp.*, 744 P.2d 1197, 1200 (Colo. 1987)). Generally, courts should not dismiss claims that could be tolled based on fraudulent concealment, particularly when "further development of the factual record could support such a tolling theory." *Id.* (collecting cases).

In this case, the plaintiffs allege that, even after they purchased their vehicles, the defendants "did not report information within their knowledge to consumers, dealerships or relevant authorities," actively denied and concealed the facts within their knowledge relating to the defect, and falsely represented to consumers that the CP4 failure was due to the use of "contaminated fuel." (FAC ¶¶ 145–47.) The defendants also allegedly breached an ongoing duty to disclose to putative class members the true quality and nature of the durability of the Class

Vehicles, the ongoing process of fuel contamination by the CP4 fuel pump in Class Vehicles (even where no catastrophic failure occurs), and the "true cause" of pump failure when it does occur. (*Id.* ¶ 150.)

The Sixth Circuit has explained that "courts should not dismiss complaints on statute-of-limitations grounds when there are disputed factual questions relating to the accrual date." *Am. Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*, 839 F.3d 458, 464 (6th Cir. 2016). "Examples of such disputed factual questions include claims that the defendant fraudulently concealed facts, thereby preventing the plaintiff from learning of its injury, and complex issues about whether information in the plaintiff's possession sufficed to alert it of the claim." *Id.*

Here, the plaintiffs have adequately alleged Nissan's knowledge that the CP4 fuel pump is defective and poses a risk of harm to anyone driving a vehicle equipped with the CP4, Nissan's failure to fully investigate or disclose the seriousness of the issue to consumers or regulatory authorities, and its continued selling and leasing of vehicles equipped with the CP4. The court has already found that the plaintiffs have sufficiently alleged their fraudulent omission claims. And, although there is a distinction between affirmative fraudulent omission claims and the defensive use of fraudulent concealment to toll a limitations period, the court, viewing all of the allegations in the FAC in the light most favorable to plaintiffs, as it must at this stage, finds that the plaintiffs have adequately alleged that fraudulent concealment applies to toll the running of the statute of limitations for the IWM claims. The court declines to dismiss these claims as barred by the otherwise applicable statutes of limitation.

### 4. *The Effect of the Expiration of the Express Warranties*

Next, Nissan argues that the IWM claims asserted by plaintiffs Perry, Fishman, and Harris are subject to dismissal, because the express written warranties covering their Trucks (for "the earlier of five years or 100,000 miles from when the vehicle is first delivered to a retail buyer or

first put in use") have expired, and Nissan's New Vehicle Limited Warranty[9] caps the duration of any implied warranty at the duration of the express warranty. (Doc. No. 31, at 40.) Nissan also cites 15 U.S.C. § 2308(b), which provides that "implied warranties may be limited in duration to the duration of a written warranty of reasonable duration, if such limitation is conscionable and is set forth in clear and unmistakable language and prominently displayed on the face of the warranty."

The plaintiffs respond that the breach of the implied warranty occurred at the point of sale, when they were sold unmerchantable vehicles, and that they did not discover the defect due to Nissan's fraudulent concealment. (Doc. No. 46, at 44.) As a result, they argue, the expiration of the express warranties has no effect on the IWM claims.

Other courts have held under similar circumstances that the expiration of an express warranty will not necessarily bar implied warranty claims. As one court confronted with CP4-failure claims succinctly explained: "Essentially, Plaintiffs allege that their trucks were 'never fit for their ordinary purpose,' so the question of whether a defect manifested within the warranty period does not arise." *Chapman*, 531 F. Supp. 3d at 1278; *see also Droesser v. Ford Motor Co.*, 19-CV-12365, 2023 WL 2746792, at *10 (E.D. Mich. Mar. 31, 2023) (denying the defendant manufacturer's motion to dismiss IWM claims based on the expiration of express warranties, finding that, "in connection with the CP4 pump, Plaintiffs plausibly allege that their class vehicles are unfit for their ordinary purpose and are not substantially free of defects" and therefore

---

[9] The court finds that it may consider the terms of Nissan's express written warranty without converting Nissan's motion into one for summary judgment, because the warranty is referenced and quoted in the FAC and is central to the plaintiffs' claims, insofar as they allege, among other things, that Nissan has frequently failed to honor its written warranty by denying within-coverage-period claims related to fuel pump failures. (FAC ¶¶ 129–32 & nn. 70, 71.) *Accord, e.g.*, *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014).

"plausibly allege[] that [the defendant] breached the implied warranty of merchantability at the point of sale"); *Sloan v. Gen. Motors LLC*, 287 F. Supp. 3d 840, 880 (N.D. Cal. 2018) ("[I]n the case of a latent defect, a product is rendered unmerchantable, and the warranty of merchantability is breached, by the existence of the unseen defect, not by its subsequent discovery."); *Varner v. Domestic Corp.*, No. 16-22482-CIV, 2017 WL 3730618, at *10 (S.D. Fla. Feb. 7, 2017) ("[T]he cases cited by [the defendant] requiring a defect to manifest within the warranty period are inapplicable to the Named Plaintiffs' latent defect theory, at least at this stage of the proceedings."); *In re Gen. Motors LLC CP4 Fuel Pump Litig.*, 393 F. Supp. 3d at 883 (same; collecting cases).

At this juncture, the court presumes the truth of the plaintiffs' allegations that the CP4 fuel pump is inherently defective and begins to harm the fuel system from its first use. Under the facts as alleged here, the defendants are not entitled to dismissal of the IWM claims simply because the express warranties have expired.

### D. Unjust Enrichment Claims

Nissan argues that the unjust enrichment claims asserted by Perry, Fishman, Werts, and Conlin are subject to dismissal, because they have alleged the existence of express contracts (the express written warranties) that define the parties' rights and responsibilities with respect to defects in the plaintiffs' vehicles. It maintains that, under the laws of Florida, Colorado, and Maryland, a plaintiff cannot assert an unjust enrichment claim if the claim's subject matter is governed by a written contract. (Doc. No. 31, at 42–43.) It also argues that Fishman's unjust enrichment claim is subject to dismissal for the alternative reason that, because he purchased his vehicle used, Nissan did not receive a benefit from the purchase.

The plaintiffs argue in response that they are entitled under Rule 8 to plead their claims in the alternative, that they have adequately alleged each of the elements of their unjust enrichment claims, and that these claims should survive Nissan's Motion to Dismiss.

Generally, a plaintiff seeking to establish unjust enrichment under the laws of any of the relevant states must show that: "(1) at plaintiff's expense; (2) defendant received a benefit; (3) under circumstances that would make it unjust for defendant to retain the benefit without paying." *Barnett v. Surefire Med., Inc.*, 342 F. Supp. 3d 1167, 1175 (D. Colo. 2018) (citing *Dudding v. Norton Frickey & Assocs.*, 11 P.3d 441, 445 (Colo. 2000) (unjust enrichment under Colorado law), and *Jason v. Nat'l Loan Recoveries, LLC*, 134 A.3d 421, 431 (Md. Ct. Spec. App. 2016) (Maryland law)); *see also Agritrade, LP v. Quercia*, 253 So. 3d 28, 33 (Fla. Dist. Ct. App. 2017) (reciting the elements of unjust enrichment as: "(1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the value thereof to the plaintiff" (citation omitted)).

The plaintiffs allege all of these elements, asserting that Nissan benefitted from selling and leasing the Class Vehicles for more than they were worth as a result of the concealed defects, and the plaintiffs overpaid for the Trucks and have incurred other expenses. (*See, e.g.*, FAC ¶¶ 267–73.) They expressly state that this claim is pleaded in the alternative to any contract-based claims. (*Id.* ¶ 266.)

The court finds, as have other courts confronted with similar arguments in the context of CP4 class actions, that the plaintiffs' unjust enrichment claims are grounded in fraudulent omission and based on Nissan's pre-sale conduct, which falls outside the scope the written warranty. Moreover, aside from the plaintiffs' overpayment theory, the FAC alleges that some plaintiffs

incurred economic injury for repair costs at Nissan dealerships, which plausibly benefitted Nissan at the plaintiffs' expense. While it may well be that other legal remedies will ultimately preclude relief, at this stage of the case, the plaintiffs may assert the unjust enrichment claims. *Accord Droesser*, 2023 WL 2746792, at *21; *In re CP4 Fuel Pump Litig.*, 393 F. Supp. 3d at 881–82 (finding that GM's argument that the plaintiffs' unjust enrichment claims were foreclosed by the existence of enforceable written warranties failed "because Plaintiffs' unjust enrichment claim relies upon pre-sale conduct which falls outside the scope of the warranty: GM concealing the fuel pump defect before Plaintiffs purchased their vehicles"). Plaintiffs Perry, Werts, and Conlin may proceed with their unjust enrichment claims.

The plaintiffs do not address Nissan's contention that Fishman's unjust enrichment claim must be dismissed because he purchased his vehicle used and, therefore, did not confer a benefit on Nissan.[10] The court finds that Fishman, who admittedly bought a used vehicle from a Nissan-authorized dealership (which presumably bought it from a third party not affiliated with the manufacturer), has not plausibly alleged facts showing that his purchase of a used vehicle benefited *Nissan* at Fishman's expense. This claim will be dismissed, but without prejudice to Fishman's ability to allege facts that support the conveyance of such a benefit.

## III. CUMMINS' MOTION TO DISMISS

### A. Personal Jurisdiction

#### 1. *Standard of Review*

When a defendant challenges personal jurisdiction under Rule 12(b)(2), "[t]he plaintiff bears the burden of making a *prima facie* showing of the court's personal jurisdiction over the

---

[10] He also does not allege that he has incurred costs to repair the Truck arising from the defective fuel pump.

defendant." *Intera Corp. v. Henderson*, 428 F.3d 605, 615 (6th Cir. 2005); *see also Beydoun v. Wataniya Rests. Holding, Q.S.C.*, 768 F.3d 499, 504 (6th Cir. 2014) ("Personal jurisdiction must be analyzed and established over each defendant independently." (citing *Days Inns Worldwide, Inc. v. Patel*, 445 F.3d 899, 904 (6th Cir. 2006))). Without personal jurisdiction, the district court has no authority to proceed to an adjudication. *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999).

If the complaint makes out a *prima facie* case for personal jurisdiction, the burden shifts to the defendant to support its motion with evidence, typically in the form of affidavits or declarations. *Sullivan v. LG Chem, Ltd.*, 79 F.4th 651, 660 (6th Cir. 2023) (citations omitted). If that evidence is sufficient to rebut the plaintiff's *prima facie* showing, the burden returns to the plaintiff, "who may no longer stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Id.* (citations omitted). If the court does not conduct an evidentiary hearing, it must "view the pleadings and affidavits in a light most favorable to the plaintiff and not weigh the controverting assertions of the party seeking dismissal." *Id.*

When considering a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), a federal court typically "look[s] to both the long-arm statute of the forum state and constitutional due-process requirements." *MAG IAS Holdings, Inc. v. Schmückle*, 854 F.3d 894, 899 (6th Cir. 2017). Because the jurisdictional limits of Tennessee law and federal due process are identical, *see Parker v. Winwood*, 938 F.3d 833, 839 (6th Cir. 2019); *First Cmty. Bank, N.A. v. First Tenn. Bank, N.A.*, 489 S.W.3d 369, 384 (Tenn. 2015); Tenn. Code Ann. § 20-2-223(a)(6), "the two questions become one." *MAG IAS Holdings*, 854 F.3d at 899 (quoting *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 549 (6th Cir. 2016)). The court, therefore, considers only whether jurisdiction comports with federal due process.

The Due Process Clause requires that a non-resident defendant have at least "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Youn v. Track, Inc.,* 324 F.3d 409, 417 (6th Cir. 2003) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "There are two kinds of personal jurisdiction within the Federal Due Process inquiry: (1) general personal jurisdiction, where the suit does not arise from defendant's contacts with the forum state; and (2) specific jurisdiction, where the suit does arise from the defendant's contacts with the forum state." *Conn v. Zakharov*, 667 F.3d 705, 712–13 (6th Cir. 2012). Only the latter is at issue here, as the plaintiffs concede that Cummins is not subject to general jurisdiction in Tennessee.

The Sixth Circuit applies a three-part test to determine whether the exercise of personal jurisdiction comports with due process: (1) the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state; (2) the claims must "arise out of or relate to the defendant's contacts with the forum"; and (3) "the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *Sullivan*, 79 F.4th at 670 (citations omitted).

### 2.    *Analysis*

The first element—purposeful availment—requires the court to consider whether Cummins has "take[n] some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State. The contacts must be the defendant's own choice and not 'random, isolated, or fortuitous." *Id.* at 671 (quoting *Ford Motor Co. v. Mont. 8th Jud. Dist. Court*, 141 S. Ct. 1017, 1024–25 (2021) (some quotation marks omitted)). Although the plaintiffs spend a substantial amount of time addressing this issue, Cummins, at this stage, does not actually contest the purposeful-availment element, and it seems unlikely that it could do so successfully.

There appears to be no dispute at this juncture that Cummins entered into a long-term supply contract with Nissan to sell it 5.0L engines for use in the Class Vehicles. In the absence of any argument to the contrary, the court presumes that this element is met.

Cummins focuses its argument on the second element: whether the plaintiffs' claims "arise out of or relate to" Cummins' contacts with Tennessee. Citing *Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255 (2017), and *Canaday v. Anthem Companies*, 9 F.4th 392 (6th Cir. 2021), it argues that there is an insufficient connection between its contacts with the state and the plaintiffs' claims and alleged injuries. It points out that none of the plaintiffs lives in Tennessee or bought a Class Vehicle in Tennessee; none of the vehicles is alleged to have failed in Tennessee; no plaintiff sought repairs in Tennessee. (Doc. No. 33, at 15.) In addition, it filed with its motion the Declaration of Mark Jamieson, a current Cummins employee and formerly Cummins' "OEM [original equipment manufacturer] account Director - Nissan." (Doc. No. 32-1 ¶ 1.)

Jamieson attests that Cummins' principal place of business is in Columbus, Indiana and that Cummins is in the business of designing and distributing component parts, including engines, that other entities install in motor vehicles. Cummins does not sell engines directly to consumers. (Doc. No. 32-1 ¶¶ 1–3.) According to Jamieson, Cummins "designed, received orders for, manufactured, and developed" the engines used in the Class Vehicles in Indiana. (*Id.* ¶ 4.) For purposes of the "arising from or relating to" element, he asserts that Cummins never "advertised or otherwise marketed the [Class Vehicle] to consumers, including in Tennessee." (*Id.* ¶ 5.) He says nothing about the actual terms of the contract(s) between Nissan and Cummins or regarding the decision to use Cummins' name in the marketing materials for the Class Vehicles, but he claims that Cummins "sold the engines used in the [Class Vehicles] in Indiana and delivered them to Nissan's manufacturing facility in Mississippi." (*Id.* ¶ 4.)

As the Supreme Court has explained, for the exercise of personal jurisdiction to satisfy due process, the plaintiff's claim must "'arise out of or relate to the defendant's contacts' with the forum" state. *Ford*, 141 S. Ct. at 1025 (quoting *Bristol-Myers*, 582 U.S. at 562). The Constitution requires "an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" *Id.* (quoting *Bristol-Myers*, 582 U.S. at 562). In *Bristol-Myers*, a group of plaintiffs, most of whom were not California residents, sued Bristol-Myers Squibb ("BSM") in California state court, alleging that they had been injured by taking Plavix, a medication manufactured by BSM, and asserting claims under California law. In that case, there was no dispute that BSM had a substantial presence in California, selling and marketing the drug there, and BSM apparently did not dispute that it had purposefully availed itself of the privilege of doing business in California. Instead, it focused on the absence of a connection between California and the nonresident defendants' claims: "[T]he nonresidents were not prescribed Plavix in California, did not purchase Plavix in California, did not ingest Plavix in California, and were not injured by Plavix in California." *Id.* at 264. Further, "all the conduct giving rise to the nonresidents' claims occurred elsewhere." *Id.* at 265. Under these circumstances, in the absence of an "adequate link between the State and the nonresidents' claims," "[i]t follow[ed] that the California courts cannot claim specific jurisdiction." *Id.* at 264, 265.

The Sixth Circuit reached a similar decision, applying *Bristol-Myers*, in *Canaday*, also relied on by Cummins here. In that case, the plaintiff, a Tennessee resident employed by defendant Anthem in Tennessee, brought a proposed collective action lawsuit against it in Tennessee under the Fair Labor Standards Act. A number of other individuals employed by Anthem in other states sought to join the case as opt-in plaintiffs. Anthem, headquartered in Indiana, sought and was

granted dismissal of the claims by the out-of-state plaintiffs on personal jurisdiction grounds. The Sixth Circuit affirmed the dismissal. *Canaday*, 9 F.4th at 394. In reaching that decision, it noted that general jurisdiction was not an option, because Anthem was headquartered in Indiana. With respect to specific jurisdiction, there was no question that Anthem did business in Tennessee and was clearly subject to personal jurisdiction with respect to the named plaintiff's claims and those of any opt-in plaintiffs who were employed by Anthem in Tennessee. Under *Bristol-Myers Squibb*, however, the court held that jurisdiction over claims brought by out-of-state plaintiffs against Anthem in Tennessee did not comport with due process, because there was no "claim-specific and Anthem-specific relationship between the out-of-state claims and Tennessee." *Id.* at 396–97. That is, the non-resident plaintiffs were not employed in Tennessee, were not paid—or underpaid—in Tennessee, and suffered no injury arising from Anthem's connections with Tennessee.

*Bristol-Myers Squibb* and *Canaday* differ from this case, however, in that Nissan's presence in Tennessee anchors Cummins' activities and the plaintiffs' claims in this state. Although it is true, as Cummins points out, that the plaintiffs did not purchase their vehicles, experience mechanical problems, seek repairs, or suffer injury in Tennessee, the fact remains that their claims against Cummins arise from and are related to Cummins' relationship with Nissan in Tennessee: it allegedly supplied to Nissan engines that it allegedly knew or should have known were defective and not compatible with the use of American diesel fuel, with knowledge that the Class Vehicles carrying the engines with defective fuel pumps would be marketed and sold nationwide. By analogy, the suit against Cummins here is like suing a drug manufacturer in the state that was the locus of a nationwide distribution agreement with its co-defendant distributor, even if the drug was not actually manufactured in that state—a situation that was not present in *Bristol-Myers*. Here, the plaintiffs' claims are causally related to Cummins' relationship with

Nissan and the state of Tennessee—irrespective of where the contract between Cummins and Nissan was actually formed and irrespective of whether Cummins actually delivered the engines to Nissan in Tennessee or in some other state. The claims arise out of the allegedly defective engines, which are the central component of Cummins' relationship with Nissan and Tennessee. Nissan's relationship with Cummins for the provision of the Cummins 5.0L diesel engine is a but-for cause of the plaintiffs' claims against both Nissan and Cummins. Any questions as to whether Cummins did in fact engage in the conduct giving rise to the claims against it, as alleged by the plaintiffs, go to the merits, rather than to whether the court has jurisdiction to consider them.

To be sure, the plaintiffs would have jurisdiction over Cummins in their home states where the injuries allegedly occurred, but to hold that they cannot sue both Cummins and Nissan in Nissan's home state, where the contractual relationship between Cummins and Nissan for the purchase of the allegedly defective engines was centered, would up-end presumptions about product-liability litigation and class actions generally. The plaintiffs' claims clearly arise from and relate to the contractual arrangement between Nissan and Cummins for the purchase and delivery of the allegedly defective engines containing the allegedly defective CP4 fuel pumps and to the branding and marketing of the vehicles in which the engines and fuel pumps were incorporated.

The exercise of jurisdiction over Cummins in this state comports with due process. Cummins' motion under Rule 12(b)(2), for dismissal for lack of personal jurisdiction, will be denied. As the finding of personal jurisdiction is based on the plaintiff's *prima facie* showing, without the court's having conducted an evidentiary hearing, the finding is necessarily without prejudice to Cummins' ability to renew its motion once some discovery has been conducted as to the defendants' actual course of dealing and the extent of Cummins' contacts with the state.

### B. Fraud Claims Against Cummins

Cummins asserts that the fraud-based claims, whether based on the common law or statute, must be dismissed as to it, because the plaintiffs fail to identify with the requisite particularity any fraudulent statements or omissions by Cummins, to adequately plead that Cummins had a duty to make disclosures to them (a required element of fraudulent omission claims), to plead reliance on any alleged omissions by Cummins, or to plausibly plead harm caused by an alleged omission by Cummins.

### 1. *Failure to Plead Fraud with the Particularity Required by Rule 9(b)*

As noted above, the plaintiffs expressly confirm that their fraud claims are "based on omissions rather than affirmative misrepresentations." (Doc. No. 46, at 17.) For claims involving fraudulent omissions, Rule 9(b) requires plaintiffs to plead "the who, what, when, where, and how" of the alleged omission or fraudulent concealment. *Smith v. Gen. Motors LLC*, 988 F.3d 873, 884 (6th Cir. 2021) (quoting *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 256 (6th Cir. 2012)). "And they must do so with particularity." *Id.* That means that the party pleading fraudulent omission must specify "(1) precisely what was omitted; (2) who should have made the representation; (3) the content of the alleged omission and the manner in which the omission was misleading; and (4) what [the defendant] obtained as a consequence of the alleged fraud." *Republic Bank & Tr.*, 683 F.3d at 256.

The plaintiffs assert that they have met this standard with respect to Cummins. They argue that they plausibly allege that "the Defendants failed to disclose a material defect about the pump at the point of sale," that the plaintiffs "accordingly overpaid for their vehicles because this information was not disclosed," and that Rule 9(b) requires nothing more. (Doc. No. 46, at 12.) They further state that the FAC identifies

the "who" (Nissan and Cummins) ([FAC] ¶¶ 1, 31–34); the "what" (knowing about, yet failing to disclose, the CP4 fuel pump defect) (*e.g.*, [*id.*] ¶¶ 1-2, 5, 7); the "when" (prior to the time of sale of the first vehicle to the present day) (*e.g.*, [*id.*] ¶¶ 7, 80, 83-86); the "where" (the various channels through which the Class Vehicles were sold) (*e.g.*, [*id.*] ¶¶ 13, 18, 22-30); and the "how" (if Plaintiffs had known of the defect, they would not have purchased the Class Vehicles, or would have paid less for them) (*id.*).

(Doc. No. 46, at 18.) They further argue that "[e]very CP4 case to date" has found these allegations sufficient to satisfy Rule 9(b) for purposes of fraudulent omissions claims. (*Id.* (collecting cases).)

None of the cases cited by the plaintiffs, however, involved claims against the manufacturer of the *engine* incorporating the CP4. Instead, they only involved claims against the vehicle manufacturers—GM, Ford, and FCA.[11] Moreover, as Cummins points out, the plaintiffs fail to plausibly allege that Cummins (or a Cummins representative) made any statements to any plaintiff that omitted material facts, sold products to the plaintiffs, communicated with the plaintiffs, or interacted with them in any way. Although the plaintiffs broadly allege that Cummins failed to disclose the alleged defect at the "point of sale," they do not actually allege that Cummins was present at the point of sale. Rather, it sold engines to Nissan well in advance of the point of sale of Nissan vehicles to consumers.

Insofar as the plaintiffs are attempting to manufacture the illusion of a relationship by alleging that "Defendants" collectively made statements that misled consumers, such allegations are so general as to prove nothing. For example, the FAC states: "Defendants repeatedly told consumers that the Class Vehicles were dependable, long-lasting, and of the highest quality."

---

[11] *Droesser*, 2023 WL 2746792, at *20 (against Ford); *Berry*, 2022 WL 18671067, at *4–5 (against FCA); *Chapman*, 531 F. Supp. 3d at 1267 (against General Motors); *Withrow v. FCA US LLC*, No. 19-13214, 2021 WL 2529847, at *16–17 (E.D. Mich. June 21, 2021), *amended*, 19-13214, 2021 WL 9629458 (E.D. Mich. July 21, 2021); *Stevens v. Ford Motor Co.*, 2:18-CV-456, 2020 WL 12573279, at *4 (S.D. Tex. Nov. 2, 2020); *Click*, 2020 WL 3118577, at *4-8 (against Ford); *In re Gen. Motors LLC CP4 Fuel Pump Litig.*, 393 F. Supp. 3d at 880.

(FAC ¶ 120.) Aside from the fact that this type of statement constitutes non-actionable puffery, it does not satisfy Rule 9(b), which requires that "each defendant named in the complaint . . . be apprised of the circumstances surrounding the fraudulent conduct with which he individually stands charged." *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003); *see also Sugarlips Bakery, LLC v. A&G Franchising, LLC*, No. 3:20-cv-00830, 2022 WL 210135, at *10 (M.D. Tenn. Jan. 24, 2022) (Trauger, J.) ("The prohibition on group pleading under Rule 9(b) prevents a plaintiff from simply lumping multiple defendants together without explaining each defendant's culpable role."). The only actual statements the FAC attributes to Cummins are from a 2015 press release and from Cummins' website (undated) (both touting the power and efficiency of the Cummins 5.0L V8 Turbo Diesel engine). (*Id.* ¶ 123 & nn. 65, 66.) But the plaintiffs do not allege that any of them saw or relied upon either of these sources.

The court finds, in short, that the FAC does not adequately allege that Cummins engaged in fraudulent omissions, because it does not plausibly allege contact between Cummins and the plaintiffs. Consequently, although the plaintiffs arguably identify "what" was fraudulently omitted (defects in the design of the CP4 fuel pump), they have not identified the "when," "where," or "how" Cummins engaged in these omissions vis-à-vis the plaintiffs themselves. This conclusion requires dismissal of all of the plaintiffs' claims against Cummins based on fraudulent omissions, whether based on each state's common-law or on the individual states' consumer protection statutes.

In addition, and largely for the same reasons, the plaintiffs fail to state a claim for common law fraudulent omission against Cummins under the relevant states' laws, which require a plaintiff to plausibly allege that the defendant had a duty to disclose the allegedly withheld information. *See, e.g.*, *Rocky Mountain Expl., Inc. v. Davis Graham & Stubbs LLP*, 420 P.3d 223, 234 (Colo.

2018) ("To succeed on a claim for fraudulent concealment or nondisclosure, a plaintiff must thus show that the defendant had a duty to disclose the material information." (citations omitted)); *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 274 (Md. 2007) (recognizing a duty to disclose as an element of fraudulent concealment). The plaintiffs here have not explained how an entity with which they did not enter into any transaction—not even an arm's-length transaction—incurred a duty to disclose facts to them prior to their purchasing vehicles from Nissan. *Accord In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 454 (S.D.N.Y. 2017) (finding under Texas law that a fraudulent concealment claim required, "[a]t a minimum, . . . proof of a transaction between the parties of some sort (even arm's length) before a duty to disclose will arise").

Under Maryland law, "[a]bsent a fiduciary relationship," a fraudulent concealment claim generally requires an affirmative action; mere silence is not sufficient. *Lloyd*, 916 A.2d at 275; *see also Hill v. Brush Engineered Materials, Inc.*, 383 F. Supp. 2d 814, 820 (D. Md. 2005) ("Under Maryland law, a duty to disclose can arise either when one party is in a fiduciary or confidential relationship with the other, or when one party makes a partial and fragmentary statement of fact." (internal quotation marks and citations omitted)). Here, as set forth above, the plaintiffs do not allege affirmative, "partial disclosures" that they saw or relied upon or that could have given rise to a duty to provide a more fulsome disclosure.

Colorado has adopted § 551 of the Restatement (Second) of Torts, pursuant to which a "party to a business transaction" owes another party to the transaction a duty to "disclose a material existing fact that in equity or good conscience should have been disclosed." *Poly Trucking, Inc. v. Concentra Health Servs., Inc.*, 93 P.3d 561, 564 (Colo. App. 2004); *see id.* ("A defendant has a duty to disclose to a plaintiff *with whom it deals* material facts that in equity or good conscience should be disclosed." (quoting *Mallon Oil Co. v. Bowen/Edwards Assocs., Inc.*, 965 P.2d 105, 111

(Colo. 1998)) (emphasis added)). Again, because Cummins never dealt directly with consumers, it did not incur a duty to them.

To summarize, all of the fraud-based claims asserted by the named plaintiffs fail as to Cummins, whether based on the common law or statute. In addition, as the court already determined, Florida's application of the economic loss rule bars Werts' Florida common law fraudulent omission and FDUTPA claims, and Texas' application of the rule bars Harris' Texas common law fraudulent omission claim.

### C.  Breach of the Implied Warranty of Merchantability

Cummins' arguments in support of the dismissal of the plaintiffs' IWM claims echo those raised in Nissan's motion: that all of the IWM claims are subject to dismissal because the plaintiffs have not plausibly alleged that the Class Vehicles are unmerchantable; that Werts' claim under Florida law fails for lack of privity between Werts and Cummins; that the IWM claims brought by Harris, Perry, and Fishman fail because they are outside the warranty period; and that several of the claims are barred by applicable statutes of limitations.

The court incorporates the reasoning set forth above to all of these arguments. Accordingly, for the reasons already discussed, Werts' IWM claim must be dismissed for lack of privity, but the court is not persuaded that the other plaintiffs' claims are outside the warranty period or barred by the applicable statutes of limitation.

### D.  Plaintiffs' "Standing" to Assert Claims on Behalf of Residents of Other States

Finally, Cummins asserts another argument not made by Nissan: that the plaintiffs lack Article III standing to sue under the laws of states where they do not live. (Doc. No. 33, at 31.) In other words, according to Cummins, the plaintiffs, who reside in Texas, Maryland, Florida, and Colorado, lack "standing" to assert common law fraud claims under the laws of the 46 states that are not represented by a named plaintiff and, therefore, that the court does not have jurisdiction

over the nationwide fraud-by-omission claims. The plaintiffs respond that they have standing to bring their own claims, and the composition of the class is more properly considered at the class certification stage. (Doc. No. 46, at 13, 35.)

The court is unpersuaded by Cummins' argument. First, all of the individual named plaintiffs' common law fraud claims against Cummins are being dismissed, so Cummins' contention that they lack standing to raise claims *against it* under other states' laws has effectively been rendered moot.

Even if it were not moot, this court has recently examined at some length the concept of "standing" in this context and has explained that a plaintiff seeking to bring suit as a representative of a Rule 23 class does not bring claims on his or her own behalf. Rather, the class representative seeks

> to bring the claims of other plaintiffs on behalf of those other plaintiffs, purely as a class action representative. Such a course of action is expressly permitted by Rule 23 of the Federal Rules of Civil Procedure, if certain requirements are met. Allowing one party to sue on behalf of another is, it bears noting, commonplace and, much of the time, uncontroversial. Guardians sue on behalf of children. *See* Fed. R. Civ. P. 17(c)(1). Shareholders sue on behalf of corporations. *See* Fed. R. Civ. P. 23.1. Whistleblowers sue on behalf of governments. *See* 31 U.S.C. § 3730(b)(1). Each of these practices is consistent with ordinary standing requirements, because the fact that a claim is being asserted through a representative does not negate the essential connection between the true plaintiff and that plaintiff's claim. Regardless of who oversees the prosecution of such a claim, the claim itself still belongs to its original owner, and it is that ultimate plaintiff's standing that is being asserted, not any freestanding right of the representative.

*Generation Changers Church v. Church Mut. Ins. Co*., 3:21-cv-00764, 2023 WL 6206152, at *3 (M.D. Tenn. Sept. 22, 2023) (Trauger, J.) (citing *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 773 (2000) (finding that an uninjured party could bring claim as a relator because "the assignee of a claim has standing to assert the injury in fact suffered by the assignor"); *see also Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 422 (6th Cir. 1998) (distinguishing between a

named plaintiff's own Article III standing and his relationship to other class members and holding that, while the former must always exist in order for the case to move forward, the latter has to do with the requirements of Rule 23, not standing).

Cummins' very cursory assertion that the named plaintiffs lack "standing" to bring claims on behalf of individuals who reside in other states confuses the concepts of Article III standing and the concept of statutory authorization to bring claims. *See also Generation Changers*, 2023 WL 6206152, at *3 (citations omitted). Cummins does not address the requirements of Rule 23 or the ability of the named plaintiffs to meet its requirements and has not established that dismissal of the nationwide claims at this juncture is warranted.

## IV.     CONCLUSION

For the reasons set forth herein, the Motions to Dismiss filed by defendants Nissan (Doc. No. 30) and Cummins (Doc. No. 32) will be granted in part and denied in part. An appropriate Order is filed herewith.

_____

ALETA A. TRAUGER
United States District Judge